# EXHIBIT B

EXPERT DISCLOSURE FOR BRIAN C. BECKER, PH.D.

Defendants anticipate that Dr. Becker will testify as an expert economist on a number of subjects related to the validity of the factual allegations of the indictment. These areas of his testimony will include, but are not limited to, the following:

1. Brian Becker has served as a professional economist for the past 29 years since earning his Ph.D. in Applied Economics from the Wharton School and his B.A. in Applied Mathematics and Economics from Johns Hopkins. In addition to his expert witness and consulting work, Dr. Becker has taught Corporate Finance, Derivative Securities, Statistics, Operations Management, and Applied Economics to undergraduate and MBA students. He has also published nearly 30 articles, book chapters, and books.

2. Dr. Becker has been engaged as a quantitative, valuation economist in more than 500 matters. These include financial disputes, damages, and international trade matters. In addition to corporations, Dr. Becker has been engaged as an expert by Government entities in the United States (DOJ, IRS, States Attorney General) and internationally (Canada, Australia, New Zealand) on more than 100 (mostly) international disputes.

3. He will address and rebut, as necessary, the testimony offered by Dr. Voetmann.

4. The institution and implementation of the antidumping and countervailing duty orders of May 2011 (the "AD/CVD orders"), which imposed extraordinarily high antidumping/countervailing duties of 407.43 percent upon certain aluminum extrusions imported from China into the United States and intended for sale in the U.S. market. Due to these orders, China Zhongwang Holdings Ltd. ("CZ", as exporter) could not sell and Perfectus Aluminum, Inc and its predecessor companies ("Perfectus", as importer) could not buy certain aluminum extrusions for resale to U. S. customers, as such sales would not be profitable. For example, a landed price of $200/pallet with the imposition of the A/CVD would require the aggregate price (inclusive of duty) to be in excess of $1,000/pallet.

5. The U. S. DOC and ITC, at the behest of the U.S. domestic aluminum industry, were successful in eliminating the importation of certain aluminum extrusions from China as designated in the AD/CVD orders, eliminating the sales of such Chinese extrusions to customers in the United States, and redirecting purchases of extrusions to U.S. manufacturers of extrusions. CZ and Perfectus, for example, had no transactions of extrusions either between themselves or with U. S. consumers after the orders became effective.

6. The AD/CVD orders had certain exceptions to the imposed extraordinary duties, one of which was an exception for "finished products."

7. Subsequent to the imposition of the AD/CVD orders, CZ designed, constructed and fully assembled, with permanent welding, finished pallets for export from China and importation into the United States. Finished aluminum products were subject to a 25 percent duty rate upon importation under the prevailing customs duty schedules in effect. As indicated in Expert Dr. Marshall White's report that was based on the testing and analysis of the pallets, these pallets imported by Perfectus: (a) were designed, assembled and fully-welded finished pallet products that met the standards of the U.S. market for commercial use; and (b) required no additional fabrication, manufacturing and/or assembly after importation. In addition, there is no evidence that any of the imported pallets were the subject of additional assembly, fabrication and/or manufacturing after importation. There is also no evidence that any of the imported finished pallets were disassembled in order for their parts to be sold as extrusions in U.S. commerce.

8. Over the period 2011-2015, approximately 2.2 million finished pallets manufactured by CZ were exported from China and imported to Perfectus in the United States. The value of such pallets was approximately $1.1 billion and the finished product 25 percent customs duties were paid on the imported pallets.

9. The Government, as evidenced by the indictment, now contends that the finished imported pallets were subject to, at the time of importation, the AD/CVD duty rates for extrusions rather than the prevailing duty rate for finished aluminum products.

10. The shipments of finished pallets were declared at the time of importation and were available for inspection by U.S. Customs and Border Control. In addition, shipments were the subject of an audit by U. S. Customs and Border Control in 2015 which concluded that the finished pallets were not subject to the AD/CVD duty rates for extrusions.

11. The government alleges in the indictment that the pallet transactions between CZ and Perfectus were not priced at arms-length. Well-established guidelines/principles exist to determine whether transactions are consistent with arm's length pricing or should be deemed related party transfers (U.S. IRS, OECD). One method is to determine the market/arm's length price of the product at issue—that is, at a price that would be expected for a competing aluminum pallet sold by one or more suppliers. In the U.S. market, there are existing examples of finished aluminum pallets imported from Chinese manufacturing sources other than CZ and sold under arm's length considerations. Such transactions can be used in an economic study to set or compare the prices charged by CZ to Perfectus.

12. Transactions between CZ and Perfectus were made at the wholesale level. Economic analysis can (and often does) adjust current retail prices to wholesale levels for the 2011-2014 period. These computed wholesale prices can be compared to the prices paid by Perfectus.

13. Dr. Becker will testify to his analysis utilizing this methodology, which computes the prices CZ charged Perfectus, on the basis of quantities and the value of imports as alleged in the indictment. This process includes Dr. Becker adding duties paid and incurred to this measure to calculate their analogous, average wholesale prices.

14. This analysis indicates that transactions between CZ and Perfectus were not made at terms inconsistent with arm's length pricing.

15. Dr. Becker will also analyze and testify concerning the economic viability of the manufacture and exportation of the finished pallets by CZ. That is, its business plan to manufacture pallets instead of extrusions after the U.S. ITC result. This plan evolved into selling the pallets at a price that only reflected the value of the aluminum contained in the pallets being resold in the scrap market. This plan was considered in the current market in particular (scrap material with similar pricing to pallets) when CZ engaged in this decision making. Dr. Becker's analysis recognizes the economic factor that, the market for aluminum products and aluminum scrap had recovered considerably by 2011 (increased 45 percent in 2010 and another 11 percent in 2011). Contemporaneous forecasts concluded that the U.S. market would sustain this price recovery.

