# EXHIBIT C

SUPPLEMENTAL EXPERT DISCLOSURE

In addition to the subjects identified in their prior disclosure, Defendants anticipate that Dr. Becker will testify regarding a variety of subjects, including, but not limited to, the following:

1. The investigations undertaken by the ITC and DOC as to imports of certain extrusions from China determined that a 374.15% CVD and a 33.28% AD rate would be applied to the value of shipments. Duties take the form of selective taxes paid by importers. To remain competitive in the U.S. market after these orders, Chinese exporters, including China Zhongwang (CZ), would have needed to offset all or a significant portion of a 407.43% duty in relation to prices for comparable products available from domestic or other foreign sources. Given the nature of the competitive market for aluminum extrusions, remaining profitable after paying a duty exceeding 400 percent was not feasible. The effective absence of imports of extrusions from China after the orders reflects these conditions.

2. Shipment level data included with the Summary Chart of Imports allows for a measure of the price per pallet charged to U.S. importers. The same data include measures of the number of pallets and the weight of each shipment. This information provides a profile of the pallets manufactured by CZ and the costs paid by what the plaintiff contends are related U.S. entities. Evidence indicates that U.S. retailers have been and are currently selling aluminum pallets made by unrelated parties in China (see for example [https://www.grainger.com/product/GRAINGER-APPROVED-2-Way-Stackable-Aluminum-Pallet-1MCU2](https://www.grainger.com/product/GRAINGER-APPROVED-2-Way-Stackable-Aluminum-Pallet-1MCU2)). Analysis of these types of information does not suggest that, if U.S. purchasing entities were related parties, CZ priced its pallets at prices inconsistent with arm's length sales.

3. The July 25, 2021, Department of Justice disclosure regarding Dr. Voetmann presents several concepts regarding China Zhongwang's ("CZ") sales into the United States. Broadly speaking, the disclosure implies that if CZ sold to a related party (without disclosure) and if CZ's pricing (product pricing and/or financing fees) were inconsistent with arm's length circumstances; such "transfer pricing" circumstances could influence investors' actions with regard to the stock. Analyzing the pricing in related party transactions is a detailed, fact-based analysis that often includes long reports and detailed testimony at trial. For example, recent trials regarding disputed transfer prices where Dr. Becker has served as an expert for the IRS against Medtronic and Coca-Cola have each lasted for weeks of valuation/expert testimony. The Defendant offers this disclosure (on which Dr. Becker may testify) as responsive to Dr. Voetmann's anticipated testimony.

4. Many, if not most, corporate transactions are between entities that are related, and as such, virtually all mid-size or larger companies engage in numerous related party transactions in which they must set a price. These "so-called" transfer prices are simply the term used to describe related party transactions—services, licenses, financial transactions, physical

product sales, or any other transaction required in commerce. Essentially, all multinational companies engage in related party transactions. Dr. Becker will provide background on transfer pricing based on his experience as a transfer pricing expert for nearly 30 years. This will include his experience in litigation matters (Coca-Cola, Medtronic, Chevron, General Electric, etc.) as well as aluminum companies like Alcoa and other multinational metal companies.

5. Dr. Voetmann's anticipated opinion that that controlled party transactions (described by Dr. Voetmann as where the seller controls the buyer and directs the buyer to buy the product) are "not true or legitimate" is in error. Such transactions are common and required parts of international and domestic commerce just like transactions between unrelated parties—except that the parties do not negotiate with each other, but rather just set a price. A transaction between related parties can be "true or legitimate" if the transaction is consistent with arm's length expectations.

6. CZ's auditors (KPMG) did not identify CZ's U.S. buyer (Perfectus and/or the trading companies) as being a related entity to CZ. It is therefore unclear how the DOJ and/or Dr. Voetmann will attempt to opine or prove that CZ and Perfectus/the trading companies are related or if that will be assumed in contradiction of the KPMG audit. If such an opinion is offered, Dr. Becker will offer his review of such analysis using his experience as a transfer pricing economist. Dr. Becker will also present his review of arm's length pricing of similar products involving Grainger and other entities as context for the general range of market prices that CZ would have expected to receive at arm's length.

7. As noted above, related parties making transactions is a standard part of modern commerce. In that sense, the only potential reason for further analysis of such transactions is to determine if their reported transfer prices are set at levels consistent with arm's length expectations. The disclosures to date do not suggest that Dr. Voetmann will be attempting to offer such a pricing opinion. If Dr. Voetmann offers an analysis that concludes Perfectus paid transfer prices for pallets from CZ at a level inconsistent with arm's length expectations—and/or offers similar conclusions on other transfer prices in which CZ is one of the related parties—Dr. Becker will offer his review of such analysis using his experience as a transfer pricing economist.

8. Should Dr. Voetmann identify specific CZ transactions that he and/or the government contend are related party transactions that required disclosure beyond those contained in its ordinary financial disclosures to shareholders, Dr. Becker will analyze such evidence and respond where appropriate.