# EXHIBIT A

number (*i.e.*, at that exporter's rate) will be liquidated at the NME-wide rate.

**Cash Deposit Requirements**

The following cash deposit requirements will be effective upon publication of the final results of this administrative review for all shipments of the subject merchandise from the PRC entered, or withdrawn from warehouse, for consumption on or after the publication date, as provided by section 751(a)(2)(C) of the Act: (1) for previously investigated or reviewed PRC and non-PRC exporters not listed above that have separate rates, the cash deposit rate will continue to be the exporter-specific rate published for the most recent period; (2) for all PRC exporters of subject merchandise which have not been found to be entitled to a separate rate, the cash deposit rate will be the PRC-wide rate of 90.83 percent; and (3) for all non-PRC exporters of subject merchandise which have not received their own rate, the cash deposit rate will be the rate applicable to the PRC exporters that supplied that non-PRC exporter. These deposit requirements, when imposed, shall remain in effect until further notice.

**Notifications**

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this POR. Failure to comply with this requirement could result in the Department's presumption that reimbursement of antidumping duties has occurred and the subsequent assessment of doubled antidumping duties.

This notice also serves as a reminder to parties subject to the administrative protective order ("APO") of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely notification of the destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

We are issuing and publishing these results and this notice in accordance with sections 751(a)(1) and 777(i) of the Act.

Dated: October 23, 2013.

Paul Piquado,

*Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2013–25594 Filed 10–28–13; 8:45 am]

**BILLING CODE 3510-DS-P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

[A–588–850]

**Certain Large Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Over 4½ Inches) From Japan: Final Results of Antidumping Duty Administrative Review; 2011–2012**

**AGENCY:** Enforcement and Compliance, formerly Import Administration, International Trade Administration, Department of Commerce.

**SUMMARY:** On July 10, 2013, the Department of Commerce (the Department) published the preliminary results of the administrative review of the antidumping duty order on certain large diameter carbon and alloy seamless standard, line, and pressure pipe (over 4½ inches) from Japan. For these final results, we continue to find that no shipments were made by JFE Steel Corporation (JFE), Nippon Steel Corporation (Nippon), NKK Tubes (NKK), or Sumitomo Metal Industries, Ltd. (SMI), and that entries of subject merchandise made by Canadian Natural Resources Limited (CNRL) should be liquidated without regard to antidumping duties.

**DATES:** *Effective Date:* October 29, 2013.

**FOR FURTHER INFORMATION CONTACT:** Nancy Decker or Joshua Morris, AD/CVD Operations, Office 1, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0196, and (202) 482–1779, respectively.

**Background**

On July 10, 2013, the Department published the preliminary results of the administrative review of the antidumping duty order on certain large diameter carbon and alloy seamless standard, line, and pressure pipe (over 4½ inches) from Japan.[1] We invited interested parties to comment on the Preliminary Results. We received no comments.

The Department has conducted this administrative review in accordance with section 751(a) of the Tariff Act of 1930, as amended (the Act).

**Scope of the Order**

The products covered by the order are large diameter seamless carbon and alloy (other than stainless) steel standard, line, and pressure pipes produced, or equivalent, to the American Society for Testing and Materials (ASTM) A–53, ASTM A–106, ASTM A–333, ASTM A–334, ASTM A–589, ASTM A–795, and the American Petroleum Institute (API) 5L specifications and meeting the physical parameters described below, regardless of application. The scope of the order also includes all other products used in standard, line, or pressure pipe applications and meeting the physical parameters described below, regardless of specification, with the exception of the exclusions discussed below. Specifically included within the scope of the order are seamless pipes greater than 4.5 inches (114.3 mm) up to and including 16 inches (406.4 mm) in outside diameter, regardless of wall-thickness, manufacturing process (hot finished or cold-drawn), end finish (plain end, beveled end, upset end, threaded, or threaded and coupled), or surface finish.

