```
 1                   UNITED STATES OF AMERICA
                  UNITED STATES DISTRICT COURT
 2               CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION
 3
                           -  -  -
 4              HONORABLE R. GARY KLAUSNER,
           UNITED STATES DISTRICT JUDGE PRESIDING
 5                         -  -  -

 6
    UNITED STATES OF AMERICA,       )
 7                                  )   CERTIFIED COPY
                 PLAINTIFF,         )
 8                                  )
    VS.                             )   CR 19-00282 RGK
 9                                  )
    PERFECTUS ALUMINUM,             )
10  INCORPORATED, PERFECTUS         )
    ALUMINUM ACQUISITIONS, LLC;     )
11  SCUDERIA DEVELOPMENT, LLC;      )
    DOUBLEDAY, LLC; VON             )
12  KARMAN-MAIN STREET, LLC;        )
    10681 PRODUCTION AVENUE,        )
13  LLC,                            )
                                    )
14               DEFENDANTS.        )
    _____ )
15

16

17                  TRIAL - DAY 5
            REPORTER'S TRANSCRIPT OF PROCEEDINGS
18              MONDAY, AUGUST 16, 2021
                     P.M. SESSION
19              LOS ANGELES, CALIFORNIA

20

21

22

23
                SHERI S. KLEEGER, CSR 10340
24           FEDERAL OFFICIAL COURT REPORTER
            312 NORTH SPRING STREET, ROOM 402
25            LOS ANGELES, CALIFORNIA 90012
                  PH:  (213)894-6604
```

```
 1

 2

 3

 4

 5    APPEARANCES OF COUNSEL:

 6    ON BEHALF OF PLAINTIFF:

 7          UNITED STATES ATTORNEY
            BY:  POONAM KUMAR, AUSA
 8               GREGORY BERNSTEIN, AUSA
                 ROGER HSIEH, AUSA
 9          ASSISTANT UNITED STATES ATTORNEY
            1100 UNITED STATES COURTHOUSE
10          312 NORTH SPRING STREET
            LOS ANGELES, CA 90012
11

12
      ON BEHALF OF DEFENDANT:
13          LARSON LLP
            BY:  STEVEN LARSON, ESQUIRE
14               HILARY POTASHNER, ATTORNEY AT LAW
                 A. ALEXANDER LOWDER, ESQUIRE
15          555 SOUTH FLOWER STREET
            SUITE 4400
16          LOS ANGELES, CA 90071

17          RUYAK CHERIAN LLP
            BY:  ROBERT F. RUYAK, ESQUIRE
18          1700 K STREET NW, SUITE 810
            WASHINGTON, DC 20006
19

20

21

22

23

24

25
```

```
 1                    I   N   D   E   X

 2

 3      WITNESS:    DIRECT   CROSS   REDIRECT   RECROSS

 4   SHEN, Po Chi Eric              10          33

 5  WANG, George       39       57,63

 6   HUANG, Jay      73

 7                  E   X   H   I   B   I   T   S

 8                    NUMBER        PAGE

 9                     204           46

10                     209           47

11                     213           47

12                     130           74

13                     145           74

14

15

16

17

18

19

20

21

22

23

24

25
```

|  | 1 | LOS ANGELES, CALIFORNIA; AUGUST 16, 2021 |
|---|---|---|
|  | 2 | P.M. SESSION |
|  | 3 |  |
| 13:00:29 | 4 | THE COURT:  Counsel, very briefly because we |
| 13:00:30 | 5 | have the jury out there waiting. |
| 13:00:33 | 6 | There's an issue on one side or the other? |
| 13:00:35 | 7 | MS. POTASHNER:  Yes, Your Honor.  The |
| 13:00:36 | 8 | Government indicated by e-mail that they intended on |
| 13:00:39 | 9 | redirect of this witness to perhaps elicit that he has |
| 13:00:43 | 10 | received death threats from Mr. Liu. |
| 13:00:46 | 11 | I just received that notification.  I would |
| 13:00:48 | 12 | move to exclude under 403.  I think that the prime facie |
| 13:00:52 | 13 | value greatly outweighs the probative.  And it was never |
| 13:00:55 | 14 | said before.  So that's my motion.  I wanted to bring it |
| 13:00:58 | 15 | up right now before he takes the stand. |
|  | 16 | THE COURT:  Sure. |
| 13:01:04 | 17 | Counsel. |
| 13:01:04 | 18 | MS. KUMAR:  Your Honor, I think |
| 13:01:05 | 19 | Ms. Potashner's cross-examination on Friday, and I |
| 13:01:07 | 20 | assume it will continue, is attacking the credibility of |
| 13:01:09 | 21 | this witness and motivations for coming forward.  And in |
| 13:01:11 | 22 | that first meeting with Agent Tsai, he indicates that he |
| 13:01:12 | 23 | has fear for his safety as well as the safety of his |
| 13:01:16 | 24 | family in that first meeting. |
| 13:01:18 | 25 | And there were a lot of questions about what |

13:01:19  1  he said at that first meeting and what he said when he

13:01:21  2  came forward.

13:01:22  3          THE COURT:  So you want to cross-examine him

13:01:25  4  only on were there threats made before that first

13:01:27  5  meeting.

13:01:29  6          MS. KUMAR:  Yes.  Redirect him on what

13:01:30  7  happened prior to that first meeting.

13:01:32  8          THE COURT:  Let me think about it, Counsel.

13:01:34  9  Because there are pros and cons on it.

13:01:38  10          I don't know how long you are going to take

13:01:40  11  on cross-examination before the issue comes up.

13:01:43  12          MS. POTASHNER:  Well, my cross is probably

13:01:45  13  another 20 minutes or so.

13:01:47  14          THE COURT:  Counsel, I'm going to let you

13:01:52  15  get into it but very limited.  You can just say, "On

13:01:55  16  your first meeting did you have threats?"  I don't want

13:01:58  17  to get "threats against your life."  I don't want to get

13:02:00  18  into "Might kill you or your family."  Just, "Did you

13:02:02  19  get threats?"  Very general.  That's all you can get

13:02:05  20  into.

13:02:06  21          MS. KUMAR:  Okay.

13:02:07  22          THE COURT:  Yes?

13:02:09  23          MR. RUYAK:  We have one other issue we've

13:02:11  24  tried really hard to resolve.

13:02:18  25          The Dupré report that you excluded, Your

| | | |
|---|---|---|
| 13:02:20 | 1 | Honor, it's a third-party report.  Hearsay, you excluded |
| 13:02:24 | 2 | it.  It says all kind of things about the company. |
| 13:02:28 | 3 | There's going to be an agent that's going to |
| 13:02:31 | 4 | testify.  And just I want to make sure that it's not |
| 13:02:33 | 5 | going to come in through the back door here because -- |
| 13:02:36 | 6 | THE COURT:  Nothing in that report should be |
| 13:02:38 | 7 | coming in.  Is that what you are saying? |
| 13:02:40 | 8 | MR. RUYAK:  Yes. |
| 13:02:41 | 9 | THE COURT:  Yes. |
| 13:02:42 | 10 | MR. BERNSTEIN:  So if I may, Your Honor. |
| 13:02:44 | 11 | Your Honor has already ruled in favor of the |
| 13:02:45 | 12 | Government on motion in limine No. 3 to admit CZW's |
| 13:02:51 | 13 | clarification reports to investors.  In those |
| 13:02:53 | 14 | clarification reports, CZW and reports signed by |
| 13:02:56 | 15 | Zhongtian Liu himself, he mentioned the Dupré report. |
| 13:03:00 | 16 | And so that's -- we are not interesting the Dupré report |
| 13:03:03 | 17 | itself, that it's correct.  Your Honor excluded the |
| 13:03:04 | 18 | report. |
| 13:03:05 | 19 | But these are reports to investors from CZW, |
| 13:03:09 | 20 | from Zhongtian Liu and he makes mention of it. |
| 13:03:11 | 21 | THE COURT:  Counsel, you're talking about |
| 13:03:12 | 22 | that he mentions there is a report or you think he's |
| 13:03:14 | 23 | going to say what was in the report?  What was in the |
| 13:03:16 | 24 | report is out. |
| 13:03:17 | 25 | MR. BERNSTEIN:  So to be clear, Your Honor, |

| | | |
|---|---|---|
| 13:03:19 | 1 | the clarification statements say something to the |
| 13:03:24 | 2 | effect -- and again, they're from Zhongtian Liu -- the |
| 13:03:25 | 3 | report alleges the following:  We deny this.  And then |
| 13:03:28 | 4 | they make a bunch of false statements to investors.  And |
| 13:03:31 | 5 | there are also false statements that are charged in the |
| 13:03:33 | 6 | indictment itself. |
| 13:03:35 | 7 | THE COURT:  So what you want to do is get |
| 13:03:36 | 8 | into the substance of the report? |
| 13:03:39 | 9 | MR. BERNSTEIN:  Only to the extent that |
| 13:03:41 | 10 | Zhongtian Liu and China Zhongwang summarizes portions of |
| 13:03:47 | 11 | the report themselves.  And then they make denials of |
| 13:03:50 | 12 | those allegations.  And then they make false statements |
| 13:03:52 | 13 | to investors. |
| 13:03:53 | 14 | THE COURT:  That may be difficult.  Are you |
| 13:03:55 | 15 | saying that the defendants made statements and talked |
| 13:03:57 | 16 | about what was in the report? |
| 13:03:59 | 17 | MR. BERNSTEIN:  Correct, Your Honor. |
| 13:04:00 | 18 | THE COURT:  And all you want to get is what |
| 13:04:01 | 19 | the defendant says was in the report, not what's in the |
| 13:04:04 | 20 | report? |
| 13:04:04 | 21 | MR. BERNSTEIN:  Correct, Your Honor. |
| | 22 | THE COURT:  Counsel. |
| 13:04:06 | 23 | MR. RUYAK:  Your Honor, this is a hearsay |
| 13:04:06 | 24 | document.  They were responding to this hearsay.  That's |
| 13:04:09 | 25 | all it is. |

13:04:09  1          And so they're trying to get into the back

13:04:12  2   door what that report is, our response to it.

13:04:15  3          THE COURT:  But it is not through the back

13:04:17  4   door.  If the defendants have made the statements that

13:04:20  5   the report says this, this or this, that's different

13:04:23  6   than a third-party statement that's strictly hearsay.

13:04:27  7          It's the defendants are making the statement

13:04:29  8   themselves.

13:04:30  9          MR. RUYAK:  But it is based on the hearsay

13:04:32  10  documents.

13:04:32  11         THE COURT:  It may be based on hearsay.  But

13:04:35  12  it is still statements they made.

13:04:39  13         I will only let in the statements that were

13:04:40  14  made by the defendant, not anybody else.  And nobody

13:04:43  15  else can testify as to what the document says.

13:04:45  16         MR. BERNSTEIN:  Yes, Your Honor.

13:04:47  17         MR. RUYAK:  But Liu is not on trial here.

13:04:49  18  He is not in --

13:04:51  19         THE COURT:  He's a co-conspirator, Counsel.

13:04:54  20  There's no question, he's a co-conspirator on this, on

13:04:59  21  the evidence we've heard so far.

13:05:00  22         One other thing I wanted to mention is that

13:05:02  23  yesterday -- not yesterday, Friday during

13:05:05  24  cross-examination -- I didn't stop anybody at that time

13:05:07  25  nor do I every want to stop somebody in front of the

| | |
|---|---|
| 13:05:11 | 1 |
| 13:05:11 | 2 |
| 13:05:15 | 3 |
| 13:05:16 | 4 |
| 13:05:18 | 5 |
| 13:05:22 | 6 |
| 13:05:26 | 7 |
| 13:05:28 | 8 |
| | 9 |
| 13:05:32 | 10 |
| 13:05:35 | 11 |
| 13:05:41 | 12 |
| 13:05:43 | 13 |
| 13:05:44 | 14 |
| 13:05:47 | 15 |
| 13:05:51 | 16 |
| 13:05:53 | 17 |
| 13:05:54 | 18 |
| 13:05:55 | 19 |
| 13:05:57 | 20 |
| 13:05:57 | 21 |
| 13:05:58 | 22 |
| 13:06:01 | 23 |
| 13:06:03 | 24 |
| 13:06:04 | 25 |

jury.

But the word liar or lying is a derogative term.  You can use other terms like "Did you mislead," et cetera.  But I dont want to hear anybody the word, "You're a liar" or "Didn't you lie."  That is a derogative term.  And everyone in this Court -- I don't care if they're a criminal defendant or not, is entitled to the dignity of not having a derogative term.  So keep that in mind.

Also, I should mention, I know you -- the two sides have been working on this diligently.  I'm still fearful of maybe losing this jury if it goes past this week.

I just don't if -- I don't know.  I don't know what's going to happen, if we can have enough alternates or not of what's going to happen.

MS. KUMAR:  Your Honor, the parties had talked about raising that.

THE COURT:  I know you have and I appreciate that.

MS. KUMAR:  The Government has cut a number of witnesses.  We do think candidly it is likely to bleed over into next week.  But we are trying our very best.

THE COURT:  All I can tell you is, if it

13:06:08   1    bleeds over to next week -- all I'm telling you is, be

13:06:09   2    prepared because it may end up in a mistrial.

13:06:11   3            I don't know what the request of the jurors

13:06:14   4    are going to be.  I'm just worried about that.  Okay.

13:06:19   5            And anyhow, it is what it is.  If it has to

13:06:22   6    be dismissed, it has to be dismissed.  If it goes over

13:06:24   7    and it's no problem, that's fine.  That's not in my

13:06:28   8    control.

13:06:29   9            Let's get the jury back in here.

13:09:47   10            (IN THE PRESENCE OF THE JURY.)

13:09:47   11            THE COURT:  Okay.  The record will reflect

13:09:50   12    that all the members of the jury are in their respective

13:09:53   13    seats in the jury box.

13:09:54   14            Came close to 1:00 o'clock, but thank you

13:09:56   15    very much for being on time.  We'll get started at this

           16    time.

13:09:57   17            The witness is on the witness stand.  I

13:09:59   18    believe we are in cross-examination, Counsel.

13:10:01   19            MS. POTASHNER:  Thank you, Your Honor.

13:10:03   20            THE CLERK:  The witness remains under oath.

13:10:05   21            THE COURT:  Yes.  Remember, you are under

13:10:08   22    oath.

13:10:08   23            THE WITNESS:  Thank you, Your Honor.

13:09:59   24            **CROSS-EXAMINATION (CONTINUED)**

           25    BY MS. POTASHNER:

13:10:09   1      Q.   Good afternoon, Mr. Shen.

13:10:10   2      A.   Good afternoon.

13:10:12   3      Q.   Mr. Shen, on Friday you testified that you had a

13:10:20   4  conversation with Mr. Zhongtian Liu about the

13:10:29   5  antidumping/countervailing duty orders; isn't that

13:10:32   6  right?

13:10:33   7      A.   Yes, that is.

13:10:33   8      Q.   And isn't it true that during that conversation

13:10:38   9  Mr. Liu said to you that he wanted to figure out a way

13:10:42  10  to satisfy that law?

13:10:50  11      A.   He asked me for ways to get around the

13:10:55  12  antidumping duty.

13:10:57  13      Q.   Now, you talked about that conversation with the

13:11:02  14  case agent in this case; isn't that right?

13:11:08  15      A.   Yes, I believe so.

13:11:09  16      Q.   And you talked to him about it on February 6,

13:11:14  17  2017?

13:11:15  18      A.   I don't recall the specific date of that

13:11:19  19  conversation.

13:11:19  20      Q.   Do you remember meeting with him in February of

13:11:23  21  2017, don't you?

13:11:24  22      A.   There were several meetings throughout the course

13:11:26  23  of meeting with the Federal Government.  So I don't

13:11:29  24  remember specifically which date that was.

13:11:31  25      Q.   And some of those meetings were in the first half

13:11:35  1   of 2017, weren't they?

13:11:37  2       A.   Possibly.   But I don't recall specifically the

13:11:42  3   date.

13:11:42  4       Q.   Isn't it true at that meeting on February 6,

13:11:46  5   2017, that when you described it, you said the word

13:11:51  6   "satisfy."   That Mr. Liu was trying to "satisfy the

13:11:55  7   law"?

13:11:56  8       A.   I do not recall the specific verbiage.

13:12:00  9            THE COURT:   Could you have said that?

13:12:02  10           THE WITNESS:   It is possible, Your Honor.

13:12:04  11           THE COURT:   Okay.

         12   BY MS. POTASHNER:

13:12:05  13       Q.   Would taking at look at the report from that day

13:12:08  14   refresh your recollection as to what you said?