16. Dr. Becker will analyze the economics of CZ exporting and selling pallets to Perfectus to serve the U.S. aluminum market. The timing of this analysis is instructive. In that sense, CZ made its initial investments and business decisions when the scrap prices were relatively high. In point of fact, the price of scrap declined after 2011, and the planned business ultimately failed.

17. Dr. Becker will also address, from and economic standpoint, the allegations of the indictment in which the government alleges that CZ made fraudulent disclosures of material information intended to deceive investors as to the company's financial wherewithal, performance and prospects, and that these disclosures put investors at risk.

18. CZ became a publicly held company in May 2009 and traded on the Hong Kong stock exchange through the time period at issue (2010-2015). Aside from shares held by the company founder, CZ was owned by institutions, not individuals. Shareholders are part-owners of any corporation. It is well accepted that shareholders need to know how a company has performed at regular intervals to decide whether to continue to hold, sell or buy more shares.

19. Financial reporting is recognized as one of the most important means by which the corporation communicates with shareholders and markets more broadly. Financial statements allow shareholders to assess the company's recent performance and independently evaluate guidance the corporation provides for future performance. Financial reporting certified by independent auditors provides assurance to shareholders that financial statements reflect well-accepted standards of preparation and review. CZ's financial reporting met such standards through their documentation, audits by KPMG, etc. The relevance and importance of other information made available to shareholders by the corporation, its agents or other entities and individuals, including the types identified by Dr. Voetmann, requires individual assessment to determine the extent, if any, to which such information may influence decisions to buy, hold or sell a stock.

20. CZ's founder typically held nearly 60 percent of the company's shares. The 25 next largest CZ shareholders typically accounted for less than 10 percent of the company's market value. Among this group, on an individual basis, large funds including international Vanguard, Black Rock, and Dimensional (John Hancock) funds, held modest amounts of CZ stock. Furthermore, among those funds, CZ stock accounts for a trivial share of their overall value. Therefore, any changes in CZ's price result in immaterial changes in the value of those funds. For example, on the dates identified by Dr. Voetmann (and accepting Dr. Voetmann's contention that no other events impacted CZ prices during those dates), declines in the price of CZ stock among the three largest institutional holders translate to a decline in the value of the funds in amounts ranging from 0.001 to 0.002 percent. Stated differently, a hypothetical $10,000 investment by an individual in any of the funds would have incurred a one-day loss ranging from 10 to 20 cents.

21. Testing the validity of whether a public disclosure was the source of changes in stock prices relies on the ability to isolate the value of the information about the company on the day or period at issue. If the disclosure at issue cannot be isolated from other relevant contemporaneous information or if full or partial disclosure of an issue was not limited to a particular day(s), the reliability of any measure of causation is compromised. This presents a significant problem as to the reliability of any of the assertions/conclusions made by the indictment and/or the government's expert witness (Dr. Voetmann) here.

22. The Indictment alleges that CZ public disclosures through the following sources were fraudulent and/or exposed the fraud of previous communications: (1) CZ IPO prospectus; (2) Annual Reports for 2009, 2010, 2011, 2012, 2013, 2014, 2015; and (3) Disclosure related to findings regarding sales to select customers (February 8, 2010, February 9, 2010).

23. In each of these cases, the sources of the communication at issue included either substantial relevant information about the company from which the disclosure at issue could not be easily isolated, or a separate unrelated simultaneous announcement that may have influenced stockholders.  For example, CZ's annual reports were more than 100 pages in length, containing audited financial statements in addition to lengthy discussion from the company concerning recent and prospective performance.  Any measure of harm to shareholders would need to isolate an effect from one among numerous relevant disclosures.   Similarly, the IPO prospectus was a 400-page document containing a detailed profile of the company and the proposed stock offering.  In this case, (in the first instance of his analysis) Dr. Voetmann assigns harm to shareholders from a single item included in a lengthy disclosure made public two weeks before the company's IPO.

24. Without isolating the effect of individual disclosures, assigning all causation to a single, particular outcome is invalid.  In such cases, stock price changes are more likely to reflect the totality of firm-specific information and other market effects present on a given day.  This is the outcome here in many instances.

25. Dr. Voetmann has apparently concluded that CZ stock price movements on three dates, September 15, 2009, February 8, 2010 and August 12, 2015, cannot be explained by the market and industry of CZ, with the inference that the events related to these disclosures harmed CZ shareholders.  This inference is unfounded.  The event/days at issue were, to varying degrees, characterized by simultaneous disclosure of unrelated events, questions over the credibility and reliability of the sources of information, other relevant disclosures made in close proximity to the dates at issue and periods when prices could not fully reflect relevant information (suspensions in trading).  Accounting for these factors demonstrates that CZ shareholders were not harmed.

26. Dr. Becker's testimony will summarize the discussion above that that the potential losses to shareholders alleged by Dr. Voetmann is either exaggerated or non-existent.  While no shareholders have sued CZ for any actions impacting their shares and CZ's financial statements (including its potential related party "transfer" prices) have been audited by KPMG, Dr. Voetmann appears to be making the argument that CZ's shareholders "should have" filed suit against CZ for various acts that caused them to lose stock price value.  Such an analysis rests on a house of cards.  Even if all of Dr. Voetmann's allegations are fully proven true, the impact on a particular shareholder— less than 20 cents per $10,000 invested—makes this allegation statistically no different from zero.  While any action could be critiqued after the fact, there exist many more obvious and large impacts to shareholders than those challenged by the plaintiff.