The seamless pipes subject to the order are currently classifiable under the subheadings 7304.10.10.30, 7304.10.10.45, 7304.10.10.60, 7304.10.50.50, 7304.19.10.30, 7304.19.10.45, 7304.19.10.60, 7304.19.50.50, 7304.31.60.10, 7304.31.60.50, 7304.39.00.04, 7304.39.00.06, 7304.39.00.08, 7304.39.00.36, 7304.39.00.40, 7304.39.00.44, 7304.39.00.48, 7304.39.00.52, 7304.39.00.56, 7304.39.00.62, 7304.39.00.68, 7304.39.00.72, 7304.51.50.15, 7304.51.50.45, 7304.51.50.60, 7304.59.20.30, 7304.59.20.55, 7304.59.20.60, 7304.59.20.70, 7304.59.60.00, 7304.59.80.30, 7304.59.80.35, 7304.59.80.40, 7304.59.80.45, 7304.59.80.50, 7304.59.80.55, 7304.59.80.60, 7304.59.80.65, and 7304.59.80.70 of the Harmonized Tariff Schedule of the United States (HTSUS).

Specifications, Characteristics, and Uses: Large diameter seamless pipe is used primarily for line applications such as oil, gas, or water pipeline, or utility distribution systems. Seamless pressure pipes are intended for the conveyance of water, steam, petrochemicals, chemicals, oil products,

---

[1] *See Certain Large Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Over 4 ½ Inches) From Japan: Preliminary Results of Antidumping Duty Administrative Review; 2011–2012,* 78 FR 41366 (July 10, 2013) and accompanying Decision Memorandum (*Preliminary Results*).

natural gas and other liquids and gasses in industrial piping systems. They may carry these substances at elevated pressures and temperatures and may be subject to the application of external heat. Seamless carbon steel pressure pipe meeting the ASTM A–106 standard may be used in temperatures of up to 1000 degrees Fahrenheit, at various American Society of Mechanical Engineers (ASME) code stress levels. Alloy pipes made to ASTM A–335 standard must be used if temperatures and stress levels exceed those allowed for ASTM A–106. Seamless pressure pipes sold in the United States are commonly produced to the ASTM A–106 standard.

Seamless standard pipes are most commonly produced to the ASTM A–53 specification and generally are not intended for high temperature service. They are intended for the low temperature and pressure conveyance of water, steam, natural gas, air and other liquids and gasses in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipes (depending on type and code) may carry liquids at elevated temperatures but must not exceed relevant ASME code requirements. If exceptionally low temperature uses or conditions are anticipated, standard pipe may be manufactured to ASTM A–333 or ASTM A–334 specifications.

Seamless line pipes are intended for the conveyance of oil and natural gas or other fluids in pipe lines. Seamless line pipes are produced to the API 5L specification. Seamless water well pipe (ASTM A–589) and seamless galvanized pipe for fire protection uses (ASTM A–795) are used for the conveyance of water.

Seamless pipes are commonly produced and certified to meet ASTM A–106, ASTM A–53, API 5L–B, and API 5L–X42 specifications. To avoid maintaining separate production runs and separate inventories, manufacturers typically triple or quadruple certify the pipes by meeting the metallurgical requirements and performing the required tests pursuant to the respective specifications. Since distributors sell the vast majority of this product, they can thereby maintain a single inventory to service all customers.

The primary application of ASTM A–106 pressure pipes and triple or quadruple certified pipes in large diameters is for use as oil and gas distribution lines for commercial applications. A more minor application for large diameter seamless pipes is for use in pressure piping systems by refineries, petrochemical plants, and chemical plants, as well as in power generation plants and in some oil field uses (on shore and off shore) such as for separator lines, gathering lines and metering runs. These applications constitute the majority of the market for the subject seamless pipes. However, ASTM A–106 pipes may be used in some boiler applications.

The scope of the order includes all seamless pipe meeting the physical parameters described above and produced to one of the specifications listed above, regardless of application, with the exception of the exclusions discussed below, whether or not also certified to a non-covered specification. Standard, line, and pressure applications and the above-listed specifications are defining characteristics of the scope of the order. Therefore, seamless pipes meeting the physical description above, but not produced to the ASTM A–53, ASTM A–106, ASTM A–333, ASTM A–334, ASTM A–589, ASTM A–795, and API 5L specifications shall be covered if used in a standard, line, or pressure application, with the exception of the specific exclusions discussed below.