13:12:13  15       A.   It may.

13:12:22  16           MS. POTASHNER:   Your Honor, may I approach?

13:12:24  17           THE COURT:   Certainly.

13:12:25  18           It will be handed up through the clerk.

13:12:27  19           MS. POTASHNER:   Yes, Your Honor.   Thank you.

13:12:33  20           THE COURT:   Okay.   Look at the document and

13:12:35  21   point to a particular area of the document.   Read it.

13:12:37  22   Turn it over.   And then answer the questions as to what

13:12:40  23   you remember.

13:12:43  24           THE WITNESS:   Yes.   Your Honor.

         25   BY MS. POTASHNER:

| | |
|---|---|
| 13:12:44 | 1 |
| 13:12:53 | 2 |
| 13:12:57 | 3 |
| 13:12:58 | 4 |
| 13:13:02 | 5 |
| 13:13:04 | 6 |
| 13:13:06 | 7 |
| 13:13:11 | 8 |
| 13:13:13 | 9 |
| 13:13:16 | 10 |
| 13:13:17 | 11 |
| 13:13:18 | 12 |
| 13:13:20 | 13 |
| 13:13:21 | 14 |
| 13:13:24 | 15 |
| 13:13:25 | 16 |
| 13:13:27 | 17 |
| 13:13:28 | 18 |
| 13:13:30 | 19 |
| | 20 |
| 13:13:36 | 21 |
| 13:13:47 | 22 |
| 13:13:51 | 23 |
| | 24 |
| 13:14:00 | 25 |

Q.  I would direct your attention to page 6, line 8.
If you could count down eight lines, to refresh your
recollection.

            THE COURT:  After you read it, turn it over.

            THE WITNESS:  Again, I don't recall the
specific verbiage that was used.  I didn't write this
report.  So I have no way of knowing if the report was
written accurately or not.

            THE COURT:  It didn't jog your memory as to
what you said?

            THE WITNESS:  It's -- again, I remember that
I had --

            THE COURT:  The only question is:  Does it
jog your memory as to using the term -- what was the
term, Counsel?

            MS. POTASHNER:  "Satisfy."  The term is
"satisfy the law."

            THE WITNESS:  It does not.

            THE COURT:  Okay.

BY MS. POTASHNER:

Q.  Okay.  Now, on Friday, if we could put up what is
already in evidence, Your Honor, Government 342, page 2.

            THE COURT:  Okay.

BY MS. POTASHNER:

Q.  Mr. Shen, this is a partial list of the items

13:14:04  1    that you purchased after stealing money from the Liu

13:14:08  2    family and Scuderia; isn't that correct?

13:14:12  3        A.  Yes, it is.

13:14:13  4        Q.  And on that list we have your purchase of a --

13:14:17  5    does that say "$32 million Ferrari" at the very top?

13:14:23  6        A.  Yes, it does.

13:14:24  7        Q.  Going down to the real estate section, does it

13:14:29  8    say that you purchased a $2 million home for your mom?

13:14:33  9    Taipei with the money that you stole?

13:14:36  10        A.  Yes, it does.

13:14:37  11        Q.  And that you also purchased another home for your

13:14:41  12    mom, this one in California, for $1.3 million.

13:14:45  13        A.  Yes, it does.

13:14:47  14        Q.  You purchased a home for your father-in-law in

13:14:50  15    Taipei with the money that you stole, and that one was

13:14:54  16    only 600,000; is that right?

13:14:58  17        A.  It references 600,000, yes.

13:15:00  18        Q.  Well, you used $600,000 to purchase the home for

13:15:05  19    your father-in-law from the money you stole, right?

13:15:08  20        A.  Yes, I did.

13:15:09  21        Q.  And it looks like you purchased a home for your

13:15:14  22    ex-wife in the amount of $4 million with the money that

13:15:19  23    you stole; is that right?

13:15:21  24        A.  Yes, that's correct.

13:15:22  25        Q.  And then at the very top, it indicates that you

13:15:29  1    purchased diamonds with the money that you stole, a

13:15:31  2    total of 40.98 carats worth of diamonds; isn't that

13:15:38  3    right?

13:15:38  4        A.   That is correct.

13:15:39  5        Q.   And that had a value of $72 million; is that

13:15:44  6    right?

13:15:45  7        A.   That's correct.

13:15:46  8        Q.   So this is a partial list of what you used the

13:15:51  9    money that you stole for, right?  It is not even a

13:15:54  10   complete list, this page?

13:15:56  11       A.   It is not complete, no.

13:15:59  12       Q.   Right.  Because the total for what is on this

13:16:02  13   page is only 159 million; is that right?

13:16:08  14       A.   That is correct.

13:16:08  15       Q.   Okay.  And so it's missing -- is my math right --

13:16:15  16   $80 million?

13:16:16  17       A.   That is correct.

13:16:17  18       Q.   And that $80 million that you stole you put into

13:16:21  19   bank accounts, right?

13:16:25  20       A.   Most of it was spent, yes.

13:16:27  21       Q.   Or spent, that's right, on other items?

13:16:30  22       A.   That is correct.

13:16:31  23       Q.   Now, after you -- after you stole that

13:16:36  24   $240 million, I want to fast-forward to May 2016.  Okay?

13:16:45  25       A.   Okay.

13:16:45  1      Q.   Do you remember back in May of 216?

13:16:55  2      A.   Is there a specific event you would like me to

13:16:57  3   reference?

13:16:57  4      Q.   Sure.  Do you remember going to Hong Kong in May

13:17:00  5   of 2016?

13:17:01  6      A.   Yes, I do.

13:17:02  7      Q.   And you went to Hong Kong, in order to -- using

13:17:05  8   your words -- mend your relationship with Mr. Liu?

13:17:08  9      A.   Yes, that's correct.

13:17:09  10     Q.   And you did meet with him?

13:17:11  11     A.   Yes, I did.

13:17:12  12     Q.   But you weren't able to smooth over stealing

13:17:16  13  $240 million from him; isn't that right?

13:17:18  14     A.   I was not able to speak with Mr. Liu directly,

13:17:21  15  no.

13:17:21  16     Q.   It's your testimony then that you didn't even

13:17:24  17  meet with him?

13:17:25  18     A.   I met with him, but I was not able to speak with

13:17:28  19  him.

13:17:28  20     Q.   You met with him in the same room?

13:17:30  21     A.   That is correct.

13:17:31  22     Q.   It's your testimony that you weren't able to

13:17:33  23  speak?

13:17:34  24     A.   Yes, that's correct.  He had --

13:17:36  25     Q.   So let me ask you some more questions about that.

13:17:40    1              So where were you when you had this meeting?

13:17:43    2       A.   We were at the Shangri-La Hotel conference room

13:17:47    3   in the business center at Shangri-La Central in Hong

13:17:50    4   Kong.

13:17:50    5       Q.   So you remember that clearly?

13:17:52    6       A.   Yes, that is correct.

13:17:53    7       Q.   It's fair to say you weren't able to smooth it

13:17:56    8   over, the stealing of all the money, right?  That is a

13:18:00    9   fair statement?

13:18:01   10       A.   Again, I was not allowed to speak to Mr. Liu

13:18:03   11   directly because of attorneys present.

13:18:05   12       Q.   It's fair to say that you weren't able to smooth

13:18:10   13   over with him the fact that you had stolen $240 million?

13:18:14   14       A.   Yes, that is correct.

13:18:15   15       Q.   And that was pretty unsettling for you, right?

13:18:22   16       A.   It was.  And there were other issues.

13:18:25   17       Q.   And so it was unsettling to you -- I mean, it was

13:18:30   18   important enough for you to travel all the way from here

13:18:33   19   to Hong Kong to try to do that, right?

13:18:35   20       A.   It was -- the trip was made at Mr. Liu's request.

13:18:38   21       Q.   And you got on the plane, and you flew to Hong

13:18:42   22   Kong, right?

13:18:42   23       A.   That is correct.

13:18:43   24       Q.   And you were there to try to mend your

13:18:45   25   relationship, right?

13:18:47   1      A.   Yes, that is correct.

13:18:48   2      Q.   And you were not able to mend your relationship,

13:18:51   3   right?

13:18:52   4      A.   We were not, no.

13:18:53   5      Q.   And that was in May of 2016, right?

13:18:56   6      A.   That's correct.

13:18:57   7      Q.   And then you returned to southern California?

13:18:59   8      A.   That is correct.

13:19:00   9      Q.   The location where you had stolen all of that

13:19:02  10   money, right?

13:19:09  11      A.   I did conduct a bunch of taking and stealing in

13:19:16  12   southern California, yes.

13:19:17  13      Q.   Because you also took and stole from other

13:19:20  14   locations besides southern California, right?

13:19:22  15      A.   That is true.

13:19:22  16      Q.   Sometimes in Asia, right?

13:19:25  17      A.   Yes, that's correct.

13:19:26  18      Q.   Sometimes in Europe?

13:19:28  19      A.   Yes, that's correct.

13:19:29  20      Q.   But a lot of it happened in southern California,

13:19:32  21   right here in this jurisdiction, right?

13:19:34  22      A.   Yes, that's correct.

13:19:35  23      Q.   And so you returned to southern California after

13:19:38  24   that meeting.

13:19:40  25           And you decide that you want to meet with

13:19:43   1   law enforcement, right?

13:19:46   2        A.   Yes, that's correct.

13:19:47   3        Q.   You set the meeting?

13:19:53   4        A.   I believe Dean Kajioka, my attorney at the time,

13:20:00   5   set the meeting.

13:20:00   6        Q.   At your request?

13:20:00   7        A.   That is correct.

13:20:01   8        Q.   So it's fair to say that you set the meeting,

13:20:08   9   right?

13:20:08   10       A.   It is fair.

13:20:09   11       Q.   And you met with federal agents, right?

13:20:12   12       A.   Yes.

13:20:12   13       Q.   And the federal agent said to you through your

13:20:16   14   counsel, that they wanted to record the meeting, didn't

13:20:20   15   they?

13:20:21   16       A.   I don't recall specifically if it was recorded or

13:20:23   17   not.

13:20:24   18       Q.   Isn't it true that they asked you to record the

13:20:27   19   meeting and you said no?

13:20:31   20       A.   I don't recall that request.  And I don't recall

13:20:34   21   declining it.

13:20:35   22       Q.   Would taking a look at the report from that day

13:20:39   23   refresh your recollection as to whether or not you

13:20:42   24   declined to allow them to record that meeting?

13:20:45   25       A.   It may.

| | | |
|---|---|---|
| 13:20:55 | 1 | MS. POTASHNER:  Your Honor, may I approach? |
| 13:20:58 | 2 | THE COURT:  Yes. |
| | 3 | BY MS. POTASHNER: |
| 13:21:30 | 4 | Q.  And, sir, I would direct your attention to the |
| 13:21:36 | 5 | fourth paragraph down on page 2, it's a single line. |
| 13:21:49 | 6 | THE COURT:  Okay. |
| 13:21:50 | 7 | THE WITNESS:  I see it. |
| | 8 | BY MS. POTASHNER: |
| 13:21:51 | 9 | Q.  You were represented by Jones Day that day, |
| 13:21:54 | 10 | weren't you? |
| 13:21:54 | 11 | A.  Yes, I was. |
| 13:21:55 | 12 | Q.  And the Government asked you if you -- if that |
| 13:21:59 | 13 | session, that meeting could be recorded, right? |
| 13:22:01 | 14 | A.  Again, I don't recall being asked that question. |
| 13:22:04 | 15 | Q.  Isn't it true that you declined through counsel |
| 13:22:08 | 16 | to let them record that meeting? |
| 13:22:10 | 17 | A.  I don't recall being asked that question; |
| 13:22:12 | 18 | therefore, I do not recall declining the request. |
| 13:22:15 | 19 | Q.  Okay.  Now, that session wasn't recorded, was it? |
| 13:22:24 | 20 | A.  I -- |
| 13:22:25 | 21 | THE COURT:  If you know. |
| 13:22:26 | 22 | THE WITNESS:  I don't recall. |
| | 23 | BY MS. POTASHNER: |
| 13:22:28 | 24 | Q.  During that session you gave your account of -- |
| 13:22:32 | 25 | of what you believe happened, right? |

13:22:38   1        A.   Again, I met with federal agents several times.
13:22:42   2   There were several meetings.  So every meeting was an
13:22:45   3   accounting of what I recall happen and the truth.
13:22:55   4        Q.   Right.  And so it's you giving your version of
13:22:58   5   events, right?
13:22:59   6        A.   Yes, that's correct.
13:23:00   7        Q.   In your way unrecorded, right?
13:23:04   8        A.   It's the truth.  Whatever was the truth was told
13:23:06   9   to the federal agents.
13:23:08  10        Q.   But you don't recall whether or not they asked
13:23:10  11   you to record, right?
13:23:11  12        A.   I do not recall.
13:23:12  13        Q.   You don't recall whether or not it was recorded?
13:23:15  14        A.   I do not.
13:23:16  15        Q.   But you remember specific conversations that
13:23:22  16   happened more than a decade ago, right; is that your
13:23:24  17   testimony?
13:23:25  18        A.   Yes, it is.
13:23:25  19        Q.   So during these meetings with the Government, you
13:23:32  20   were not subjected to a lie detector test, right?
13:23:36  21        A.   No, I was not.
13:23:37  22        Q.   You didn't ask or offer to be put under --
13:23:43  23   questioned under a lie detector, did you?
13:23:46  24        A.   No, I was not.
13:23:51  25        Q.   You met with the Government 16 separate times,

13:23:55  1   right?

13:23:56  2       A.   I don't recall the specific number of times, but

13:23:58  3   there were several meetings.

13:24:03  4       Q.   Fair to say more than ten?

13:24:04  5       A.   I'm sorry, I don't recall the specific number of

13:24:08  6   meetings I've had with them.

13:24:08  7       Q.   Fair to say more than two?

13:24:09  8       A.   It would be more than two.

13:24:11  9       Q.   More than five?

13:24:12  10      A.   I really don't recall the specific number.

13:24:15  11      Q.   Okay.  But in terms of your best estimate, would

13:24:19  12   you say it was more than five?

13:24:23  13      A.   Possible, yes.  More than five.

13:24:25  14      Q.   Okay.  More than ten?

13:24:29  15      A.   I -- I don't recall if it was more than ten, less

13:24:32  16   than ten.  Again, I don't recall the specific number of

13:24:35  17   times I met with them.

13:24:37  18      Q.   Okay.  So after you meet with the Government many

13:24:40  19   times, in the end you are not charged in an indictment

13:24:45  20   with stealing this $240 million, are you?

13:24:48  21      A.   No, I was not.

13:24:49  22      Q.   You were able to navigate around that, weren't

13:24:53  23   you?

13:24:55  24              MS. KUMAR:  Objection, Your Honor.

13:24:56  25   Argumentative.

13:24:57  1            THE COURT:  Sustained.

          2  BY MS. POTASHNER:

13:24:58  3      Q.  And after all of those meetings with the

13:25:00  4  Government, the indictment came out in this case, right?

13:25:06  5      A.  I don't recall specifically the timing or the

13:25:09  6  order.

13:25:10  7      Q.  Okay.  You started meeting with the Government in

13:25:13  8  what year?

13:25:17  9      A.  2016.

13:25:19 10      Q.  Okay.  And then after -- during 2016, 2017, 2018,

13:25:24 11  it's fair to say that you met with them a number of

13:25:27 12  times?

13:25:28 13      A.  It's fair to say I met them several times, yes.

13:25:30 14      Q.  Yes.  And after meeting with them several times,

13:25:34 15  an indictment came out in this case.  This case that we

13:25:37 16  are dealing with right now, right?

13:25:40 17      A.  I don't recall the specific date in which this

13:25:43 18  particular case indictment came out.

13:25:46 19      Q.  But you do know this case was indicted?

13:25:48 20      A.  Yes.

13:25:49 21      Q.  And we are sitting here today because of that

13:25:51 22  indictment, right?

13:25:52 23      A.  That is correct.