For example, there are certain other ASTM specifications of pipe which, because of overlapping characteristics, could potentially be used in ASTM A–106 applications. These specifications generally include ASTM A–161, ASTM A–192, ASTM A–210, ASTM A–252, ASTM A–501, ASTM A–523, ASTM A–524, and ASTM A–618. When such pipes are used in a standard, line, or pressure pipe application, such products are covered by the scope of the order.

Specifically excluded from the scope of the order are:

A. Boiler tubing and mechanical tubing, if such products are not produced to ASTM A–53, ASTM A–106, ASTM A–333, ASTM A–334, ASTM A–589, ASTM A–795, and API 5L specifications and are not used in standard, line, or pressure pipe applications.

B. Finished and unfinished oil country tubular goods (OCTG), if covered by the scope of another antidumping duty order from the same country. If not covered by such an OCTG order, finished and unfinished OCTG are included in the scope when used in standard, line or pressure applications.

C. Products produced to the A–335 specification unless they are used in an application that would normally utilize ASTM A–53, ASTM A–106, ASTM A–333, ASTM A–334, ASTM A–589, ASTM A–795, and API 5L specifications.

D. Line and riser pipe for deepwater application, *i.e.,* line and riser pipe that is: (1) Used in a deepwater application, which means for use in water depths of 1,500 feet or more; (2) intended for use in and is actually used for a specific deepwater project; (3) rated for a specified minimum yield strength of not less than 60,000 psi; and (4) not identified or certified through the use of a monogram, stencil, or otherwise marked with an API specification (*e.g.,* API 5L).

With regard to the excluded products listed above, the Department will not instruct U.S. Customs and Border Protection (CBP) to require end-use certification until such time as petitioner or other interested parties provide to the Department a reasonable basis to believe or suspect that the products are being utilized in a covered application. If such information is provided, we will require end-use certification only for the product(s) (or specification(s)) for which evidence is provided that such products are being used in a covered application as described above. For example, if, based on evidence provided by petitioner, the Department finds a reasonable basis to believe or suspect that seamless pipe produced to the A–335 specification is being used in an A–106 application, we will require end-use certifications for imports of that specification. Normally we will require only the importer of record to certify to the end use of the imported merchandise. If it later proves necessary for adequate implementation, we may also require producers who export such products to the United States to provide such certification on invoices accompanying shipments to the United States.

Although the HTSUS subheadings are provided for convenience and customs purposes, our written description of the merchandise subject to the scope is dispositive.

**Final Results of Review**

We have made no changes to our findings announced in the *Preliminary Results.* Consistent with our findings in the *Preliminary Results,*[2] we find that JFE, Nippon, NKK, and SMI had no shipments for the period June 1, 2011, through May 31, 2012.

Also consistent with the *Preliminary Results,*[3] we find that CNRL had no sales to unaffiliated customers in the United States, or to unaffiliated customers for exportation to the United States. Although CNRL entered subject

---

[2] *See Preliminary Results* and accompanying Decision Memorandum at 6–8.
[3] *Id.* at 8–13.

merchandise for consumption during the period of review (POR), the merchandise was not sold in any form, either in the form as entered or as further manufactured; it was exported back to CNRL in Canada. As a result, consistent with our decision in *OCTG from Japan*,[4] antidumping duties would not be applied to CNRL's subject merchandise under current law and practice. Accordingly, we will instruct CBP to liquidate the entries at issue without regard to antidumping duties.

### Assessment Rates

Because we found that CNRL did not sell subject merchandise to an unaffiliated customer in the United States, or to unaffiliated customers for exportation to the United States, but exported all the subject merchandise back to CNRL in Canada we will instruct CBP to liquidate its entries covered by this review without regard to antidumping duties.

The Department clarified its "automatic assessment" regulation on May 6, 2003. This clarification will apply to POR entries by JFE, Nippon, NKK, and SMI because these companies certified that they made no POR shipments of subject merchandise for which they had knowledge of U.S. destination and we are making a final determination of no shipments. We will instruct CBP to liquidate these entries at the all-others rate established in the less-than-fair-value investigation (68.88 percent) if there is no rate for the intermediary involved in the transaction. For a full discussion of this clarification, *see Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties*, 68 FR 23954 (May 6, 2003).

We intend to issue instructions to CBP 15 days after publication of the final results of this review.

### Notifications

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Secretary's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of doubled antidumping duties.