13:25:53 24      Q.  And the story that you told the Government put

13:25:56 25  you right in the center of the events at issue in this

```
13:26:01   1    case, right?
13:26:05   2        A.  I --
13:26:07   3            MS. KUMAR:  Objection, Your Honor.  Vague,
13:26:08   4    argumentative.
13:26:09   5            THE COURT:  Overruled on that ground.
13:26:13   6            THE WITNESS:  Sorry.  Can you repeat the
13:26:14   7    question?
           8    BY MS. POTASHNER:
13:26:15   9        Q.  Sure.  After -- now I forget my question.  So I
13:26:20  10    will ask it a different way.
13:26:23  11            At some point indictment came out in this
13:26:25  12    case, right?
13:26:25  13        A.  Yes, it did.
13:26:27  14        Q.  And your account that you told the Government put
13:26:33  15    you right in the center of what's at issue in this case,
13:26:37  16    right?
13:26:39  17        A.  I believe the events that took place in reality
13:26:44  18    is -- are the events that took place, and that would be
13:26:48  19    what the indictment would have been based on.
13:26:51  20        Q.  And the indict -- and what -- your account put
13:26:56  21    you right in the center of what this indictment would be
13:26:59  22    based on, right?
13:27:01  23            MS. KUMAR:  Objection.  Argumentative.
13:27:02  24            THE COURT:  It is not argumentative.  But it
13:27:04  25    is speculating.
```

```
13:27:07   1   BY MS. POTASHNER:
13:27:08   2       Q.  If you know, sir.
13:27:08   3       A.  I was involved in certain aspects of what was
13:27:10   4   indicted, yes.
13:27:12   5       Q.  Yet you were not indicted in this case, were you?
13:27:17   6       A.  I was not.
13:27:17   7       Q.  You're not a defendant in this case?
13:27:20   8       A.  I am not.
13:27:20   9       Q.  Not even in a single count?
13:27:24  10       A.  No.
13:27:24  11       Q.  So you were able to navigate your way around
13:27:27  12   that, weren't you?
13:27:28  13           MS. KUMAR:  Objection, Your Honor.
13:27:29  14   Argumentative.
13:27:30  15           THE COURT:  Sustained.
13:27:31  16   BY MS. POTASHNER:
13:27:32  17       Q.  So you avoided -- after your many meetings with
13:27:39  18   the Government, you avoided being charged with the
13:27:41  19   $250 million theft, right?
13:27:45  20           MS. KUMAR:  Objection, Your Honor, asked and
13:27:46  21   answered.
13:27:46  22           THE COURT:  Sustained.
          23   BY MS. POTASHNER:
13:27:47  24       Q.  You're not facing a prison sentence based on
13:27:49  25   stealing $240 million now, are you?
```

13:27:52  1          MS. KUMAR:  Objection, Your Honor.

13:27:53  2          THE COURT:  It's sustained.  It's been asked

13:27:56  3  and answered.

13:27:58  4  BY MS. POTASHNER:

13:27:59  5      Q.  You did plead guilty to something, right?  You

13:28:03  6  plead guilty and you're awaiting sentencing right now?

13:28:06  7      A.  That is correct.

13:28:07  8      Q.  And that something you plead guilty to was just a

13:28:11  9  single count of not paying taxes; isn't that right?

13:28:14  10     A.  That is correct.

13:28:15  11     Q.  And that single count of not paying taxes only

13:28:19  12  has a maximum sentence of five years; isn't that right?

13:28:23  13     A.  Five years is a long time to me, Counselor.

13:28:27  14     Q.  And, sir -- but my question is:  You're only

13:28:30  15  facing five years under this not paying taxes, right?

13:28:36  16     A.  It is limited to five years, correct.

13:28:38  17     Q.  Because you're not going to be sentenced on

13:28:40  18  stealing the $240 million.

13:28:43  19         MS. KUMAR:  Objection, Your Honor.  Asked

13:28:44  20  and answered.

13:28:44  21         THE COURT:  Sustained.

          22  BY MS. POTASHNER:

13:28:46  23     Q.  You're not going to be sentenced on this case

13:28:48  24  because you're not even charged in this case?

13:28:50  25         MS. KUMAR:  Objection, Your Honor.

13:28:51  1          THE COURT:  It's been asked and answered.
13:28:52  2   He testified he has not been charged in this case.
          3   BY MS. POTASHNER:
13:28:55  4      Q.  And so you just testified that you are facing
13:28:59  5   some time, five years, right?
13:29:01  6      A.  Yes.
13:29:01  7      Q.  And it's fair -- what you said is fair, five
13:29:06  8   years is a significant period of time, right?
13:29:08  9      A.  Yes.
13:29:08 10      Q.  And so you are on the stand today trying to work
13:29:15 11   your way down from that five years, aren't you?
13:29:19 12      A.  I am here to give an accounting of the truth of
13:29:21 13   the events that I'm aware of.
13:29:23 14      Q.  And just as a good samaritan?  Or is there
13:29:27 15   something you're going to get from it?
13:29:30 16      A.  I am cooperating with the Government in this
13:29:33 17   case.
13:29:34 18      Q.  Right.  So you have a deal that if you testify,
13:29:39 19   right, in this case, that's going to be taken in account
13:29:44 20   at your sentencing, right?
13:29:47 21      A.  There's no way to influence the sentencing judge
13:29:50 22   to have a certain outcome of the sentence.
13:29:53 23      Q.  It is your testimony today that you don't have a
13:29:57 24   deal that if you testify and you substantially assist
13:30:00 25   this Government that they are going to let the Court

| | | |
|---|---|---|
| 13:30:04 | 1 | know to reduce your sentence; is that your testimony? |
| 13:30:07 | 2 | MS. KUMAR: Objection. Misstates the |
| 13:30:09 | 3 | testimony. |
| 13:30:09 | 4 | THE COURT: Why don't you ask what the deal |
| 13:30:11 | 5 | is, Counsel. |
| 13:30:14 | 6 | MS. POTASHNER: I'm sorry, Your Honor. I |
| 13:30:15 | 7 | didn't hear what the Court just said. |
| 13:30:17 | 8 | THE COURT: Why don't you just ask what the |
| 13:30:19 | 9 | deal is rather than -- because it maybe misstates the |
| 13:30:22 | 10 | testimony. |
| 13:30:24 | 11 | Did you have a deal with the Government that |
| 13:30:25 | 12 | if you testified they may make a motion to reduce your |
| 13:30:29 | 13 | sentence? |
| 13:30:31 | 14 | THE WITNESS: They would make a |
| 13:30:32 | 15 | recommendation -- yes, I do, Your Honor. |
| 13:30:33 | 16 | THE COURT: And it would be a |
| 13:30:34 | 17 | recommendation? |
| 13:30:34 | 18 | THE WITNESS: It would only be a |
| 13:30:36 | 19 | recommendation, correct. |
| 13:30:37 | 20 | THE COURT: Okay. Go ahead, Counsel. |
| | 21 | BY MS. POTASHNER: |
| 13:30:39 | 22 | Q. And you understand that their recommendation |
| 13:30:40 | 23 | would be taken into account with the Court, right? |
| 13:30:43 | 24 | A. It may be, yes. |
| 13:30:44 | 25 | Q. You understand that the Court is going to hear |

13:30:49  1   from both sides before you are sentenced in your case,

13:30:51  2   right?

13:30:53  3       A.   Yes.

13:30:54  4       Q.   Yes, right?

13:30:56  5       A.   Yes.

13:30:57  6       Q.   You have a lawyer in that case, right?

13:30:59  7       A.   Yes, I do.

13:31:00  8       Q.   And that lawyer has given you advice and told you

13:31:03  9   what would happen at every part -- step of the

13:31:08  10  proceeding, right?

13:31:08  11      A.   As best as he can, right.

13:31:10  12      Q.   As best as he can.

13:31:12  13           So you understand that the Government will

13:31:16  14  be making a motion under something called "substantial

13:31:20  15  assistance" in your case; isn't this right?

13:31:23  16           MS. KUMAR:   Objection.   Asked and answered.

13:31:24  17           THE COURT:   Overruled.   Do you know if the

13:31:30  18  Government will be making a motion because of

13:31:33  19  substantial assistance?

13:31:34  20           THE WITNESS:   I believe that was part of the

13:31:35  21  deal.

          22  BY MS. POTASHNER:

13:31:36  23      Q.   You believe that was part of the deal?

13:31:37  24      A.   Yes.

13:31:37  25      Q.   Okay.   And so you also understand that -- well,

13:31:42  1   you know that the more you deliver in this case, the

13:31:45  2   better it's going to be for you at sentencing; isn't

13:31:49  3   that right?

13:31:50  4              MS. KUMAR:  Objection, Your Honor.

13:31:51  5   Misstates testimony and is argumentative.

13:31:52  6              THE COURT:  Sustained.

13:31:53  7              I'm sorry, I'm going to clear it up because

13:31:54  8   we're giving misconceptions.  This is a deal that the

13:31:57  9   Government depending on your substantial assistance may

13:32:01 10   recommend a lower sentence to the Court?

13:32:03 11              THE WITNESS:  Yes, Your Honor.

13:32:06 12              THE COURT:  Is there any guarantee the Court

13:32:09 13   will take that recommendation?

13:32:09 14              THE WITNESS:  No, Your Honor.

13:32:10 15              THE COURT:  It's completely up to the Court

13:32:11 16   as to what it's going to do?

13:32:11 17              THE WITNESS:  Yes, Your Honor.

13:32:13 18              THE COURT:  But the Government will if you

13:32:15 19   substantially -- or assist them, they will make a

13:32:17 20   recommendation to the Court for a lower sentence?

13:32:21 21              Is that your understanding?

13:32:21 22              THE WITNESS:  Yes, Your Honor.

         23              THE COURT:  Okay.  Go ahead, Counsel.

         24   BY MS. POTASHNER:

13:32:22 25       Q.  You can advise that the guidelines would be

| | | |
|---|---|---|
| 13:32:23 | 1 | something that would be considered at your sentencing; |
| 13:32:25 | 2 | isn't that right? |
| 13:32:26 | 3 | A.  Yes. |
| 13:32:27 | 4 | Q.  You've been advised that the guidelines call for |
| 13:32:31 | 5 | five years in your case; isn't that right? |
| 13:32:33 | 6 | A.  Yes. |
| 13:32:33 | 7 | Q.  And you've been advised that one way to get below |
| 13:32:37 | 8 | the guidelines is for the Government to make that |
| 13:32:38 | 9 | recommendation below the guidelines; isn't that right? |
| 13:32:43 | 10 | A.  Again, they can make the recommendation, yes. |
| 13:32:46 | 11 | Q.  You are hoping for that recommendation, right? |
| 13:32:48 | 12 | A.  Yes, I am. |
| 13:32:49 | 13 | Q.  You are hoping that the Government makes a strong |
| 13:32:51 | 14 | recommendation in your case, aren't you? |
| 13:32:53 | 15 | A.  Yes, I am. |
| 13:32:54 | 16 | Q.  You are hoping that the Government makes a |
| 13:32:57 | 17 | recommendation that you don't go to prison, right? |
| 13:33:00 | 18 | A.  Yes. |
| 13:33:00 | 19 | Q.  So you are hoping to avoid prison altogether in |
| 13:33:04 | 20 | this situation, right? |
| 13:33:05 | 21 | A.  Yes, I would. |
| 13:33:08 | 22 | Q.  You're hoping for that to happen despite the fact |
| 13:33:11 | 23 | that you stole $240 million; isn't that right? |
| 13:33:14 | 24 | MS. KUMAR:  Objection. |
| 13:33:15 | 25 | THE WITNESS:  Your Honor, argumentative. |

| | | |
|---|---|---|
| 13:33:18 | 1 | THE COURT:  Sustained. |
| | 2 | BY MS. POTASHNER: |
| 13:33:19 | 3 | Q.  You're hoping that the Government will recommend |
| 13:33:22 | 4 | all the way down to zero days in custody for you despite |
| 13:33:25 | 5 | your own account putting you in the middle of all of |
| 13:33:28 | 6 | this? |
| 13:33:29 | 7 | MS. KUMAR:  Objection, Your Honor. |
| 13:33:30 | 8 | THE COURT:  Sustained.  Argumentative. |
| | 9 | BY MS. POTASHNER: |
| 13:33:35 | 10 | Q.  When's your sentencing, Mr. Shen? |
| 13:33:37 | 11 | MS. KUMAR:  Objection, Your Honor. |
| 13:33:38 | 12 | Relevance. |
| 13:33:39 | 13 | THE COURT:  Overruled. |
| 13:33:41 | 14 | Do you know when it is? |
| 13:33:43 | 15 | THE WITNESS:  I think it's October. |
| 13:33:45 | 16 | THE COURT:  Okay. |
| | 17 | BY MS. POTASHNER: |
| 13:33:47 | 18 | Q.  October of this year? |
| 13:33:48 | 19 | A.  Yes. |
| 13:33:48 | 20 | Q.  You pled guilty back in 2019; isn't that right? |
| 13:33:53 | 21 | A.  Yes. |
| 13:33:54 | 22 | Q.  And you were told that your sentencing wouldn't |
| 13:33:57 | 23 | happen until this trial happened; isn't this right? |
| 13:34:04 | 24 | A.  I believe so, yes. |
| 13:34:08 | 25 | MS. POTASHNER:  No further questions. |

| | | |
|---|---|---|
| 13:34:10 | 1 | THE COURT:  Okay. |
| 13:34:12 | 2 | Redirect? |
| 13:34:14 | 3 | **REDIRECT EXAMINATION** |
| 13:34:18 | 4 | BY MS. KUMAR: |
| 13:34:27 | 5 | Q.  Good afternoon, Mr. Shen. |
| 13:34:28 | 6 | A.  Good afternoon. |
| 13:34:29 | 7 | Q.  Counsel asked you a series of questions about |
| 13:34:32 | 8 | your meetings with the Government. |
| 13:34:33 | 9 | Do you remember that? |
| 13:34:34 | 10 | A.  Yes. |
| 13:34:35 | 11 | Q.  Your first meeting with the Government was in |
| 13:34:38 | 12 | July of 2016; is that right? |
| 13:34:41 | 13 | A.  Again, I don't recall the specific date. |
| 13:34:42 | 14 | Q.  Sometime in 2016? |
| 13:34:44 | 15 | A.  Yes. |
| 13:34:45 | 16 | Q.  And just a yes or no here, but prior to the |
| 13:34:48 | 17 | meeting had you received threats? |
| 13:34:51 | 18 | A.  Can you be specific?  From whom? |
| 13:34:56 | 19 | Q.  From Mr. Liu. |
| 13:34:58 | 20 | A.  Yes. |
| 13:34:59 | 21 | THE COURT:  Did you receive any threats, is |
| 13:35:01 | 22 | what she asked. |
| 13:35:03 | 23 | THE WITNESS:  Yes, Your Honor.  Yes, I did. |
| | 24 | BY MS. KUMAR: |
| 13:35:05 | 25 | Q.  The counsel also asked you about being sued in |

| | | |
|---|---|---|
| 13:35:08 | 1 | 2016; do you remember that? |
| 13:35:10 | 2 | A.  Yes. |
| 13:35:10 | 3 | Q.  Where were you sued? |
| 13:35:13 | 4 | A.  Globally.  I was sued in several jurisdictions. |
| 13:35:17 | 5 | The UK, Singapore, Taiwan, Texas, California. |
| 13:35:25 | 6 | Q.  Were other members of your family sued? |
| 13:35:27 | 7 | A.  Yes, they were.  My mother was sued in Orange |
| 13:35:33 | 8 | County.  And my sister was sued in Orange County. |
| 13:35:38 | 9 | Q.  Counsel also asked about your plea agreement with |
| 13:35:42 | 10 | the Government. |
| 13:35:42 | 11 | As you sit here now, do you have any idea |
| 13:35:45 | 12 | what the Government is going to recommend at your |
| 13:35:46 | 13 | sentencing? |
| 13:35:47 | 14 | A.  No, I do not. |
| 13:35:48 | 15 | Q.  And Mr. Shen, if you lie in Court or at any time |
| 13:35:54 | 16 | during your meetings with the Government, what happens? |
| 13:36:01 | 17 | MS. POTASHNER:  Objection.  Calls for |
| 13:36:02 | 18 | speculation. |
| 13:36:02 | 19 | THE COURT:  Overruled. |
| 13:36:04 | 20 | In your mind, what would happen? |
| 13:36:06 | 21 | THE WITNESS:  I would face charges of |
| 13:36:07 | 22 | perjury.  I would go to jail on those charges.  And all |
| 13:36:10 | 23 | of the agreements under our existing deal would go out |
| 13:36:13 | 24 | the window.  And I face criminal charges on all of my |
| 13:36:18 | 25 | past conduct. |

13:36:20   1          MS. KUMAR:  Nothing further, Your Honor.

13:36:24   2          THE COURT:  Redirect.  Counsel.  Anything

13:36:29   3  from Perfectus?

13:36:34   4              **RECROSS EXAMINATION**

13:36:34   5  BY MS. POTASHNER:

13:36:43   6     Q.  Just focusing on the threats, you just testified

13:36:45   7  that you received threats before the first time you met

13:36:48   8  with the Government, right?

13:36:50   9     A.  That is correct.