This notice also serves as a reminder to parties subject to the administrative protective order (APO) of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely notification of the destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

We are issuing and publishing these results and this notice in accordance with sections 751(a)(1) and 777(i)(1) of the Act.

Dated: October 23, 2013.

**Paul Piquado,**
*Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2013–25603 Filed 10–28–13; 8:45 am]

**BILLING CODE 3510-DS-P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–588–857]

### Welded Large Diameter Line Pipe From Japan: Continuation of Antidumping Duty Order

**AGENCY:** Enforcement and Compliance, Formerly Import Administration, International Trade Administration, Department of Commerce.

**SUMMARY:** As a result of the determinations by the Department of Commerce (the Department) and the U.S. International Trade Commission (USITC) that revocation of the antidumping duty order on welded large diameter line pipe (LDLP) from Japan would likely lead to continuation or recurrence of dumping and material injury to an industry in the United States, the Department is publishing a notice of continuation of this antidumping duty order.

**DATES:** *Effective Date:* October 29, 2013.

**FOR FURTHER INFORMATION CONTACT:** John Drury or Angelica Mendoza, AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–0195 and (202) 482–3019, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On December 6, 2001, the Department published the antidumping duty order on LDLP from Japan.[1] On October 1, 2012, the Department initiated the second sunset review of the antidumping duty order on LDLP from Japan pursuant to section 751(c) of the Tariff Act of 1930, as amended (the Act).[2]

As a result of this sunset review, the Department determined that revocation of the antidumping duty order on LDLP from Japan would likely lead to continuation or recurrence of dumping and, therefore, notified the USITC of the magnitude of the margins likely to prevail should the order be revoked.[3]

On October 2, 2013, the USITC determined, pursuant to section 751(c) of the Act, that revocation of the antidumping duty order on LDLP from Japan would be likely to lead to a continuation or recurrence of material injury to an industry in the United Sates within a reasonably foreseeable time.[4]

### Scope of the Order

The product covered by this order is certain welded carbon and alloy line pipe, of circular cross section and with an outside diameter greater than 16 inches, but less than 64 inches, in diameter, whether or not stenciled. This product is normally produced according to American Petroleum Institute (API) specifications, including Grades A25, A, B, and X grades ranging from X42 to X80, but can also be produced to other specifications. The product currently is classified under U.S. Harmonized Tariff Schedule (HTSUS) item numbers 7305.11.10.30, 7305.11.10.60, 7305.11.50.00, 7305.12.10.30, 7305.12.10.60, 7305.12.50.00, 7305.19.10.30, 7305.19.10.60, and 7305.19.50.00. Although the HTSUS item numbers are provided for

---

[4] In *OCTG from Japan,* the subject merchandise entered the United States under a temporary import bond. Upon re-exportation, pursuant to the North American Free Trade Agreement, the entries were treated as if they had entered the United States for consumption. The Department determined that the subject merchandise was not sold in any form, and liquidated without regard to duties. *See Oil Country Tubular Goods From Japan: Preliminary Results and Rescission {sic} in Part of Antidumping Duty Administrative Review,* 64 FR 48589, 48590–91 (September 7, 1999) (*OCTG from Japan*).

[1] *See Antidumping Duty Order: Welded Large Diameter Line Pipe from Japan,* 66 FR 63368 (December 6, 2001).

[2] *See Initiation of Five-Year ("Sunset") Review,* 77 FR 59897 (October 1, 2012).

[3] *See Welded Large Diameter Line Pipe From Japan: Final Results of the Expedited Second Sunset Review of the Antidumping Duty Order,* 78 FR 10134 (February 13, 2013).

[4] *See LDLP from Japan,* 78 FR 60897 (October 2, 2013), and USITC Publication 4427 (September 2013). As explained in the memorandum from the Assistant Secretary for Enforcement and Compliance, the Department has exercised its discretion to toll deadlines for the duration of the closure of the Federal Government from October 1, through October 16, 2013. *See* Memorandum for the Record from Paul Piquado, Assistant Secretary for Enforcement and Compliance, "Deadlines Affected by the Shutdown of the Federal Government" (October 18, 2013). Therefore, all deadlines in this segment of the proceeding have been extended by 16 days. As a result, this notice of continuation of the order is timely.