13:36:50  10     Q.  And you told the Government that you had been

13:36:53  11  threatened starting back in 2010, right?  That was your

13:36:57  12  claim?

13:36:59  13     A.  I was threaten by Mr. Liu in 2013.

13:37:02  14     Q.  You told the Government at your first meeting

13:37:05  15  that the threats started in 2010, didn't you?

13:37:09  16     A.  I don't recall saying that.

13:37:10  17     Q.  Would taking a look at that account of that

13:37:13  18  meeting refresh your recollection?

13:37:18  19     A.  It wouldn't change the facts.  But I will take a

13:37:21  20  look.

13:37:24  21     Q.  You already know by reading the report that it's

13:37:28  22  not going to help you remember what you said during that

13:37:30  23  meeting; is that your testimony?

13:37:31  24     A.  I was threatened in 2013 by Mr. Liu.

13:37:34  25          THE COURT:  The question is whether or not

```
13:37:36   1   seeing a document might refresh your memory as to
13:37:40   2   whether you ever said you had threats in 2010?
13:37:43   3                THE WITNESS:  It may.  I will take a look.
13:37:49   4                THE COURT:  Do you want to pass it up?
13:37:51   5                MS. POTASHNER:  I do, Your Honor.  Hold on
13:37:53   6   one second.
13:37:54   7                THE COURT:  No problem.
13:38:33   8                MS. POTASHNER:  May I have one moment, Your
13:38:35   9   Honor?
13:38:36  10                THE COURT:  Sure.
13:38:38  11                MS. POTASHNER:  If I may approach, Your
13:38:40  12   Honor.
13:38:41  13                THE COURT:  Sure.
13:38:52  14                Counsel, is there a particular page?
13:38:56  15                MS. POTASHNER:  Turn to the page -- if you
13:38:56  16   could please review -- if you could please review
13:39:04  17   page 3.
13:39:07  18                THE CLERK:  What is the exhibit number,
13:39:09  19   Counsel, please?
13:39:10  20                THE COURT:  This is not an exhibit.
13:39:12  21                THE CLERK:  Okay.
13:39:12  22                Thank you, Your Honor.
13:39:26  23                THE COURT:  Let me know when you finish page
13:39:29  24   3.  And then turn the document over.
13:39:31  25                THE WITNESS:  Yes, Your Honor.
```

13:39:42  1  BY MS. POTASHNER:

13:39:43  2     Q.  Mr. Shen, if you could direct your attention to

13:39:45  3  the bullet point third up from the bottom on page 3.

13:39:54  4     A.  Which one?

13:39:55  5     Q.  The bullet point third up from the bottom on page

13:39:59  6  3 of the document that was just handed you.

13:40:01  7     A.  Yes, I see it.

13:40:02  8                THE COURT:  Okay.

          9  BY MS. POTASHNER:

13:40:04  10     Q.  Isn't it true that you told the Government that

13:40:06  11  you had been threatened as of 2010?

13:40:09  12     A.  I don't recall saying that date.

13:40:12  13     Q.  Isn't it true that you purchased $611,000 worth

13:40:20  14  of goods from Hermès after 2010?

13:40:24  15                MS. KUMAR:  Objection, Your Honor.  Beyond

13:40:26  16  the scope.

13:40:27  17                THE COURT:  Sustained.

          18  BY MS. POTASHNER:

13:40:29  19     Q.  You testified that your mother was sued with

13:40:31  20  respect to these events; is that correct?

13:40:35  21     A.  She was sued by Liu Zhongtian and his proxies.

13:40:41  22     Q.  Isn't it true that you used some of the money

13:40:44  23  that you stole to buy your mom real property?

13:40:46  24     A.  Yes, I did.

13:40:47  25     Q.  And you said that your sister was sued as well,

```
13:40:50   1   right?
13:40:51   2      A.  She was.
13:40:52   3      Q.  Isn't it true that you used some of the proceeds
13:40:54   4   that you stole to benefit your sister?
13:40:57   5      A.  Yes, it is.
13:40:59   6              MS. POTASHNER:  No further questions.
13:41:01   7              THE COURT:  You may step down.
13:41:03   8              May this witness be excused?
13:41:05   9              MS. KUMAR:  Yes, Your Honor.  From the
13:41:07  10   Government.
13:41:08  11              MS. POTASHNER:  Your Honor, we'd like to
13:41:09  12   retain him for recall.
13:41:12  13              THE COURT:  You will be on call then.
13:41:28  14              Next witness.
13:41:30  15              MR. HSIEH:  Your Honor, the Government calls
13:41:32  16   George Wang.  This witness will use a Mandarin
13:41:47  17   interpreter, Your Honor.
13:41:59  18              THE CLERK:  Mr. Wang, this way, please.
13:42:17  19   Please raise your right hand.
13:42:22  20              Do you solemnly swear the testimony you are
          21   about to give in the matter now before the Court shall
          22   be the truth, the whole truth and nothing but the truth
          23   so help you God.
          24              THE WITNESS:  Yes.
          25              THE CLERK:  Please be seated.
```

                         Would you please state and spell your full

13:42:51   2   name for the record.

13:42:51   3                 THE COURT:   The witness has been sworn in

13:42:53   4   before.

13:42:54   5                 THE CLERK:   Please spell it.   Thank you.

13:43:02   6                 THE WITNESS:   George Wang.

13:43:02   7                 THE COURT:   Okay.   Counsel, you may inquire.

           8                 **DIRECT EXAMINATION**

           9   BY MR. HSIEH:

13:43:12  10      Q.   Good afternoon, Mr. Wang.   What do you do for a

13:43:16  11   living?

13:43:16  12      A.   I'm a customs broker.

13:43:23  13      Q.   How long have you been a customs broker for,

13:43:26  14   Mr. Wang?

13:43:30  15      A.   About 30 years.

13:43:33  16      Q.   In your 30 years as a customs broker, what type

13:43:36  17   of customers have you had?

13:43:47  18      A.   Just general importers.

13:43:50  19      Q.   What type of goods do these importers import?

13:44:04  20      A.   Clothing, shoes, some daily usage products.

13:44:10  21      Q.   Would you estimate that you have had hundreds of

13:44:17  22   customers in your 30 years as a customs broker?

13:44:27  23      A.   More or less.

13:44:29  24      Q.   Now, Mr. Wang, would you please briefly tell the

13:44:36  25   jury how a customs brokers assists an importer of goods

13:44:42  1   to the United States.

13:44:43  2       A.  I just assisted those clients to have their

13:45:07  3   product entry the custom of the United States.

13:45:10  4       Q.  And in doing that work as a customs broker, do

13:45:15  5   you help submit paperwork to customs and border

13:45:20  6   protection?

13:45:22  7       A.  Correct, yes, I have.

13:45:31  8       Q.  Mr. Wang, would you please briefly describe to

13:45:34  9   the jury, in your role as a customs broker what is an

13:45:39 10   ISF 10+2 form?

13:46:03 11       A.  That is a goods information that importer needs

13:46:07 12   to file before the goods was exported.

13:46:10 13       Q.  And is it the importer that provides you that

13:46:14 14   information to fill out the ISF 10+2?

13:46:25 15       A.  Yes.

13:46:25 16       Q.  Now, after the importer provides you the

13:46:28 17   information to fill out the ISF 10+2 and the merchandise

13:46:36 18   arrives, does the importer typically send you other

13:46:39 19   information to facilitate the release of the products?

13:46:45 20       A.  Yes.  There should be valid and clearance

13:47:01 21   documents supporting.

13:47:03 22       Q.  Can you give a brief overview to the jury of some

13:47:06 23   of the clearance documents that the importer provides

13:47:09 24   you.

13:47:20 25       A.  We also require the commercial receipt, the

13:47:40   1   container number, also the bill of lading and arrival

13:47:45   2   notice.

13:47:46   3       Q.   Would other words for the documents, Mr. Wong, be

13:47:51   4   an invoice and packing list that the importer provides

13:47:55   5   you?

13:48:04   6       A.   That's right.

13:48:05   7       Q.   Now, after the merchandise arrives and the

13:48:08   8   importer has provided you things like the invoice,

13:48:10   9   packing list, bill of lading and arrival notice, do you

13:48:14  10   then file this information with the CBP?

13:48:23  11       A.   Correct.

13:48:39  12       Q.   And after you file that information, do you

13:48:41  13   receive an entry summary or Form 7501?

13:49:00  14       A.   Correct.

13:49:00  15       Q.   And does CBP require you to keep those documents

13:49:05  16   as a customs broker for a certain period of time?

13:49:18  17       A.   Yes.  For a period of five years.

13:49:20  18       Q.   Now, after you filed the ISF 10+2 with the

13:49:25  19   information from the importer and then receive an entry

13:49:28  20   summary filled out with information you receive from the

13:49:31  21   importer, what is the next step?

13:49:57  22       A.   Notify the client about the clearance, and also

13:50:03  23   charge the fee.

13:50:04  24       Q.   How much do you typically charge for a fee,

13:50:07  25   Mr. Wang, to fill out this customs work, paperwork?

| 13:50:20 | 1 | A. 75 to a hundred. |
| 13:50:26 | 2 | Q. That's $75 to $100; is that correct? |
| 13:50:34 | 3 | A. Correct. |
| 13:50:34 | 4 | Q. Now, we'll look at some 7501s. But before we do, |
| 13:50:40 | 5 | is there a field number one filer code, Mr. Wang, that |
| 13:50:45 | 6 | you're familiar with? |
| 13:50:46 | 7 | A. Correct. Yes, I'm familiar with. |
| 13:50:56 | 8 | Q. What is your filer code? |
| 13:50:58 | 9 | A. HR7. |
| 13:51:06 | 10 | Q. Now, is there also a box on the 7501, box No. 2, |
| 13:51:12 | 11 | entry type that you're familiar with? |
| 13:51:22 | 12 | A. Yes. |
| 13:51:23 | 13 | Q. And is there a code 01 that corresponds to |
| 13:51:29 | 14 | regular duties? |
| 13:51:39 | 15 | A. Yes. |
| 13:51:39 | 16 | Q. And on the other hand, is there a code 03 that |
| 13:51:44 | 17 | refers to AD/CVD duties? |
| 13:52:00 | 18 | A. Correct. |
| 13:52:01 | 19 | Q. Now, Mr. Wang, as a customs broker are you |
| 13:52:04 | 20 | allowed to inspect cargo once it arrives to the port? |
| 13:52:10 | 21 | A. No. |
| 13:52:24 | 22 | Q. Where is your office located, Mr. Wang? |
| 13:52:34 | 23 | A. Currently located in Diamond Bar City. |
| 13:52:38 | 24 | Q. And in your role as a customs broker, do you |
| 13:52:41 | 25 | submit the customs work paperwork from Diamond Bar? |

13:52:52  1   A.  Correct.

13:52:53  2   Q.  Now, do you have a sister that also acts as a

13:52:56  3   customs broker?

13:53:05  4   A.  Correct.

13:53:06  5   Q.  Where is her office located?

13:53:08  6   A.  San Gabriel.

13:53:09  7   Q.  And from your relationship with your sister, do

13:53:14  8   you understand that she submits customs paperwork from

13:53:18  9   San Gabriel?

13:53:27  10  A.  Correct.

13:53:27  11  Q.  Now, Mr. Wang, are you familiar with an

13:53:30  12  individual named Johnson Shao?

13:53:32  13  A.  Yes, I know.

13:53:40  14  Q.  How did you become familiar with Mr. Shao?

13:53:43  15  A.  He was introduced by a previous client.

13:53:55  16  Q.  And are you familiar with the company called

13:54:01  17  Pengcheng Aluminum?

13:54:04  18  A.  I do.

13:54:04  19  Q.  How did you come to work with Pengcheng Aluminum?

13:54:08  20  A.  It was introduced by Johnson.

13:54:20  21  Q.  Was that in the 2008 or 2009 time frame?

13:54:28  22  A.  Yes.

13:54:29  23  Q.  Now, after Johnson Shao introduced you to

13:54:33  24  Pengcheng Aluminum, was your primary contact Johnson

13:54:37  25  Shao or someone else?

13:55:01    1      A.   A warehouse manager whose name was Toby.

13:55:04    2      Q.   That's your primary contact; is that right?

13:55:10    3      A.   Yes.

13:55:11    4      Q.   What kind of products did you help Pengcheng

13:55:15    5  Aluminum import?

13:55:32    6      A.   Aluminum materials.

13:55:33    7      Q.   What type of aluminum materials did you initially

13:55:36    8  help Pengcheng Aluminum import to the United States?

13:55:40    9           MR. LOWDER:   Objection.  Vague as to time.

13:55:42   10           THE COURT:   Sustained.

          11  BY MR. HSIEH:

13:55:44   12      Q.   Mr. Wang, when you were first put into contact

13:55:47   13  with Johnson Shao as you testified around 2008, 2009,

13:55:50   14  what type of aluminum materials did you help import?

13:56:04   15      A.   Extrusion, in English.  And ingot, in English.

13:56:14   16      Q.   Now after helping Pengcheng Aluminum import

13:56:19   17  extrusions and ingots in around 2008 or 2009, did you

13:56:22   18  help them import a different type of aluminum product?

13:56:43   19      A.   Supposedly no others.

13:56:55   20      Q.   Did you ever help Pengcheng Aluminum import

13:57:01   21  aluminum pallets?

13:57:03   22      A.   Yes.

13:57:05   23      Q.   And how much did you charge Pengcheng Aluminum to

13:57:10   24  fill out customs paperwork?

13:57:22   25      A.   $75.

13:57:24  1     Q.  Now, I'm going to show just the witness a few

13:57:30  2  exhibits.  And we'll move in several documents into

13:57:36  3  evidence, and then go into some exhibits in more detail

13:57:40  4  with specific pages.

13:57:42  5            MR. HSIEH:  So first, I'd like to show just

13:57:44  6  the witness Exhibit 204.  I'm showing just the witness

13:58:08  7  page 1 of Government's 204.

13:58:16  8     Q.  Mr. Wang, do you recognize your filer code in

13:58:19  9  box 1 of page 1 of Government's Exhibit 204?

13:58:29  10     A.  Yes.

13:58:33  11     Q.  On the bottom of page 1 of Government

13:58:37  12  Exhibit 204, do you recognize your signature?

13:58:39  13     A.  Yes.

13:58:45  14     Q.  Looking at page 2, is that an invoice that you

13:58:51  15  received in filling out this customs paperwork?

13:59:02  16     A.  Yes.

13:59:03  17     Q.  Looking at page 3, is that a packing list that

13:59:10  18  you also received from the importer to help fill out the

13:59:13  19  customs paperwork?

13:59:22  20     A.  Correct.

13:59:23  21     Q.  Is page 4 a bill of lading you received from the

13:59:29  22  importer to fill out the customs paperwork?

13:59:37  23     A.  Yes.

13:59:38  24     Q.  And is page 5 the ISF 10+2 form that you

13:59:49  25  referenced earlier to the jury?

| | | |
|---|---|---|
| 13:59:56 | 1 | A.   Yes. |
| 13:59:58 | 2 | MR. HSIEH:  Your Honor, the Government moves |
| 13:59:59 | 3 | to admit Exhibit 204 into evidence. |
| 14:00:02 | 4 | THE COURT:  It will be received. |
| 14:00:04 | 5 | Do you want to publish it? |
| | 6 | (Exhibit 204 is received.) |
| 14:00:06 | 7 | MR. HSIEH:  I will go through a few more of |
| 14:00:08 | 8 | these exhibits if that's okay and then go through |
| 14:00:13 | 9 | specific documents. |
| 14:00:14 | 10 | Now, showing just the witness -- well, |
| 14:00:26 | 11 | unless there is any objection, I move to admit |
| 14:00:29 | 12 | Exhibits -- to speed this up -- 205, 206, 207, 208, 210, |
| 14:00:43 | 13 | 211 and 212.  Those are all customs records. |
| 14:00:51 | 14 | MR. LOWDER:  Your Honor. |
| 14:00:52 | 15 | THE COURT:  Yes. |
| 14:00:54 | 16 | MR. LOWDER:  Just an objection to -- for |
| 14:00:55 | 17 | this witness, coming through this witness, 210 and 212 |
| 14:01:00 | 18 | are not his. |
| 14:01:01 | 19 | THE COURT:  210 and 212? |
| 14:01:05 | 20 | MR. LOWDER:  Yes. |
| 14:01:06 | 21 | THE COURT:  The others there's no objection |
| 14:01:07 | 22 | to. |
| 14:01:08 | 23 | MR. LOWDER:  Sorry.  I think we can resolve |
| 14:01:10 | 24 | it.  Sorry. |
| 14:01:17 | 25 | Your Honor, no objection. |

| | | |
|---|---|---|
| 14:01:18 | 1 | THE COURT:  It will be received then. |
| 14:01:20 | 2 | MR. HSIEH:  And the Government's also moving |
| 14:01:21 | 3 | to admit Exhibits 209 and 213. |
| 14:01:24 | 4 | MR. LOWDER:  No objection, Your Honor. |
| 14:01:26 | 5 | THE COURT:  209 and 213? |
| 14:01:34 | 6 | MR. HSIEH:  That's correct, Your Honor. |
| 14:01:35 | 7 | THE COURT:  Received. |
| 14:01:37 | 8 | (Exhibits 209 and 213 are received.) |
| | 9 | BY MR. HSIEH: |
| 14:01:38 | 10 | Q.  So now that we've admitted those exhibits, I'll |
| 14:01:43 | 11 | take you through specific pages. |
| | 12 | THE COURT:  Do you want them published? |
| | 13 | MR. HSIEH:  Yes, please, Your Honor. |
| 14:01:45 | 14 | I'm going back to 204-1. |
| 14:01:56 | 15 | Now, publishing page 1 of Government's |
| 14:02:00 | 16 | Exhibit 204. |
| | 17 | BY MR. HSIEH: |
| 14:02:01 | 18 | Q.  Again, is this the entry code that -- filer code |
| 14:02:12 | 19 | that refers to you, Mr. Wang? |
| 14:02:14 | 20 | A.  Correct. |
| 14:02:14 | 21 | Q.  And this is what we talked about earlier, box 2, |
| 14:02:20 | 22 | 01 referring to just regular duties, no |
| 14:02:24 | 23 | antidumping/countervailing duties? |
| 14:02:40 | 24 | A.  Correct. |
| 14:02:42 | 25 | Q.  Who's the importer of record, Mr. Wang, on this |

14:02:46    1    particular CBP 7501?

14:02:51    2        A.   Pengcheng Aluminum.

14:03:05    3        Q.   Now, showing page 2 of Government Exhibit 204.  I

14:03:14    4    think you described this as the invoice related to that

14:03:19    5    7501; is that correct, Mr. Wang?

14:03:24    6        A.   Correct.

14:03:27    7        Q.   What's the product in this particular invoice?

14:03:41    8        A.   Aluminum pallets.

14:03:48    9            MR. HSIEH:  Now, I'm going to publish

14:03:52   10    Government's Exhibit 211, which was introduced without

14:03:57   11    objection, pages 37 to 42; 43 to 48; 49 to 54.

14:04:05   12            First showing and publishing pages 37 to 42

14:04:11   13    of Government's Exhibit 211.

14:04:13   14            THE COURT:  Okay.

           15    BY MR. HSIEH:

14:04:22   16        Q.   Now, Mr. Wang, I'm going to be asking you similar

14:04:25   17    questions.  I will try to move through this relatively

14:04:28   18    quickly.

14:04:33   19        A.   That's fine.

14:04:34   20        Q.   Now on page 37, does the top right-hand corner --

14:04:53   21    what does the summary date reflect on the top right-hand

14:04:56   22    corner, Mr. Wang, 5/23/14?

14:05:11   23        A.   That is the date that when the duty was paid.

14:05:16   24        Q.   And is this your filer code?

14:05:30   25        A.   Yes.

14:05:31   1      Q.   And who pays the duty?

14:05:44   2      A.   Pengcheng paid it themselves.

14:05:47   3      Q.   Now, turning to page 38.  What is this form we

14:05:57   4  are looking at page 38 of 211, Mr. Wang?

14:06:07   5      A.   It is a releasing form.

14:06:08   6      Q.   Does that mean the cargo could be released to the

14:06:11   7  importer?

14:06:25   8      A.   Correct.

14:06:26   9      Q.   Looking at page 39, is this the invoice related

14:06:29  10  to that 7501 we saw on page 37?

14:06:35  11      A.   Yes.

14:06:41  12      Q.   Is that for 10,584 aluminum pallets?

14:06:51  13           THE INTERPRETER:  Counsel, could you make it

14:06:56  14  bigger.

          15  BY MR. HSIEH:

14:06:56  16      Q.   Is that for 10,584 aluminum pallets?

14:07:00  17      A.   Correct.

14:07:05  18      Q.   Is page 40 the associated packing list with that

14:07:17  19  7501?

14:07:18  20      A.   Yes.

14:07:23  21      Q.   Is page 41 that we're showing the bill of lading

14:07:30  22  associated with that 7501?

14:07:32  23      A.   Yes.

14:07:36  24      Q.   And is page 42 the ISF 10+2 associated with that

14:07:45  25  shipment and 7501?

| | | |
|---|---|---|
| 14:07:50 | 1 | A.   Correct. |
| 14:07:56 | 2 | MR. HSIEH:   Now, I won't stop at every page, |
| 14:07:58 | 3 | but I'm going to show the witness pages 43 through 48. |
| 14:08:08 | 4 | Q.   Showing page 43.   Do you recognize your filer |
| 14:08:12 | 5 | code, Mr. Wang? |
| 14:08:17 | 6 | A.   Yes. |
| 14:08:17 | 7 | Q.   Now, flipping individually to page 44. |
| 14:08:28 | 8 | A.   All right. |
| 14:08:28 | 9 | Q.   Page 45. |
| 14:08:33 | 10 | A.   Yes. |
| 14:08:39 | 11 | Q.   Page 46. |
| 14:08:43 | 12 | A.   Yes. |
| 14:08:45 | 13 | Q.   Page 47. |
| 14:08:50 | 14 | A.   Yes. |
| 14:08:54 | 15 | Q.   Page 48. |
| 14:08:59 | 16 | Now, Mr. Wang, were pages 43 through 48 of |
| 14:09:04 | 17 | Government's Exhibit 211 associated with the 7501 shown |
| 14:09:08 | 18 | on page 43? |
| 14:09:14 | 19 | Mr. Wang, were the last pages we just saw, |
| 14:09:17 | 20 | 43 through 48, documents associated with the 7501 on |
| 14:09:22 | 21 | page 43? |
| 14:09:41 | 22 | A.   Yes. |
| 14:09:42 | 23 | Q.   Now, I'm going to do the same thing, the final |
| 14:09:46 | 24 | pages, that will show of this particular exhibit, pages |
| 14:09:48 | 25 | 49 through 54.   Enlarging page 49.   Showing the witness |

14:10:10    1    page 50, page 51, page 52, page 53, page 54.

14:10:48    2              Now, Mr. Wang, were pages 49 through 54

14:10:52    3    again documents you received from the importer to help

14:10:55    4    facilitate the release of goods?

14:11:09    5        A.  Correct.

14:11:09    6        Q.  Now, I'm going to show the witness a different

14:11:16    7    exhibit, pages 163 to 169, 170 to 175, 176 to 181, and

14:11:28    8    pages 226 to 231 of what is previously admitted as

14:11:34    9    Exhibit 212.

14:11:54   10              Now, I am now showing the witness and the

14:11:56   11    jury page 163 of 231.

14:12:10   12              THE COURT:  Sorry, Counsel.  What?

14:12:13   13              MR. HSIEH:  163 of Exhibit 231.  Sorry.  My

14:12:17   14    apologies.  I misspoke.  Page 163 of Exhibit 212.

14:12:22   15              THE COURT:  Of 212.  Okay.  Thank you.

           16    BY MR. HSIEH:

14:12:31   17        Q.  Now, looking at the bottom of page 163 of

14:12:35   18    Exhibit 212, is this your sister's company on the bottom

14:12:38   19    left-hand side?

14:12:48   20        A.  Yes.

14:12:48   21        Q.  Did she assist you with filing certain imports

14:12:52   22    for Pengcheng Aluminum in New Jersey that arrived in New

14:12:56   23    Jersey?

14:13:03   24        A.  Correct.

14:13:03   25        Q.  And why did she assist you with some particular

14:13:08  1   imports for Pengcheng Aluminum?

14:13:09  2       A.   At the time, I did not have the license to be a

14:13:27  3   broker in other states.

14:13:30  4       Q.   Did these documents follow the same process in

14:13:34  5   which you received information from Pengcheng Aluminum

14:13:38  6   and pass that to your sister?

14:13:48  7       A.   Yes.

14:13:48  8       Q.   Did you receive copies of the 7501s after filing?

14:13:59  9       A.   Yes.

14:14:02  10              MR. HSIEH:   Now, I'm showing the witness

14:14:03  11  page 164 of Exhibit 212.   165 of Exhibit 212.   166 of

14:14:27  12  Exhibit 212.   167, 168 and 169.   Enlarging the top

14:14:48  13  portion of 169.

14:14:52  14      Q.   Even though your sister filed the 7501s, did you

14:14:56  15  file the ISF 10+2 for these filings, Mr. Wang?

14:15:08  16      A.   Correct.

14:15:09  17              MR. HSIEH:   Now, to show you another set of

14:15:11  18  imports, pages 170 through 175 to the witness.   Showing

14:15:19  19  page 170, 171, page 172, page 173, 174, and 175.

14:16:05  20      Q.   Were those pages, Mr. Wang, 170 through 175,

14:16:10  21  associated with 7501 submitted on behalf of Pengcheng

14:16:16  22  Aluminum?

14:16:16  23      A.   Yes.

14:16:29  24              MR. HSIEH:   Now, going through pages 176

14:16:33  25  through 181 of the same exhibit, 212.   Page 176, 177,

14:16:52  1  178, 179, 180, 181.

14:17:17  2      Q.  Same question, Mr. Wang.  Were pages 176 to 181

14:17:21  3  another group of associated documents related to a

14:17:24  4  submission of a 7501?

14:17:37  5      A.  Correct.

14:17:42  6              MR. HSIEH:  Now, showing pages 226 to 231 of

14:17:46  7  Government's Exhibit 212.  Page 226 is visible to the

14:17:58  8  witness and the jury.  Showing page 227.  And briefly

14:18:11  9  enlarging the pages as we flip through them.  Page 228,

14:18:28  10  page 229, page 230, page 231.

14:18:43  11      Q.  Same question, Mr. Wang:  Are pages 226 through

14:18:47  12  231 of Government's Exhibit 212 another group of

14:18:51  13  documents associated with the 7501 submitted on behalf

14:18:55  14  of Pengcheng Aluminum?

14:18:57  15      A.  Yes.

14:19:14  16              MR. HSIEH:  I'm going back to Government's

14:19:16  17  Exhibit 211, page 37.  Looks like the date on the top

14:19:25  18  right-hand corner is May 23, 2014.

14:19:32  19      Q.  Now, Mr. Wang, you testified that you filled out

14:19:34  20  information on a 7501 based on the information the

14:19:39  21  importer provided to you.

14:19:40  22              Did you ever become aware in around 2011

14:19:46  23  regarding something called antidumping/countervailing

14:20:11  24  duties?

14:20:11  25      A.  Yes, I am aware.

14:20:12    1       Q.   How did you become aware of that?  Through what

14:20:15    2   or whom?

14:20:21    3       A.   Pengcheng Aluminum notified us.  Well, Johnson.

14:20:35    4       Q.   Is that Johnson Shao, Mr. Wang?

14:20:42    5       A.   Yes, Johnson Shao.

14:20:48    6       Q.   Prior to Johnson Shao notifying you about AD/CVD

14:20:53    7   duties, have you spoken to him recently?

14:21:16    8       A.   No.

14:21:17    9       Q.   Was the last time you spoke to Johnson Shao prior

14:21:23   10   to when he introduced you to Pengcheng Aluminum?

14:21:26   11       A.   Correct.  After that introduction, we lost

14:21:45   12   contact.

14:21:46   13       Q.   But then he contacted you about AD/CVD duties,

14:21:54   14   correct?

14:21:55   15                MR. LOWDER:  Objection.  Leading.

14:21:58   16                THE COURT:  Overruled.  Foundation.

14:22:01   17                THE WITNESS:  Yes.

           18   BY MR. HSIEH:

14:22:05   19       Q.   What happened during that conversation?

14:22:10   20                MR. LOWDER:  Objection.  Calls for hearsay.

14:22:14   21   Proffer.

14:22:14   22                THE COURT:  Sustained.

14:22:19   23                Well, I take that back.  If you were asking

14:22:21   24   what was said during the conversation, it's sustained.

14:22:23   25                If you are asking what he saw, it would not

14:22:25  1    be sustained.

14:22:27  2                MR. HSIEH:  What was the last part, Your

14:22:28  3    Honor?

14:22:28  4                THE COURT:  If you're asking what happened

14:22:29  5    or what he saw, he can testify to that.

14:22:32  6                But he can't testify to what he heard at

14:22:34  7    that exchange.

14:22:35  8                And your question I believe just talked

14:22:37  9    about what happened at the exchange.

14:22:39  10               Why don't you ask the question again.

          11               MR. HSIEH:  Sure.

          12   BY MR. HSIEH:

14:22:42  13      Q.   What happened during that exchange, Mr. Wang,

14:22:45  14   with Mr. Shao?

14:22:53  15      A.   On that phone call, he mentioned there will be --

14:23:02  16               THE COURT:  That will be sustained.

14:23:05  17               MR. HSIEH:  Your Honor, if I just may, a

14:23:05  18   co-conspirator statement that we established throughout

14:23:08  19   the course of the agent of --

14:23:11  20               THE COURT:  So you're introducing it as a

14:23:13  21   co-conspirator statement?

14:23:14  22               MR. HSIEH:  Yes, Your Honor.  As Pengcheng

14:23:16  23   Aluminum.

14:23:16  24               THE COURT:  Okay.  Overruled.

14:23:18  25               MR. LOWDER:  Objection, Your Honor.

14:23:19   1                    THE COURT:  It will be noted for the record.

           2   BY MR. HSIEH:

14:23:23   3       Q.  What did Mr. Shao tell you during that

14:23:32   4   conversation?

14:23:36   5       A.  It was mentioned that the aluminum products were

14:23:41   6   facing the antidumping duty.

14:23:58   7       Q.  Did you receive further instruction from Johnson

14:24:01   8   Shao?

14:24:01   9       A.  No.

14:24:11  10       Q.  Mr. Wang, when you fill out a 7501, based upon

14:24:28  11   which -- based upon whose information do you fill out

14:24:33  12   box 2, "entry type"?

14:24:35  13       A.  Client, the importer.

14:24:52  14       Q.  Who was the importer in this case?

14:24:54  15       A.  Pengcheng Aluminum.

14:25:02  16       Q.  Was that Johnson Shao who provided you with that

14:25:09  17   information?

14:25:10  18       A.  Yes.

14:25:26  19                    MR. HSIEH:  May I have one moment, Your

14:25:28  20   Honor?

14:25:28  21                    THE COURT:  Yes.

14:25:40  22                    MR. HSIEH:  No further questions at this

14:25:42  23   time.

14:25:42  24                    THE COURT:  Okay.  Cross-examination.

14:25:46  25                    **CROSS-EXAMINATION**

                 1    BY MR. RUYAK:

14:26:00         2        Q.   Good afternoon, Mr. Wang.

14:26:02         3        A.   Hello.

14:26:04         4        Q.   I just had a few questions about some of the

14:26:10         5    exhibits.

14:26:12         6             MR. RUYAK:   If you could please bring up --

14:26:16         7    let's switch gears here.

14:26:20         8             THE COURT:   Sure.

14:26:21         9             MR. RUYAK:   If you could bring up

14:26:25        10    Exhibit 211, please, Allen.

                11    BY MR. RUYAK:

14:26:32        12        Q.   Mr. Wang, on Exhibit 211, I would like to focus

14:26:36        13    you on the description box right down here where it

14:26:40        14    says, "Other aluminum articles."

14:26:42        15             Do you see that?

14:26:42        16             THE COURT:   That was 211, page...

14:26:46        17             MR. RUYAK:   Oh, right.   211, page 37.

14:26:49        18    Sorry.

14:26:50        19             THE COURT:   That's okay.   Thanks.

                20    BY MR. RUYAK:

14:26:52        21        Q.   And before I ask you the question, this is the

14:26:54        22    7501 form, correct?

14:27:00        23        A.   Yes.

14:27:01        24        Q.   Okay.   And I want to focus you on the description

14:27:06        25    box which says, "Other aluminum articles."

14:27:09  1          Do you see that?

14:27:22  2      A.  Yes.

14:27:23  3      Q.  What is the number that is right under the

14:27:25  4  definition of "Other aluminum articles"?

14:27:40  5      A.  It is a custom code from the border.

14:27:43  6      Q.  And that's the customs code for particular

14:27:46  7  product that determines what it is at the time of entry,

14:27:52  8  correct?

14:27:59  9      A.  Yes.

14:28:00  10     Q.  And the question I have is, in any of the many

14:28:07  11  documents 7501 that you filed, did customs ever question

14:28:14  12  the use of that number for the aluminum pallets?

14:28:33  13     A.  Supposedly, no.  As I recall, no.  But that's

14:28:44  14  what I recall.

14:28:44  15     Q.  So each time when you submitted the Form 7501

14:28:50  16  with that number, designating aluminum pallets, custom

14:28:54  17  accepted that number, correct?

14:29:06  18     A.  Correct.

14:29:06  19     Q.  And each time that you submitted a -- the

14:29:13  20  documents, were also the pallets themselves presented to

14:29:17  21  customs for inspection?

14:29:21  22          MR. HSIEH:  Objection.  Calls for

14:29:22  23  speculation.

14:29:23  24          THE COURT:  Overruled.  If you know.

14:29:25  25          THE WITNESS:  As far as I know, no.

1    BY MR. RUYAK:

14:29:43    2    Q.  So you weren't involved in the actual physical

14:29:45    3    transportation of the products that are subject to the

14:29:50    4    importation, correct?

14:30:05    5    A.  Correct.  What we did was merely reviewing the

14:30:07    6    documents.

14:30:08    7    Q.  Okay.  So someone else was actually transferring

14:30:14    8    the products from the ships or whatever, airplanes, and

14:30:21    9    to customs so they could review the product, correct?

14:30:36    10   A.  Correct.

14:30:37    11   Q.  Now, let's look back at that same page for a

14:30:40    12   moment.

14:30:41    13           THE COURT:  We're going to take a short

14:30:42    14   break at this time.

14:30:44    15           Ladies and gentlemen, your afternoon break.

14:30:45    16   See you back in 15 minutes.

14:30:47    17           Remember the admonishment not to discuss the

14:30:49    18   case among yourselves, with anybody else or form or

14:30:51    19   express any opinions about the matter until submitted to

14:30:55    20   you and you retire to the jury room.

14:30:58    21           We will be in recess.

14:37:15    22           (BRIEF RECESS.)

14:47:22    23           THE COURT:  Let the record reflect that all

14:47:24    24   the jurors are present in their respective seats in the

14:47:27    25   jury box.  Witness is on the witness stand.

14:47:29   1          And, Counsel, you may inquire.

14:47:34   2          MR. RUYAK:  Thank you, Your Honor.

14:47:35   3   BY MR. RUYAK:

14:47:35   4   Q.  Mr. Wang, I'm going to put back up the document

14:47:38   5   we were looking at which is Exhibit 211, page 37 on that

14:47:44   6   document.

14:47:46   7          And I believe in the upper right-hand

14:47:52   8   corner, box 3, it says "Summary date."  But that's the

14:47:56   9   date upon which the duty was actually paid into customs,

14:48:01  10   correct?

14:48:16  11   A.  Yes.

14:48:16  12   Q.  And box 7 below it is the date upon which the

14:48:19  13   product actually came in through customs, correct?

14:48:32  14   A.  That is the date for clearance.

14:48:34  15   Q.  For clearance.  Okay.  We will talk about

14:48:38  16   clearance in just a second.  Let's go to page 39, just a

14:48:44  17   second.  Page 39.

14:48:46  18          I'd like to focus your attention to the

14:48:48  19   handwritten numbers right there.

14:48:55  20          Do you see those numbers?

14:49:01  21   A.  Yes.

14:49:01  22   Q.  And that number, 7616 and following, that is the

14:49:07  23   tariff classification number that we looked at on the

14:49:11  24   front page, correct?

14:49:19  25   A.  That's right.

14:49:20  1    Q.  So that tariff classification number was the
14:49:26  2  tariff classification for aluminum pallets, correct?
14:49:38  3    A.  Yes.
14:49:39  4    Q.  And it says 2.5 percent.  Is that the duty that
14:49:44  5  was applicable during this period of time for aluminum
14:49:48  6  pallets, the nominal duty?
14:49:50  7          MR. HSIEH:  Objection.  Calls for
14:49:52  8  speculation.
14:49:53  9          THE COURT:  Overruled.
14:50:04  10          THE WITNESS:  Correct.
          11  BY MR. RUYAK:
14:50:05  12    Q.  So whether or not any antidumping duties or other
14:50:11  13  duties applied, pallets coming into the country at that
14:50:15  14  time would have at least a 2.5 percent duty, correct?
14:50:21  15    A.  Correct.
14:50:27  16    Q.  Did you know whose handwriting it is on this
14:50:31  17  document that has the tariff classification number and
14:50:35  18  the 2.5 percent?
14:50:52  19    A.  If I was the one to handle the clearance, then
14:50:55  20  that would be me.
14:50:56  21    Q.  Okay.  So let's go to page 38 for just a moment.
14:51:08  22  And I believe, Mr. Wang, you said this was the release
14:51:12  23  form; is that correct?  That's what you said, it was a
14:51:15  24  release form?
14:51:20  25    A.  Correct.

14:51:21   1     Q.   And this is a form that the Bureau of Customs and

14:51:26   2   Border Protection -- that's at the top.  This is a

14:51:30   3   document they issue when they actually release the

14:51:32   4   product for shipment to its location in the United

14:51:36   5   States, correct?

14:51:52   6     A.   Correct.

14:51:53   7     Q.   And so as you mentioned, when there's clearance

14:51:56   8   by customs, you would get this document to show that the

14:52:01   9   product could be released, correct?

14:52:10   10    A.   Correct.

14:52:10   11    Q.   Now, are you aware of any shipment for Pengcheng

14:52:20   12   Aluminum that you handled?  Any shipment that was

14:52:23   13   detained and not released by customs after importation?

14:52:49   14    A.   It might happen, but I do not have vivid memory

14:52:52   15   on this.  Even if that exist, it won't be too much.

14:52:56   16    Q.   So you don't remember any long-term delay in the

14:53:02   17   release of the aluminum pallets coming in for Pengcheng

14:53:06   18   Aluminum, correct?

14:53:18   19    A.   Correct.

14:53:19   20    Q.   Are you familiar with the term liquidation?

14:53:31   21    A.   Yes.

14:53:31   22    Q.   And what does liquidation mean when you have

14:53:35   23   goods entering the country through customs?

14:53:55   24    A.   That means the duty was paid and in an accurate

14:54:02   25   amount.

14:54:02   1      Q.   So that's when custom accepts the duty and says

14:54:08   2   it's okay and releases any further obligation to pay

14:54:12   3   duty; is that correct?

14:54:22   4      A.   Correct.

14:54:23   5      Q.   And if customs has a problem with the duty paid,

14:54:30   6   they can suspend liquidation for a period of time to

14:54:34   7   review that, correct?

14:54:44   8      A.   Correct.

14:54:44   9      Q.   Do you recall any instance when you were filing

14:54:49   10  these documents for Pengcheng Aluminum, when customs on

14:54:54   11  a particular shipment suspended liquidation for some

14:54:59   12  significant period of time?

14:55:13   13     A.   No.

14:55:15   14          MR. RUYAK:   Thank you, that is all the

14:55:17   15  questions I have.

14:55:19   16          THE COURT:   Counsel.

14:55:22   17          MR. LOWDER:   Thank you, Your Honor.

14:25:46   18                   **CROSS-EXAMINATION**

           19  BY MR. LOWDER:

14:55:34   20     Q.   Good afternoon, Mr. Wang.

14:55:36   21     A.   Afternoon.

14:55:38   22     Q.   Now, do I have it right that you've been a

14:55:42   23  customs broker for 30 years?

14:55:47   24     A.   Yes.

14:55:51   25     Q.   And over that time period, over your 30 years as

14:55:56   1   a customs broker, you've had hundreds of customers; is

14:56:02   2   that right?

14:56:04   3       A.   Yes.

14:56:04   4       Q.   Your reputation as a customs broker is important

14:56:08   5   to you, isn't it?

14:56:10   6       A.   Yes.

14:56:13   7       Q.   It is also important to you to maintain your

14:56:17   8   integrity as a customs broker; is that right?

14:56:22   9       A.   Yes.

14:56:25   10      Q.   And I believe you mentioned earlier that as a

14:56:28   11  customs broker you are licensed; is that correct?

14:56:34   12      A.   Yes.

14:56:37   13      Q.   You complete an examination in order to receive

14:56:42   14  your license; is that right?

14:56:49   15      A.   Correct.

14:56:49   16      Q.   And in order to maintain your license, it is

14:56:54   17  important for you to be truthful with Customs in any

14:56:58   18  forms that you submit; is that right?

14:57:07   19      A.   Correct.

14:57:08   20      Q.   And I believe you mentioned earlier that you are

14:57:11   21  familiar with antidumping/countervailing duty orders; is

14:57:18   22  that right?

14:57:30   23      A.   I only know some of it.  Antidumping is such a

14:57:38   24  complicated matter.

14:57:39   25      Q.   You're aware of the concept, though, of an

14:57:46  1   antidumping/countervailing duties order, correct?

14:57:49  2       A.   Yes.

14:57:50  3       Q.   You know that antidumping/countervailing duties

14:57:55  4   orders don't prohibit the importation of a specific

14:58:00  5   product; is that right?

14:58:09  6       A.   Yes.

14:58:10  7       Q.   Antidumping/countervailing duties orders simply

14:58:15  8   require a heightened duty, if an importer wanted to

14:58:19  9   bring a specific product into the United States,

14:58:22  10  correct?

14:58:22  11      A.   Correct.

14:58:33  12      Q.   Now, in your role as a Customs broker -- and I

14:58:36  13  think we went through some of these, and we'll pull some

14:58:40  14  up, you complete customs forms for importers that

14:58:49  15  contract with you; is that right?

14:58:52  16      A.   Yes.

14:58:54  17           MR. LOWDER:   Can you show Mr. Wang

14:58:56  18  Exhibit 211, which is already in evidence and page 37.

14:59:05  19      Q.   Mr. Wang, what you are seeing on your screen is

14:59:10  20  Exhibit 211, page 37.   This is an example of a Form 7501

14:59:14  21  that you completed, correct?

14:59:24  22      A.   Yes.

14:59:24  23      Q.   Now, prior to completing -- well, strike that.

14:59:48  24           MR. LOWDER:   Allen, can you scroll down to

14:59:50  25  page 38.   Okay.

14:59:56   1      Q.   And Mr. Wang, did you also complete the form here

15:00:01   2   that's listed at page 38?

15:00:08   3      A.   Correct.

15:00:09   4      Q.   And if we look at box 20 there, it says "Aluminum

15:00:12   5   pallets"; do you see that?

15:00:19   6      A.   Yes.

15:00:19   7      Q.   Mr. Wang, prior to completing this example of

15:00:24   8   this Customs form, did you have an opportunity to review

15:00:27   9   the antidumping and countervailing duty order regarding

15:00:33  10   aluminum extrusions from China?

15:00:53  11      A.   Yes, I did.

15:00:54  12      Q.   And if we look up at box 3 it says -- it has code

15:01:03  13   01.

15:01:03  14           Do you see that?

15:01:05  15      A.   I have seen it, yes.

15:01:10  16      Q.   And that indicates that this is just a normal

15:01:14  17   duty for this product, correct?

15:01:21  18      A.   Yes.

15:01:22  19      Q.   And when you completed the form, you believed

15:01:24  20   that to be accurate, that the aluminum pallets that

15:01:28  21   Pengcheng Aluminum imported were only subject to the

15:01:31  22   normal duty, correct?

15:01:32  23      A.   Correct.

15:01:42  24      Q.   In fact, prior to completing these import forms,

15:01:47  25   you looked at a Website dealing with aluminum pallets,

15:01:51    1    correct?

15:01:51    2        A.  Yes.

15:02:01    3        Q.  Because you wanted to assure yourself that the

15:02:04    4    information you included on this form was true and

15:02:07    5    accurate, correct?

15:02:15    6        A.  Correct.

15:02:16    7        Q.  Now, Mr. Wang, isn't it true that the duty for

15:02:22    8    scrap aluminum is different than the duty for coding for

15:02:32    9    the aluminum pallets?

15:02:32   10        A.  Correct.

15:02:40   11        Q.  And isn't it true that the duty for scrap

15:02:44   12    aluminum -- sorry.  Did you have anything else?

15:02:48   13        A.  The complete answer was yes, it is different.

15:02:50   14        Q.  Isn't it true that the duty for scrap aluminum is

15:02:55   15    zero percent?

15:02:56   16        A.  Yes.

15:03:00   17        Q.  Now, Mr. Wang, if I could direct your attention

15:03:07   18    to Exhibit 211, and let's look at page 39.

15:03:18   19             Do you see that page 39 in front of you,

15:03:21   20    Mr. Wang?

15:03:23   21        A.  Yes.

15:03:24   22        Q.  And if I understand this correctly, this is

15:03:26   23    information that you received from the importer in order

15:03:28   24    to submit to Customs, correct?

15:03:30   25        A.  Yes.

15:03:36  1    Q.  And isn't it true, Mr. Wang, that no one told you
15:03:41  2  to disguise the fact that Pengcheng Aluminum was
15:03:47  3  importing aluminum pallets into the United States?
15:04:04  4    A.  Based on the documentation, it states "aluminum
15:04:08  5  pallets."
15:04:11  6    Q.  And Mr. Wang, isn't it true that you did not make
15:04:14  7  any effort to disguise the fact that Pengcheng Aluminum
15:04:16  8  was importing aluminum pallets into the United States?
15:04:28  9    A.  Correct.
15:04:28 10    Q.  Mr. Wang, to date no one has come to you and
15:04:32 11  asserted that you lied on the Customs form that you
15:04:35 12  submitted on behalf the Pengcheng Aluminum, have they?
15:04:39 13         MR. HSIEH:  Objection.  Outside the scope of
15:04:42 14  direct.  Calls for speculation.
15:04:45 15         THE COURT:  I'm going to allow it in.  It is
15:04:48 16  probably outside the scope of direct.  But I'm going to
15:04:56 17  allow it in.
15:04:58 18         Go ahead.
15:04:59 19         THE INTERPRETER:  Sorry.  Counsel, can you
15:05:01 20  repeat the question for interpreter.
         21  BY MR. LOWDER:
15:05:04 22    Q.  Isn't it true that no one has come to you to
15:05:07 23  assert that you lied on any of the customs forms that
15:05:09 24  you submitted on behalf of Pengcheng Aluminum?
15:05:18 25    A.  Correct.

15:05:19  1        MR. LOWDER:  And, Allen, if we could have

15:05:21  2   Mr. Wang look at page 37, Exhibit 211.  If you could

15:05:30  3   scroll up a little bit for me.

15:05:33  4        If you could look at the box 36.  If I could

15:05:38  5   have you blow that up for me.

15:05:42  6        Q.  Do you see box 36 there, Mr. Wang?

15:05:46  7        A.  Yes.

15:05:51  8        Q.  And this certification is common to every 7501

15:05:56  9   that you fill out, correct?

15:06:02 10        A.  Correct.

15:06:03 11        Q.  And it's attesting to the fact that you believe

15:06:05 12   that your submission is true an accurate to the best of

15:06:08 13   your knowledge, correct?

15:06:08 14        A.  Correct.

15:06:13 15        Q.  And you wouldn't have signed this declaration if

15:06:16 16   you didn't in fact believe that the submissions you were

15:06:20 17   taking were true and accurate, correct?

15:06:29 18        A.  Yes.

15:06:31 19        MR. LOWDER:  No further questions, Your

15:06:33 20   Honor.

15:06:34 21        THE COURT:  Redirect?

15:06:35 22        MR. HSIEH:  Yes, please, Your Honor.

15:06:43 23        **REDIRECT EXAMINATION**

         24   BY MR. HSIEH:

15:06:47 25        Q.  Now, Mr. Wang, counsel asked you about some Form

15:06:52   1   7501s.  I will pull them up again.  I think it is 211,

15:06:57   2   page -- page 39.

15:07:22   3               Mr. Wang, on direct we went through a lot of

            4   these forms and you were asked about the 7501.

15:07:29   5               So I'm filling out the 7501.  You're in part

15:07:34   6   relying on this invoice supplied by Pengcheng Aluminum;

15:07:38   7   is that right?

15:07:48   8     A.  Correct.

15:07:48   9     Q.  In part you are relying on this packing list

15:07:53   10   provided by Pengcheng Aluminum; is that right?

15:08:04   11     A.  Yes.

15:08:05   12     Q.  And you're also relying or receive the bill of

15:08:11   13   lading in filling out that form from Pengcheng Aluminum;

15:08:16   14   is that right?

15:08:23   15     A.  Correct.

15:08:23   16     Q.  And you rely on the information provided by the

15:08:31   17   importer to fill out the 7501, is that right?

15:08:35   18     A.  Yes.

15:08:42   19     Q.  Including the entry type, field No. 2; is that

15:08:51   20   right?

15:08:51   21     A.  Correct.

15:08:52   22     Q.  And it was Johnson Shao who provided the

15:08:57   23   information to you for box 2; is that right?

15:09:00   24     A.  Correct.

15:09:02   25     Q.  Now, Mr. Lowder asked you some questions about

15:09:06   1    your professional reputation and being honest.

15:09:14   2            Pengcheng Aluminum paid you $75 to fill out

15:09:16   3    these forms; is that right?

15:09:30   4        A.  Yes.

15:09:30   5        Q.  And you have to review all these forms, fill out

15:09:33   6    an ISF 10+2, any information in 7501.  And that takes

15:09:42   7    you upwards of an hour for submission; is that right?

15:10:02   8        A.  Yes.  Approximately an hour.

15:10:05   9        Q.  And you never worked for Customs and Border

15:10:11   10   Protection; is that right?

15:10:17   11       A.  That's right.

15:10:18   12       Q.  And you never worked for the Department of

15:10:20   13   Commerce; is that right?

15:10:23   14       A.  Correct.

15:10:24   15       Q.  And Pengcheng Aluminum never paid you to do legal

15:10:29   16   research on antidumping/countervailing duties; is that

15:10:32   17   right?

15:10:39   18       A.  Correct.

15:10:41   19            MR. HSIEH:  No further questions.

15:10:43   20            THE COURT:  Redirect?  Counsel.

15:10:46   21            MR. RUYAK:  No, Your Honor.

15:10:53   22            MR. LOWDER:  No, Your Honor.

15:10:54   23            THE COURT:  You may step down.

15:10:57   24            May this witness be excused?

15:11:00   25            MR. HSIEH:  Yes, from the Government, Your

15:11:01  1    Honor.
15:11:01  2             THE COURT:  You are free to go.  Thank you
          3    for coming in, sir.
15:11:02  4             Next witness.
15:11:04  5             MR. BERNSTEIN:  Your Honor.  Government
15:11:06  6    calls Special Agent Jay Huang.
15:11:18  7             THE CLERK:  Please raise your right hand.
15:11:19  8             Do you solemnly swear the testimony you are
          9    about to give in the matter now before the Court shall
         10    be the truth, the whole truth and nothing but the truth
         11    so help you God.
15:11:23 12             THE WITNESS:  I do.
         13             THE CLERK:  Please be seated.
         14             Would you please state and spell your full
15:11:33 15    name for the record.
15:11:33 16             THE WITNESS:  First name's Jay, spelled
         17    J-a-y.
15:11:37 18             Last name's Huang, spelled H-u-a-n-g.
15:11:39 19             THE COURT:  Thank you very much.
15:11:40 20             Counsel, you may inquire.
15:11:41 21             MR. BERNSTEIN:  Thank you, Your Honor.
         22             **DIRECT EXAMINATION**
         23    BY MR. BERNSTEIN:
15:11:42 24        Q.  Special Agent Huang, what do you do?
15:11:44 25        A.  I'm a special agent with Homeland Security

15:11:46  1    Investigations.

15:11:47  2        Q.   How long have you been doing that?

15:11:49  3        A.   For over six years.

15:11:50  4        Q.   And HSI, that's another name for saying Homeland

15:11:56  5    Securities Investigations?

15:11:58  6        A.   Yes, it is.

15:11:58  7        Q.   Before your six years with HSI, what did you do?

15:12:02  8        A.   I was a fifth grade public school teacher in

15:12:04  9    Los Angeles County and also served in the U.S. Army.

15:12:08  10       Q.   And were you with Secret Service at some point?

15:12:11  11       A.   Yes, I was a special agent with the Secret

15:12:14  12   Service for over 11 years.

15:12:16  13       Q.   Okay.  So were you one of the lead case agents in

15:12:24  14   the investigation of Perfectus, Zhongtian Liu?

15:12:32  15       A.   Yes, I'm one of the co-case agents on this case.

15:12:36  16       Q.   And the other lead case agent was who?

15:12:38  17       A.   Special Agent John Chopp.  Last name's spelled

15:12:44  18   C-h-o-p-p.

15:12:44  19       Q.   Prior to your testimony today, did we ask you to

15:12:46  20   review certain exhibits?

15:12:48  21       A.   That's correct.  Yes.

15:12:49  22       Q.   And did those exhibits include Exhibits 130

15:12:58  23   through 145, annual reports issued by the company, China

15:13:08  24   Zhongwang, to investigators, and then clarification

15:13:11  25   reports to its investors?

| | | |
|---|---|---|
| 15:13:13 | 1 | A.  Yes, that's correct. |
| 15:13:14 | 2 | Q.  And the exhibits in that range -- again, that's |
| 15:13:18 | 3 | Exhibits 130 to 145, did you obtain those exhibits |
| 15:13:26 | 4 | yourself? |
| 15:13:27 | 5 | A.  Yes, I did.  I went on the China Zhongwang's |
| 15:13:32 | 6 | public Website and downloaded the documents. |
| 15:13:35 | 7 | Q.  And the Exhibits 130 through 145, are they fair |
| 15:13:39 | 8 | and accurate copies of the China Zhongwang annual |
| 15:13:40 | 9 | reports and then the clarification reports to its |
| 15:13:44 | 10 | shareholders? |
| 15:13:45 | 11 | A.  Yes.  I directly downloaded from the China |
| 15:13:49 | 12 | Zhongwang website. |
| 15:13:50 | 13 | Q.  And the Government also received certified copies |
| 15:13:52 | 14 | of those reports as well? |
| 15:13:53 | 15 | A.  That is correct. |
| 15:13:54 | 16 | MR. BERNSTEIN:  Your Honor, the Government |
| 15:13:55 | 17 | moves to admit Exhibits 130 to 145. |
| 15:14:01 | 18 | THE COURT:  Received. |
| 15:14:01 | 19 | (Exhibits 130 to 145 are received.) |
| 15:14:02 | 20 | MR. RUYAK:  Your Honor, I do have an |
| 15:14:03 | 21 | objection to the portion of the clarification reports on |
| 15:14:05 | 22 | hearsay. |
| 15:14:07 | 23 | MR. BERNSTEIN:  Which has been overruled, |
| 15:14:08 | 24 | Your Honor. |
| 15:14:08 | 25 | THE COURT:  Go ahead.  The objection is |

15:14:11   1   noted for record.

15:14:14   2              MR. BERNSTEIN:  So I want to show just

15:14:16   3   the -- actually, permission to publish Exhibit 130, Your

15:14:20   4   Honor.

15:14:22   5              THE COURT:  Yes.

           6   BY MR. BERNSTEIN:

15:14:25   7      Q.  And Special Agent Huang, you have that in front

15:14:28   8   of you?

15:14:29   9      A.  Yes, I do.

15:14:30  10      Q.  And so starting with Exhibit 130 at page 1, what

15:14:55  11   does it say in the portion that I just blew up?

15:14:58  12      A.  "China Zhongwang Holdings Limited."

15:15:02  13      Q.  And this is the annual report for 2009?

15:15:05  14      A.  That is correct.

15:15:06  15      Q.  I want to take you to page 4 of this exhibit.  Is

15:15:16  16   this the page for the company's corporate information?

15:15:21  17      A.  Yes, it is.

15:15:21  18      Q.  And in the 2009 CZW annual report, on page 4,

15:15:28  19   what does it say under "Place of listing"?

15:15:30  20      A.  "The Stock Exchange of Hong Kong Limited."

15:15:33  21      Q.  And the executive directors consist of five

15:15:37  22   individuals, including a chairman?

15:15:38  23      A.  Yes.

15:15:39  24      Q.  Who is the listed chairman?

15:15:41  25      A.  The chairman is Zhongtian Liu.

| | | |
|---|---|---|
| 15:15:46 | 1 | Q.   And we see independent nonexecutive directors. |
| 15:15:49 | 2 | Are there a few names listed there? |
| 15:15:51 | 3 | A.   Yes, there are four names listed. |
| 15:15:54 | 4 | Q.   At the bottom, do you see "Strategy and |
| 15:15:59 | 5 | Development Committee"? |
| 15:16:00 | 6 | A.   I do. |
| 15:16:01 | 7 | Q.   Who's the listed chairman of CZW Strategy and |
| 15:16:06 | 8 | Development Committee? |
| 15:16:07 | 9 | A.   That would be Mr. Zhongtian Liu. |
| 15:16:11 | 10 | Q.   And if you go over to company Website.  What's |
| 15:16:14 | 11 | the company's websites? |
| 15:16:16 | 12 | A.   It is WWW.Zhongwang.com. |
| 15:16:24 | 13 | Q.   And what is the domain that China Zhongwang uses |
| 15:16:26 | 14 | for its e-mail accounts? |
| 15:16:26 | 15 | A.   At Zhongwang.com. |
| 15:16:31 | 16 | Q.   All right.  I'm going to take you now to page 6. |
| 15:16:50 | 17 | At the top we see "Corporate profile"? |
| 15:16:53 | 18 | A.   Yes. |
| 15:16:53 | 19 | Q.   And then I want to have you -- I will Zoom in.  I |
| 15:17:04 | 20 | want you to read one sentence at page 6. |
| 15:17:08 | 21 | A.   Sure. |
| 15:17:09 | 22 | MR. RUYAK:  Your Honor, I object.  If we are |
| 15:17:11 | 23 | just going to read the annual report. |
| 15:17:12 | 24 | THE COURT:  Sustained. |
| 15:17:14 | 25 | MR. BERNSTEIN:  Could I have one moment, |

```
         1    Your Honor?
         2              THE COURT:  Yes.
         3    BY MR. BERNSTEIN:
15:17:34 4    Q.  All right.  So in that case, Special Agent Huang,
15:17:37 5    can you give us, for the record, an idea of what the
15:17:40 6    first sentence is conveying?
15:17:42 7    A.  Yes.  The first sentence indicates that China
15:17:46 8    Zhongwang Holdings Limited is the third largest
15:17:50 9    manufacturer in the world and the largest manufacturer
15:17:52 10   in Asia and China of aluminum.
15:17:57 11   Q.  All right.  I am going to take you down to page
15:18:01 12   10.
15:18:05 13             Do you see at the top where it says
15:18:08 14   "Chairman's statement"?
15:18:09 15   A.  Yes, I do.
15:18:10 16   Q.  And do you see a photograph on the left-hand side
15:18:14 17   of the page?
15:18:15 18   A.  I do.
15:18:16 19   Q.  Who is that individual, if you recognize him?
15:18:19 20   A.  Yes, I do.  That individual is Mr. Zhongtian Liu.
15:18:23 21   Q.  This chairman statement, who is it addressed to?
15:18:27 22   A.  The shareholders.
15:18:28 23   Q.  And again, without reading word for word what's
15:18:32 24   conveyed in the first full paragraph which I've
15:18:35 25   highlighted?
```

15:18:35   1    A.   This report is the annual report for Zhongwang
15:18:45   2    for 2009.
15:18:47   3    Q.   And the part I just listed, does it convey that
15:18:52   4    China Zhongwang was listed on the Hong Kong stock
15:18:57   5    exchange of May 8 of 2009?
15:18:59   6    A.   That is true, correct.
15:19:00   7    Q.   All right.   The second -- next page.   Page 11.
15:19:17   8         Do you see a reference to Liaoyang Zhongwang
15:19:23   9    Group Limited?
15:19:24   10   A.   Yes, I do.
15:19:25   11   Q.   How does the China Zhongwang 2009 annual report
15:19:31   12   refer to Liaoyang Zhongwang Group Company Limited?
15:19:34   13   A.   Liaoyang Zhongwang Group Company Limited is
15:19:36   14   referred to as a wholly owned subsidary of the company.
15:19:42   15   Q.   I'm going to go to Exhibit 130, page 12.   Do we
15:19:58   16   see a date of the report?
15:20:00   17   A.   I do.   It's dated April 20th, 2010.
15:20:04   18   Q.   Who's it signed by?
15:20:04   19   A.   The name is Zhongtian Liu.
15:20:08   20   Q.   On page 12 of Exhibit 130, what is conveyed in
15:20:13   21   the portion that I just highlighted?
15:20:15   22   A.   That China Zhongwang's export grew from
15:20:18   23   3.3 percent in 2008.   It went up to 44 percent in 2009.
15:20:32   24   Q.   All right.   We're going to skip down to page 21
15:20:35   25   of Exhibit 130.   Staying on the 2009 CZW report.

15:20:42  1               Do you see a bar chart depicted in front of
15:20:45  2    you?
15:20:46  3        A.  Yes.  A pie chart?
15:20:49  4        Q.  That's why you're a fifth grade teacher.
15:20:55  5               So you have a pie chart in front of you?
15:20:57  6        A.  Yes.
15:20:58  7        Q.  What's depicted in this pie chart?
15:21:00  8        A.  It shows the exports about China Zhongwang for
15:21:05  9    the year 2009.
15:21:09 10        Q.  And does it have a -- part of the pie chart is
15:21:14 11    green?
15:21:15 12        A.  Yes.  The green section indicates the export to
15:21:19 13    the United States which was 226,000 tons.
15:21:24 14        Q.  And then there's a sentence underneath the pie
15:21:26 15    chart.  What's being communicated in that sentence?
15:21:29 16        A.  That the export of aluminum extrusions by China
15:21:37 17    Zhongwang increased by 72 percent as compared to year
15:21:40 18    2008.
15:21:41 19        Q.  And then just one sentence down.  What's
15:21:58 20    communicated in that first full sentence?
15:22:02 21        A.  The export of -- correction.
15:22:06 22               The imports of aluminum extrusions by major
15:22:10 23    economies in the world, such as the United States,
15:22:12 24    increased in 2009.
15:22:16 25        Q.  All right.  I am going down to page 62 now.  We

15:22:23   1   are skipping about 24 pages here.

15:22:27   2            And on page 62, is there a section,

15:22:39   3   "Communications with shareholders and its investors"?

15:22:43   4       A.   There is.

15:22:44   5       Q.   And on page 62 of CZW's 2009 annual report,

15:22:49   6   what's being communicated?

15:22:52   7       A.   That China Zhongwang adheres to the principle of

15:22:56   8   good faith and complies with the laws of disclosure to

15:23:01   9   its shareholders.

15:23:03  10       Q.   Now, we are going to skip down to page 108 of

15:23:10  11   Exhibit 130.  And on the financial statements for 2009

15:23:23  12   for China Zhongwang, do you see a section "Amounts To

15:23:29  13   and From -- From and To related parties"?

15:23:31  14       A.   I do.

15:23:34  15       Q.   In that section, do you see where it says

15:23:38  16   "Notes"?

15:23:38  17       A.   I do.

15:23:41  18       Q.   For related parties, is there a definition that

15:23:47  19   China Zhongwang provides for what a related party is?

15:23:51  20       A.   Right.  The related parties of China Zhongwang

15:23:53  21   are beneficially owned by Mr. Zhongtian Liu.

15:24:01  22       Q.   So CZW is defining related parties as parties

15:24:06  23   that Zhongtian Liu beneficially owns?

15:24:09  24            MR. RUYAK:  Objection, leading.

15:24:11  25            THE COURT:  Overruled.  Foundation.

15:24:13  1                    Is that right?

15:24:14  2                    MR. BERNSTEIN:  You can answer.

15:24:16  3                    THE WITNESS:  Yes, Your Honor.

15:24:18  4                    THE COURT:  Okay.

          5    BY MR. BERNSTEIN:

15:24:38  6        Q.   And then underneath that there are a series of

15:24:41  7    companies listed?

15:24:42  8        A.   That's correct.

15:24:43  9        Q.   Is Perfectus or any of the companies that

15:24:46  10   ultimately merge into Perfectus, like Pengcheng

15:24:49  11   Aluminum, are any of those listed?

15:24:51  12       A.   No, I do not see Perfectus or the other Perfectus

15:24:55  13   predecessor entities to include Pengcheng Aluminum.

15:25:03  14       Q.   Just for clarification, go to 108, page 4, which

15:25:04  15   is in evidence, when we talk about the companies that

15:25:06  16   merge into Perfectus, is that Aluminum Industrial,

15:25:11  17   Century American Transport, Pengcheng, Global Aluminum,

15:25:15  18   American Apex and Aluminum Source?

15:25:17  19       A.   That is correct.

15:25:20  20       Q.   All right.  Last page on Exhibit 130.  Going to

15:25:27  21   go to page 17 -- 117.

15:25:40  22                    Do you see a section called "Related party

15:25:43  23   transactions"?

15:25:45  24       A.   I do.

15:25:45  25       Q.   What is being communicated in the -- by CZW in

15:25:52  1    the paragraph below that?

15:25:53  2        A.   It is conveying the below entities are related to

15:25:58  3    parties to China Zhongwang.

15:25:59  4        Q.   And where it says "Sales to a related company" is

15:26:06  5    anything at all listed for 2009?

15:26:09  6        A.   No.   There were no sales listed in 2009.

15:26:13  7        Q.   As reported by CZW --

15:26:15  8        A.   That's correct.

15:26:16  9        Q.   -- to related parties, just to be...

15:26:19  10       A.   Yes.   No sales to related parties in 2009 by

15:26:22  11   China Zhongwang.

15:26:24  12       Q.   All right.   I want to take you now to 131, page

15:26:29  13   1.   And this is the 2010 annual report?

15:26:35  14       A.   That is correct.

15:26:36  15       Q.   I want to take you down to page 4.   Do you still

15:26:54  16   see Zhongtian Liu listed as the chairman.

15:26:57  17       A.   Yes, Zhongtian Liu is still the chairman.

15:26:57  18       Q.   And he's also the chairman of the Strategy and

15:27:01  19   Development Committee?

15:27:01  20       A.   That's correct.   Still Zhongtian Liu.

15:27:05  21       Q.   I don't think we did this on the last one.

15:27:07  22            But according to CZW's 2010 annual report as

15:27:12  23   depicted on page 4 out of 112, what is the head office

15:27:17  24   and principal place of business in the P.R.C.?

15:27:20  25       A.   In China, the China Zhongwang's head office is in

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
|          | 1  | Liaoyang City, Liaoning, China.                                      |
| 15:27:33 | 2  | Q.   That's 299 Wensheng Road?                                       |
|          | 3  | A.   That is correct.                                                |
| 15:27:36 | 4  | Q.   Does it also have a place of business in Hong                   |
| 15:27:38 | 5  | Kong?                                                                |
| 15:27:38 | 6  | A.   In Hong Kong, the address is 56 Floor, Bank of                  |
| 15:27:41 | 7  | China Tower, 1 Garden Road, Hong Kong.                               |
| 15:27:45 | 8  | Q.   So I want to take you to exhibit -- page 8 of                   |
| 15:27:51 | 9  | Exhibit 131.  Still on 2010.                                         |
| 15:27:55 | 10 | Does this show the financial highlights for                         |
| 15:27:57 | 11 | China Zhongwang in 2010?                                             |
| 15:28:01 | 12 | A.   Yes, it does.                                                   |
| 15:28:01 | 13 | Q.   And it has things like revenue, gross profits,                  |
| 15:28:06 | 14 | expenses, et cetera?                                                 |
| 15:28:07 | 15 | A.   Correct.                                                        |
| 15:28:08 | 16 | Q.   I want to go to page 12.  Is this the 2010                      |
| 15:28:22 | 17 | chairman statement?                                                  |
| 15:28:24 | 18 | A.   Yes, it is.                                                     |
| 15:28:25 | 19 | Q.   And that's Zhongtian Liu depicted again?                        |
| 15:28:29 | 20 | A.   It is Zhongtian Liu.                                            |
| 15:28:32 | 21 | Q.   And the paragraph I just zoomed in on, is this                  |
| 15:28:49 | 22 | a -- does it generally say that the group continued to               |
| 15:28:54 | 23 | drive its vigorous efforts to sell its aluminum                      |
| 15:29:02 | 24 | products?                                                            |
| 15:29:02 | 25 | A.   Correct.  The company faced challenges in 2010,                 |

15:29:07  1   largely due to the antidumping/countervailing duties

15:29:12  2   investigations by the United States during that year.

15:29:15  3       Q.   And does it also say what percentage of the

15:29:19  4   groups -- China Zhongwang Groups gross profits were

15:29:24  5   attributable to aluminum extrusions?

15:29:26  6       A.   99.6 percent was attributed to aluminum

15:29:32  7   extrusions.

15:29:34  8       Q.   Okay.  At the bottom, we see "Challenges and

15:29:53  9   opportunities in the market."

15:29:55 10       A.   Yes.

15:29:56 11       Q.   And, again, there is another reference to the

15:30:03 12   AD/CVD investigation?

15:30:05 13       A.   Yes.

15:30:05 14       Q.   I'm going to go down to page 15 of China

15:30:13 15   Zhongwang's 2010 annual report.

15:30:20 16            And, again, just the individual who signed

15:30:25 17   the chairman statement, who was that?

15:30:27 18       A.   That would be Zhongtian Liu.

15:30:30 19       Q.   I want to go down to page 23 now.

15:30:42 20            And here we won't get into it in detail, but

15:30:47 21   did CZW publish a whole section in its annual report to

15:30:53 22   shareholders about the antidumping and countervailing

15:30:56 23   duty investigations?

15:30:58 24       A.   That is correct.

15:30:59 25       Q.   And then there's some language about how they'll

15:31:11  1   adjust the strategy accordingly?

15:31:14  2       A.   Correct.   Sales to the United States will be

15:31:16  3   adjusted accordingly.

15:31:18  4       Q.   All right.   I'm going to page 27.   So this page

15:31:37  5   right here, what does this depict?

15:31:39  6       A.   It depicts the revenue by the differential

15:31:43  7   graphic regions for China Zhongwang for 2009 and 2010.

15:31:50  8       Q.   And focusing just on the United States, what was

15:31:57  9   CZW, the percentage of its exports to the United

15:32:00 10   States -- or the percentage of its revenue in 2009?

15:32:02 11   What did CZW report as its revenue percentage to the

15:32:06 12   United States?

15:32:07 13       A.   In 2009 the percentage was 40.8.

15:32:12 14       Q.   Percent?

15:32:13 15       A.   Percent.

15:32:14 16       Q.   And CZW reported 56.0 percent of its sales were

15:32:21 17   through the P.R.C.?

15:32:23 18       A.   Correct.   For 2009.

15:32:24 19       Q.   And besides the U.S. and P.R.C., People's

15:32:29 20   Republic of China, the rest of the world in terms of its

15:32:32 21   exports was what?

15:32:33 22       A.   3.2 percent for 2009.

15:32:37 23       Q.   And in 2010, the percentage of China Zhongwang's

15:32:43 24   revenue consisted of what?

15:32:48 25       A.   It went down to 29.1 percent for the United

15:32:52  1    States.

15:32:55  2        Q.   And China was 55.6 percent?

15:32:59  3        A.   That's correct.

15:33:00  4        Q.   And we go down to page 91.  At the bottom, this

15:33:29  5    has the raw revenue numbers measured in R.M.B. to the

15:33:37  6    United States and other countries, like the P.R.C. and

15:33:41  7    Australia in 2009 and 2010.

15:33:44  8        A.   Yes, that's correct.

15:33:45  9        Q.   What is China Zhongwang in its 2010 report to

15:33:49  10   shareholders communicating in the paragraph I just

15:33:52  11   highlighted?

15:33:54  12       A.   So for 2010 the revenue from the United States

15:33:59  13   was over 3 billion R.M.B.  It was a decrease from 2009

15:34:07  14   which it was about 5.6 billion R.M.B.

15:34:13  15       Q.   And is the company also communicating that it

15:34:21  16   recorded revenue in the United States that it sold to

15:34:27  17   certain customers in P.R.C. who then shipped the goods

15:34:31  18   to the ultimate customers in the United States?

15:34:33  19       A.   Correct.

15:34:34  20       Q.   Okay.  I'm going to go to Exhibit 131, page 102.

15:35:01  21            And, again, does this have the related party

15:35:03  22   transactions that CZW reported to its shareholders?

15:35:09  23       A.   Yes.

15:35:13  24       Q.   In 2010 does it have the same note that a company

15:35:16  25   is a related company if it's beneficially owned by

15:35:20   1   Mr. Liu?

15:35:20   2       A.  Yes.

15:35:21   3       Q.  I will go now to page 109.

15:35:44   4           And then at the top it says what?

15:35:47   5       A.  "Related party transactions."

15:35:49   6       Q.  And then does it communicate that the -- reports

15:35:52   7   to investors that the group entered into the following

15:35:56   8   transactions with related companies in which Mr. Liu has

15:35:59   9   a beneficiary interest?

15:36:02  10       A.  Yes, that's what it says.

15:36:03  11       Q.  And then reports purchases from related

15:36:07  12   companies?

15:36:09  13       A.  Right.  There are three businesses listed under

15:36:13  14   that purchase from related companies.

15:36:17  15       Q.  Are any of those businesses Perfectus or one of

15:36:20  16   the companies that merged into Perfectus like Pengcheng

15:36:24  17   Aluminum?

15:36:24  18       A.  No.  Perfectus or the other Perfectus entities

15:36:27  19   are not listed in here.

15:36:30  20       Q.  All right.  And last page, to show on

15:36:34  21   Exhibit 131, it says "Section 38, Subsidiaries"?

15:36:45  22       A.  Yes.

15:37:01  23           MR. BERNSTEIN:  I'm sorry, I didn't hit the

15:37:01  24   page number.  That's page 11, Your Honor.

15:37:04  25           THE COURT:  Thank you.  All right.

1    BY MR. BERNSTEIN:

2        Q.   Do we see a number of subsidiaries listed, such

3    as Zhongwang P.R.C., Zhongwang China Investment Limited,

4    and Zhongwang China Investment H.K. Limited?

5        A.   Yes, I do.

6        Q.   And those are all listed as 100 percent

7    subsidiaries of China Zhongwang?

8        A.   That's correct.

9        Q.   And the same thing at the bottom here, "Liaoning

10   Zhongwang at 100 percent"?

11       A.   Yes.

12       Q.   I want to go to the 2011 report.  That will be

13   132, page 1.  This is the, again, the 2011 report from

14   China Zhongwang to its shareholders?

15       A.   That is correct.

16       Q.   Annual report 2011?

17       A.   Yes.

18       Q.   What is CZW's tag line in 2011?

19       A.   "Committed to lightweight development for a

20   greener world."

21       Q.   Okay.  If we scroll down here, we still see

22   Zhongtian Liu as the chairman.

23       A.   Yes, Zhongtian Liu's still listed as the

24   chairman.

25       Q.   Of the executive directors?

15:38:39   1        A.   Yes, he is.

15:38:40   2        Q.   And he's also the chairman of the strategy and

15:38:43   3   development committee still?

15:38:44   4        A.   That is correct.

15:38:45   5        Q.   All right.  Going to page 8, this is the --

15:38:53   6   the -- CZW's financial highlights for the year?

15:38:58   7        A.   Yes.

15:38:58   8        Q.   And I want to take you to 132, page 36.  All

15:39:21   9   right.

15:39:21  10             Is this, again, the breakdown of China

15:39:25  11   Zhongwang's total revenue by geographic region?

15:39:29  12        A.   Yes, it is.

15:39:30  13        Q.   And we saw in 2010 29.1 percent of CZW's revenue

15:39:36  14   was to the United States?

15:39:38  15        A.   That's correct.

15:39:38  16        Q.   As depicted in this chart, how much of CZW's

15:39:46  17   revenue was to the United States in 2011?

15:39:48  18        A.   In 2011, it was 3.9 percent.

15:39:53  19        Q.   I will take you to page 196 --

15:40:09  20             MR. BERNSTEIN:   96.  I'm sorry, Your Honor.

15:40:23  21             132, page 96.

15:40:26  22        Q.   And do we have in the segment information the

15:40:30  23   same note to shareholders that CZW reports revenue in

15:40:37  24   the United States that's sold to shippers and then

15:40:41  25   shipped to the United States?

15:40:42  1    A.   Yes.  That is correct.

15:40:43  2    Q.   And last page on Exhibit 132 that I'm going to

15:40:48  3  show is page 112.

15:41:04  4         Is this the section for related party

15:41:08  5  transactions?

15:41:08  6    A.   Yes, it is.

15:41:09  7    Q.   And for 2011?

15:41:11  8    A.   That is correct, for 2011.

15:41:15  9    Q.   And this year it says, These companies -- the

15:41:19  10  related parties are ones in which Mr. Liu has beneficial

15:41:22  11  interest that gives him control?

15:41:23  12    A.   Yes.

15:41:24  13    Q.   And then in 2011 did CZW report any related party

15:41:31  14  transactions with Perfectus or any of the companies that

15:41:34  15  merged into Perfectus, like Pengcheng Aluminum?

15:41:36  16    A.   No.  I do not see Perfectus or there Perfectus

15:41:39  17  related entities.

15:41:41  18    Q.   All right.  I'm going to go to Exhibit 133.

15:41:52  19         Is this the 2012 annual report from China

15:41:56  20  Zhongwang to its investors?

15:41:57  21    A.   Yes, it is.

15:42:00  22    Q.   Same thing, committed to lightweight?

15:42:03  23    A.   Yes.

15:42:04  24    Q.   All right.  I'm going to Exhibit 133, page 4.

15:42:14  25         Is Zhongtian Liu still listed as the

15:42:17   1   chairman of the Executive Directors and the Chairman of

15:42:20   2   the Strategy and Development Committee.

15:42:23   3       A.   Yes.  Zhongtian Liu's listed under both sections.

15:42:26   4       Q.   And we still see CZW having the same principal

15:42:31   5   place of business in China and Hong Kong?

15:42:33   6       A.   That is correct.

15:42:34   7       Q.   Same Website too, Zhongwang.com?

15:42:38   8       A.   Correct.

15:42:39   9       Q.   I am going to page 8.  Is this the financial

15:42:45  10   highlights page of CZW's annual report?

15:42:51  11       A.   Yes, it is.

15:42:52  12       Q.   I will go to page 16 of Exhibit 133.  Is this the

15:43:01  13   chairman's statement?

15:43:02  14       A.   That's correct.

15:43:03  15       Q.   The individual depicted here is who?

15:43:18  16       A.   That is Zhongtian Liu.

15:43:20  17       Q.   We will go down to -- actually, let me zoom in on

15:43:37  18   a portion of this.

15:43:44  19            Does this communicate -- what does this

15:43:48  20   highlighted section communicate?

15:43:50  21       A.   That China expanded into the development of deep

15:43:55  22   processed industrial aluminum extrusion products.

15:44:05  23       Q.   I'm going to go to page 17 and zoom in on a

15:44:21  24   paragraph towards the bottom of the page of page 17 of

15:44:28  25   Exhibit 133.

15:44:29  1          What's being communicated on this page?

15:44:41  2     A.   That its export sales increased by 141.6 percent

15:44:46  3  as compared to the previous year.

15:44:48  4     Q.   And where it says "Exports," does it identify the

15:44:53  5  market?

15:44:54  6     A.   I'm sorry.  Yes, exports to the United States.

15:45:01  7     Q.   And we will go down to page 18.

15:45:14  8          Is there a section now on the deprocessing

15:45:23  9  business titled "Reopening the Door to Overseas

15:45:26  10 Markets"?

15:45:26  11    A.   Yes.

15:45:27  12    Q.   All right.  I'm going to take you to Exhibit 133,

15:45:33  13 page 32.

15:45:47  14         For 2012, what percentage of China

15:45:53  15 Zhongwang's total revenue went to the United States as

15:45:57  16 reported in the annual report to shareholders?

15:46:02  17    A.   For 2012, it was 8.32 percent to the United

15:46:07  18 States.

15:46:08  19    Q.   And now I will go to --

         20         THE COURT REPORTER:  I'm sorry.  My writer turned

         21 off.  It's having an issue.

         22         (PAUSE IN PROCEEDINGS.)

         23         THE COURT:  Remember the admonishment not to

         24 discuss among yourselves, or form or express any

         25 opinions about this case until it's submitted to you and

1   you retire to the jury room.

2          (PROCEEDINGS CONCLUDED.)

```
 1              CERTIFICATE OF REPORTER

 2

 3   COUNTY OF LOS ANGELES      )

 4                              )  SS.

 5   STATE OF CALIFORNIA        )

 6

 7   I, SHERI S. KLEEGER, OFFICIAL COURT REPORTER, IN AND FOR

 8   THE UNITED STATES DISTRICT COURT FOR THE CENTRAL

 9   DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

10   TO SECTION 753, TITLE 28, UNITED STATES CODE, THE

11   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

12   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

13   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

14   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE

15   JUDICIAL CONFERENCE OF THE UNITED STATES.

16

17

18   DATE:  AUGUST 16, 2021

19

20   /S/_____

21   SHERI S. KLEEGER, CSR

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25
```

