Stephen G. Larson (SBN 145225)
*slarson@larsonllp.com*
Hilary Potashner (SBN 167060)
*hpotashner@larsonllp.com*
A. Alexander Lowder (SBN 269362)
*alowder@larsonllp.com*
**LARSON LLP**
555 South Flower Street, Suite 4400
Los Angeles, California 90071
Telephone:   (213) 436-4888
Facsimile:   (213) 623-2000

Attorneys for Defendants SCUDERIA
DEVELOPMENT, LLC, 1001
DOUBLEDAY, LLC, VON KARMAN -
MAIN STREET, LLC, and 10681
PRODUCTION AVENUE, LLC

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 19-cr-00282 RGK |
| Plaintiff, | Judge:   R. Gary Klausner |
| vs. | **WAREHOUSE DEFENDANTS' JOINT OBJECTIONS TO PRESENTENCE REPORT (10681 PRODUCTION AVENUE, LLC)** |
| ZHONGTIAN LIU, | |
|     aka "Liu Zhongtian," | |
|     aka "Chairman," | |
|     aka "Uncle Liu," | |
|     aka "UL," | |
|     aka "Big Boss," | |
| CHINA ZHONGWANG HOLDINGS LIMITED, | |
|     aka "ZW," | |
|     aka "Mother Ship," | |
| ZHAOHUA CHEN, | Sentencing Date: April 11, 2022 |
|     aka "Chen Zhaohua," | Time:   1:30 p.m. |
|     aka "Uncle Chen," | |
| XIANG CHUN SHAO, | |
|     aka "Johnson Shao," | |
| PERFECTUS ALUMINIUM, INC., | |
|     aka Perfectus Aluminum Inc.," | |
| PERFECTUS ALUMINUM ACQUISITIONS, LLC, | |
| SCUDERIA DEVELOPMENT, LLC, | |
| 1001 DOUBLEDAY, LLC, | |
| VON KARMAN - MAIN STREET, LLC, and | |
| 10681 PRODUCTION AVENUE, LLC, | |
| Defendants. | |

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   THERE IS NO STATUTORY AUTHORITY TO ORDER THE
WAREHOUSE DEFENDANTS TO PAY RESTITUTION ........................... 3

    A.    The MVRA Is Inapplicable to Count One ............................................. 4

    B.    The MVRA Does Not Authorize Restitution for Passing False
Papers Through a Customshouse in Violation of 18 U.S.C. § 545 ........ 7

        1.    The CBP Does Not Have a Property Interest in the Unpaid
AD/CV Duties ............................................................................ 7

        2.    Post-Importation Storage of the Aluminum Pallets at the
Warehouses Did Not Directly or Proximately Cause the
AD/CV Duties to Go Unpaid ..................................................... 12

        3.    Probation Overstates Any Loss to the CBP ............................... 15

    C.    The Convictions in Counts Two through Ten of Wire Fraud Do
Not Support Probation's Recommended Restitution Award ................ 18

        1.    The 28 Institutional Investors Are Not "Victims" under the
MVRA ...................................................................................... 18

        2.    There Is Insufficient Evidence that the Warehouse
Defendants Caused a Loss ......................................................... 20

        3.    Probation's Mathematical Calculation of Restitution Is
Significantly and Irreparably Flawed ........................................ 24

    D.    Any Restitution Owed Should Be Assessed on a Pure Several
Liability Basis .................................................................................... 26

III.  THE COURT SHOULD NOT ORDER IMMEDIATE PAYMENT OF
RESTITUTION IN AN AMOUNT THAT WOULD DIVEST THE
WAREHOUSE DEFENDANTS OF ALL THEIR PROPERTY ................... 27

IV.  ADDITIONAL OBJECTIONS TO THE PSR ........................................... 30

V.    CONCLUSION .................................................................................................31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LARSON
LOS ANGELES

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

4

**Cases**

5

*In re Bofl Holding, Inc. Securities Litigation*,
   977 F.3d 781 (9th Cir. 2020) .............................................................18, 21, 22, 23

6

7

*Cleveland v. United States*,
   531 U.S. 12 (2000) ...................................................................................8, 9

8

9

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336, 343 (2005) .................................................................................23

10

11

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) .............................................................................22

12

13

*Kelly v. United States*,
   140 S. Ct. 1565 (2020).................................................................................8, 9

14

15

*Niz-Chavez v. Garland*,
   141 S. Ct. 1474 (2021) ...................................................................................12

16

17

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
   730 F.3d 1111 (9th Cir. 2013) .............................................................................22

18

19

*Paroline v. United States*,
   572 U.S. 434 (2014) ......................................................................3, 12, 22

20

21

*Perfectus Aluminum, Inc. v. United States*,
   391 F. Supp. 3d 1341 (Ct. Int'l Trade 2019).......................................................11

22

*Robers v. United States*,
   572 U.S. 639 (2014) ...................................................................................8

23

24

*SKF USA Inc. v. United States*,
   28 C.I.T. 170 (2004) .................................................................................10

25

26

*United States v. Brock-Davis*,
   504 F.3d 991 (9th Cir. 2007) .............................................................................4

27

28

*United States v. Burger*,
   739 F.2d 805 (2d Cir. 1984) .............................................................................13

*United States v. Butler*,
  694 F.3d 1177 (10th Cir. 2012) ...................................................................... 5

*United States v. Catoggio*,
  326 F.3d 323 (2d Cir. 2003) ......................................................................... 19

*United States v. Collins*,
  854 F.3d 1324 (11th Cir. 2017) ...................................................................... 8

*United States v. Conley*,
  349 F.3d 837 (5th Cir. 2003) .......................................................................... 6

*United States v. Farish*,
  535 F.3d 815 (8th Cir. 2008) .......................................................................... 5

*United States v. Ferguson*,
  584 F.Supp.2d 447 (D. Conn. 2008) ............................................................ 20

*United States v. Gamma Tech Indus., Inc.*,
  265 F.3d 917 (9th Cir. 2001) ........................................................................ 17

*United States v. Garcia-Sanchez*,
  189 F.3d 1143 (9th Cir. 1999) ........................................................................ 4

*United States v. Gossi*,
  608 F.3d 574 (9th Cir. 2010) .......................................................................... 3

*United States v. Hunter*,
  618 F.3d 1062 (9th Cir. 2010) ........................................................................ 3

*United States v. Lillard*,
  935 F.3d 827 (9th Cir. 2019) .......................................................................... 5

*United States v. Liquidators of Eur. Fed. Credit Bank*,
  630 F.3d 1139 (9th Cir. 2011) ...................................................................... 12

*United States v. Lo*,
  839 F.3d 777 (9th Cir. 2016) .......................................................................... 3

*United States v. Loscalzo*,
  18 F.3d 374 (7th Cir. 1994) .......................................................................... 26

*United States v. Luis*,
  765 F.3d 1061 (9th Cir. 2014) .................................................................... 3, 8

iv

*United States v. Marks*,
    530 F.3d 799 (9th Cir. 2008) ................................................................. 3

*United States v. May*,
    706 F.3d 1209 (9th Cir. 2013) ............................................................. 16

*United States v. Napier*,
    463 F.3d 1040 (9th Cir. 2006) ............................................................. 16

*United States v. Nelson*,
    454 F. App'x 574 (9th Cir. 2011) ........................................................ 7

*United States v. Peterson*,
    538 F.3d 1064 (9th Cir. 2008) ............................................................. 4

*United States v. Quicksey*,
    525 F.2d 337 (4th Cir. 1975) ............................................................... 6

*United States v. Razzouk*,
    984 F.3d 181 (2d Cir. 2020) ................................................................ 8

*United States v. Rechnitz*,
    2021 WL 5232395 (S.D.N.Y. Nov. 9, 2021) ..................................... 26

*United States v. Stratos*,
    2017 WL 272213 (E.D. Cal. Jan. 20, 2017) ...................................... 23

*United States v. Swor*,
    728 F.3d 971 (9th Cir. 2013) ............................................................. 12

*United States v. Tyler*,
    767 F.2d 1350 (9th Cir. 1985) ..................................................... 13, 14

*United States v. Vera*,
    770 F.3d 1232 (9th Cir. 2014) ............................................................. 6

*United States v. Waknine*,
    543 F.3d 546 (9th Cir. 2008) ............................................................... 4

*United States v. Ward*,
    2013 WL 57855 (N.D. Cal. Jan. 3, 2013) ......................................... 23

*United States v. Zillgitt*,
    286 F.3d 128 (2d Cir. 2002) ................................................................ 6

LARSON
LOS ANGELES

WAREHOUSE DEFENDANTS' JOINT OBJECTIONS TO PRESENTENCE REPORT
(10681 PRODUCTION AVENUE, LLC)

*United Steel & Fasteners, Inc. v. United States*,
  947 F.3d 794 (Fed. Cir. 2020) ................................................................... 10

*Wind Tower Trade Coal. v. United States*,
  741 F.3d 89 (Fed. Cir. 2014) ..................................................................... 10

**Statutes**

18 U.S.C. § 371 ............................................................................................... 5

18 U.S.C. § 545 ....................................................................................... *passim*

18 U.S.C. §§ 982 ........................................................................................... 31

Mandatory Victim Restitution Act

    18 U.S.C. § 3663A ................................................................................. 1, 5
    18 U.S.C. § 3663A(2) ................................................................................. 3
    18 U.S.C. § 3663A(a)(2) ...................................................................... 16, 17
    18 U.S.C. § 3663A(c) .............................................................................. 3, 5
    18 U.S.C. § 3663A(c)(1)(B) ...................................................................... 19
    18 U.S.C. § 3664 ...................................................................................... 26
    18 U.S.C. § 3664(d)(4) .......................................................................... 3, 32
    18 U.S.C. § 3664(h) .................................................................................. 26

19 U.S.C. § 1500 ........................................................................................... 10

19 U.S.C. § 1501 ........................................................................................... 11

19 U.S.C. § 1514(a) ...................................................................................... 11

19 U.S.C. § 1595a(a) ..................................................................................... 31

**Sentencing Guidelines**

    U.S.S.G. §8A1.2(b)(1) ........................................................................... 2,27
    U.S.S.G. §8B1.1(e) ..................................................................................... 2
    U.S.S.G. 8C1.1 ......................................................................................... 30

**Other Authorities**

Dimensional Fund Advisors LP, *Dimensional ETFs*,
  https://us.dimensional.com/etfs (last visited Feb. 28, 2022) ............................ 19

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300-01 (Sept. 20, 2021)..................................................................................................11

*US EFT Market Structure Primer*, SIFMA INSIGHTS (Sept. 2018), https://www.sifma.org/wp-content/uploads/2018/09/SIFMA-Insights-US-ETF-Primer.pdf ...........................................................................20

LARSON
LOS ANGELES

WAREHOUSE DEFENDANTS' JOINT OBJECTIONS TO PRESENTENCE REPORT
(10681 PRODUCTION AVENUE, LLC)

I.    **INTRODUCTION**[1]

Defendants Scuderia Development, LLC ("SDL"), 1001 Doubleday, LLC ("Doubleday"), Von Karman – Main Street, LLC ("Von Karman"), and 10681 Production Avenue, LLC ("Production Avenue") (collectively, the "Warehouse Defendants") object to the restitution award recommended in paragraphs 54 through 56 of the Presentence Investigation Report ("PSR").  It appears that Probation, in an effort to arrive at the largest restitution award possible, relied on the conspiracy conviction—Count One—to pull in claimed losses beyond the specific transactions charged in the substantive offenses.  Probation's recommendation must be rejected as it runs afoul of the statutory framework of the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A.  The law is clear that a conspiracy conviction is, on its own, insufficient to justify a restitution award under the MVRA.  Courts must, instead, look to the underlying object of the conspiracy to determine whether the MVRA applies.  Here, the underlying substantive convictions do not support Probation's recommendation that, combined, the U.S. Customs and Border Protection ("CBP") and certain financial institutions receive a restitution award in excess of $1.9 billion.

First, the customs fraud counts—Counts Eleven through Seventeen—do not support the imposition of a $1.8 billion restitution order based on the unpaid AD/CV duties at issue in this matter.  Not only does Probation fail to provide any legal authority that the Warehouse Defendants committed an offense against "property" as required under the MVRA, but Probation also fails to articulate how it is that the Warehouse Defendants directly or proximately caused these duties to go unpaid.  The Warehouse Defendants did not import the pallets at issue.  Nor did the

---

[1] Except for a few of the PSR paragraph numbers, the Warehouse Defendants' Joint Objections to the Presentence Report filed by Defendants Scuderia Development, LLC, 1001 Doubleday, LLC, Von Karman – Main Street, LLC, and 10681 Production Avenue, LLC are entirely identical.

Warehouse Defendants fill out or submit a single customs form to the CBP.  Indeed, the only evidence offered against the Warehouse Defendants at trial was simply that these entities own the Warehouses where the aluminum pallets were stored after the Perfectus Defendants imported them into the United States.  Accordingly, there is no basis to order the Warehouse Defendants to pay restitution to the CBP for the unpaid AD/CV duties.

Second, the Warehouse Defendants object to the imposition of restitution relating to the investments made in China Zhongwang Holdings Limited ("CZW").  As a threshold matter, the 28 "institutional investors" identified by the government are not "victims" under the MVRA, as they were not and are not the beneficial owners of any CZW shares.  Additionally, there is simply no evidence that the offense conduct—let alone the Warehouse Defendants' role therein—caused these 28 institutional investors to collectively lose $124,270,000.  In fact, as explained below, this purported loss figure actually defies any rational mathematic calculation.

Accordingly, because the MVRA does not apply to the substantive convictions for customs fraud and wire fraud, there is no basis for Probation to rely on the conspiracy conviction to support its restitution recommendation.  Its recommendation therefore must be rejected.

Finally, the Warehouse Defendants object to a finding that they are "criminal purpose organizations" within the meaning of U.S.S.G. §8A1.2(b)(1).  It appears that this designation is being sought by Probation to support its request that this Court order an immediate payment of restitution in an amount intended to strip the Warehouse Defendants of all their assets.  Based on the Warehouse Defendants' legitimate formations—which predate the conduct detailed in the Indictment in this case—and their ongoing business activities, such a draconian sentence is unwarranted.  Instead, as is consistent with U.S.S.G. §8B1.1(e), should any restitution be ordered, the order should require payments based on a reasonable and periodic payment plan.  Moreover, should the Court be considering the imposition

1    of any restitution, it should do so after holding an evidentiary hearing pursuant to 18

2    U.S.C. § 3664(d)(4).

3    **II.      THERE IS NO STATUTORY AUTHORITY TO ORDER THE**

4    **          WAREHOUSE DEFENDANTS TO PAY RESTITUTION**

5           "Federal courts have no inherent power to award restitution, but may do so

6    only pursuant to statutory authority." *United States v. Gossi*, 608 F.3d 574, 577 (9th

7    Cir. 2010); *see also Paroline v. United States*, 572 U.S. 434, 462 (2014) (holding

8    "[r]estitution orders should represent "an application of law," not "a decisionmaker's

9    caprice").  A district court has no discretion to order restitution outside "the bounds

10   of the statutory framework" of the applicable restitution statute.  *See United States v.*

11   *Marks*, 530 F.3d 799, 811 (9th Cir. 2008) ("[a] restitution order is reviewed for an

12   abuse of discretion, provided that it is within the bounds of the statutory

13   framework"); *United States v. Lo*, 839 F.3d 777, 785 (9th Cir. 2016) (defining an

14   "illegal sentence" as "one not authorized by the judgment of conviction or in excess

15   of the permissible statutory penalty for the crime.").

16          The MVRA requires a "defendant convicted of an offense described in [18

17   U.S.C. § 3663A(c)]" to make restitution to an "identifiable victim" of the offense

18   who "suffered … pecuniary loss." *United States v. Luis*, 765 F.3d 1061, 1065 (9th

19   Cir. 2014) (citing 18 U.S.C. § 3663A(a)(1), (c)(1)).  Confined to the "bounds of the

20   statutory framework" of the MVRA, the Court is authorized to order restitution only

21   if the government proves that: (i) the Warehouse Defendants were convicted of an

22   offense that falls within the meaning of 18 U.S.C. § 3663A(c); (ii) the CBP and the

23   28 institutional investors are "identifiable victims" as defined in 18 U.S.C. §

24   3663A(2); and, (iii)  the "actual losses" the CBP and institutional investors suffered

25   were a direct and proximate cause of the conduct committed by each particular

26   Warehouse Defendant for which the Warehouse Defendants were convicted.  *See*

27   *United States v. Hunter*, 618 F.3d 1062, 1064 (9th Cir. 2010) (holding the amount of

28   restitution is limited to the victim's "actual losses" that are a direct and proximate

result of the defendant's offense); *United States v. Peterson*, 538 F.3d 1064, 1074–75 (9th Cir. 2008) (stating the government has the burden of establishing that the victim's damages were caused by the conduct of which the defendant was convicted).

To satisfy its burden, the government is required to submit evidence that has "sufficient indicia of reliability to support its probable accuracy." *United States v. Garcia-Sanchez*, 189 F.3d 1143, 1148-49 (9th Cir. 1999); *see also United States v. Brock-Davis*, 504 F.3d 991, 1002 (9th Cir. 2007) ("[T]he government must provide the district court with more than just…general invoices…ostensibly identifying the amount of their losses."); *United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008) (district court erred by calculating actual loss for restitution purposes "by relying exclusively on the one-page loss summaries provided by the victims and in not requiring more detailed explanations of the losses each victim suffered," when there was no documentation to support the victims' claims, and the victims' affidavits were "too summary and too conclusory to be sufficiently reliable in the face of [the defense]'s objections.").

Without sufficient analysis or discussion, Probation recommends restitution under the MVRA, seemingly predicated on the Warehouse Defendants' conspiracy convictions—Count 1 of the Indictment.  (PSR, ¶ 43-56.)  In describing the offense conduct, Probation refers to "the overall conspiracy" and asserts that "[t]he defendants conspired to evade and evade $1,836,244,745.03 in customs duties." (*Id*., ¶¶ 54, 55.)  However, for the reasons below, it is improper for Probation to rely on the conspiracy conviction to determine the restitution award.

### A.    The MVRA Is Inapplicable to Count One

Conspiracy, in and of itself, is not an independent basis to award restitution under the MVRA.  Instead, the Court must look to the underlying objects of the conspiracy to determine whether the conduct of the conviction falls within the requirements of the MVRA.  In this case, the Government's strategic decision to

charge a multiple objects conspiracy in Count One significantly impacts the restitution analysis.  The charged objects of Count One include: (i) a conspiracy to defraud the United States by obstructing the lawful functions of U.S. Customs and Border Protection by deceitful and dishonest means; (ii) a conspiracy to commit wire fraud; (iii) a conspiracy to commit the passing of false papers through a customhouse of the United States; and (iv) a conspiracy to commit international promotional money laundering.  (Indictment, ¶ 32.)  As a threshold issue, because the government objected to, and the Court declined to adopt, the Warehouse Defendants' requested jury instructions and special verdict form, it is impossible to now determine upon which of the four objects of the conspiracy the jury unanimously agreed.

The statutory language in the MVRA requires that restitution be tied to a conviction of an "offense described in subsection (c)" of 18 U.S.C. § 3663A.  Therefore, a restitution order can only be based on an offense of conspiracy in violation of 18 U.S.C. § 371 when "the underlying object of the conspiracy" is an offense that falls under 18 U.S.C. § 3663A(c).  *United States v. Butler*, 694 F.3d 1177, 1183 (10th Cir. 2012) (emphasis added).  In this case, the absence of a special verdict form, or special interrogatories, prevents the Court from concluding that the underlying object of Count One is within the statutory bounds of the MVRA.  In fact, when the offense of conviction is uncertain, courts must assume that the jury convicted the defendant of the offense that carries lowest sentence.[2]  *United States v. Farish*, 535 F.3d 815, 826–27 (8th Cir. 2008) (holding, in the absence of a specific finding by the jury as to whether the jury convicted the defendant of conspiracy or aiding and abetting an offense, the court must assume that the defendant was convicted of aiding and abetting the offense in awarding restitution).

---

[2] "[R]estitution is part of a defendant's punishment under the MVRA." *United States v. Lillard*, 935 F.3d 827, 835 (9th Cir. 2019).

In *United States v. Vera*, the Ninth Circuit held that where "a defendant was convicted of a conspiracy charge alleging multiple objects of the conspiracy, at least one of which increased the statutory sentencing range," but "the jury did not specify which object supported the conviction," the appropriate remedy is to either: (i) allow the government to choose between affirming the convictions and sentence "the defendants ***based on the conspiratorial object with the lowest statutory sentencing range***;" or (ii) vacate the conspiracy convictions and remand for retrial with a special jury verdict. *United States v. Vera*, 770 F.3d 1232, 1252 (9th Cir. 2014). Other circuits are in accord. *See, e.g., United States v. Conley*, 349 F.3d 837, 840 (5th Cir. 2003); *United States v. Quicksey*, 525 F.2d 337, 341 (4th Cir. 1975) ("in the absence of a special verdict, it is not possible to ascertain whether the jury intended to find the defendants guilty of conspiracy to violate the Travel Act or the Drug Act, or both Acts."); *United States v. Zillgitt*, 286 F.3d 128, 136, n. 7 (2d Cir. 2002) (noting the majority of circuits have adopted this remedy in the absence of a special verdict from the jury as to the object of the conspiracy where multiple objects were alleged). Thus, even if the Court finds a basis to award restitution, it must base the sentence of the object that carries the lowest sentence.

With respect to Count One, the Court instructed the jury that it "must find that there was a plan to commit at least one of the crimes alleged in the indictment, as an object to the conspiracy, *with all of you agreeing as to the particular crime which the conspirators agreed to commit*." *See* Trial Tr., Vol. 9, at 119:4-8 (emphasis added). On August 23, 2021, the jury convicted the Warehouse Defendants on Count One, but the general verdict did not specify which of the four objects of the conspiracy supported the conviction. (ECF 276.)

Of the four objects charged in Count One, the Warehouse Defendants were only convicted of substantive offenses for two—wire fraud (Counts Two through Ten) and passing false papers through a customshouse (Counts Eleven through Seventeen). Therefore, the Court should look only to those two objects when

determining whether restitution under the MVRA is proper.  In doing so, the Court must resolve the issue of whether the object of a conspiracy to commit wire fraud or the object of a conspiracy to commit passing false papers through a customhouse fall within the statutory bounds of the MVRA.  As discussed below, passing false papers through a customshouse is not an "offense against property" under the MVRA.  Accordingly, the Court is not authorized to order restitution for this object. Although the object of wire fraud may constitute an "offense against property," the government cannot otherwise satisfy its burden of proving the other MVRA requirements to make restitution proper on this basis.  For these reasons, Probation cannot rely on Count One to support an order of restitution for all unpaid AD/CV duties or to the 28 "institutional investors" identified by the government.

**B.**     **The MVRA Does Not Authorize Restitution for Passing False Papers Through a Customshouse in Violation of 18 U.S.C. § 545**

The Warehouse Defendants object to Probation's recommendation that they pay restitution in the amount of $1,836,244,745.03 to the CBP to satisfy the unpaid AD/CV duties on the aluminum pallets imported by the Perfectus Defendants between January 3, 2011, and June 16, 2014.  (PSR, ¶¶ 55.)  As a matter of law, the CBP is not entitled to restitution for the unpaid AD/CV duties under the MVRA. First, the Warehouse Defendants' Section 545 convictions are not offenses against a property interest held by the CBP.  Second, Defendants' passive storage of aluminum, after importation, did not cause any AD/CV duties to go unpaid.  Third, and finally, Probation's restitution recommendation improperly extends beyond the transactions charged in Counts Eleven through Seventeen.

1.     The CBP Does Not Have a Property Interest in the Unpaid AD/CV Duties

The MVRA is triggered only by "crimes of violence, crimes against property, and crimes related to tampering with consumer products."  *United States v. Nelson*, 454 F. App'x 574, 576 (9th Cir. 2011) (citing 18 U.S.C. § 3663A(c)(1)).  Without

citing any authority, Probation asserts that "the provisions of the [MVRA] apply" to the Warehouse Defendants' convictions.  (PSR, ¶¶ 53.)  To the extent Probation asserts that a conviction under 18 U.S.C. § 545 constitutes an "offense against property" as defined in the MVRA, Probation is incorrect as a matter of law.  By the same token, the CBP is not a victim within the meaning of the MVRA.

While the MVRA does not define "offense against property," the Ninth Circuit has held that "against property" means "infringing on a victim's property interest" in the specific property lost by a victim.  *United States v. Luis*, 765 F.3d 1061, 1065 (9th Cir. 2014); *see also Robers v. United States*, 572 U.S. 639, 640–41 (2014) (holding restitution under the MVRA is limited to "only to the specific property lost by a victim").  Courts, interpreting the statutory text, do not look to the elements of the offense to evaluate whether an offense against property occurred.  *United States v. Razzouk*, 984 F.3d 181, 186–88 (2d Cir. 2020); *see also United States v. Collins*, 854 F.3d 1324, 1334–35 (11th Cir. 2017).  Rather, courts are to examine the facts of the crime of which the defendant is convicted.  *See Razzouk*, 984 F.3d at 187-188; *see also Collins*, 854 F.3d at 1334-35.  In making that determination, "criminal conduct does not necessarily qualify as an 'offense against property' solely because it results in property damage or because someone suffers a loss at some point during its execution."  *Collins*, 854 F.3d at 1331–32.

Following this authority, any assertion that the Warehouse Defendants' convictions under 18 U.S.C. § 545 constitute an "offense against property" under the MVRA fails because CBP does not have a "property right" in the claimed AD/CV duties.  First, the Department of Commerce's decision to impose an import barrier—AD/CV duties—does not create a property right protected under the MVRA.  The Supreme Court's decisions in *Cleveland v. United States*, 531 U.S. 12 (2000) and *Kelly v. United States*, 140 S. Ct. 1565 (2020) are instructive here.  In *Cleveland*, the Supreme Court made clear that regulatory interests, such as the rights to allocation, exclusion, and control, do not constitute "property" as the ability to

issue licenses does not constitute "property in the hands of the victim." *Cleveland*, 531 U.S. at 15, 20-22. "Even when tied to an expected stream of revenue, the State's right of control does not create a property interest any more than a law licensing liquor sales in a State that levies a sales tax on liquor. Such regulations are paradigmatic exercises of the States' traditional police powers." *Id.* at 23.

Relying heavily on *Cleveland*, the Supreme Court in *Kelly* held that the right to control access to the bridge was simply a regulatory choice and thus not "property" within the meaning of the property fraud statutes." *Kelly*, 140 S. Ct. at 1573. The Court, recognizing that the defendants' conduct deprived the Port Authority of full control over the toll plaza's use and used the time and labor of employees paid by the Port Authority, nonetheless concluded that defendants did not obtain "the Port Authority's money or property[.]" *Id*. at 1573-74. In other words, while the scheme had a completely foreseeable byproduct of the use of the Port Authority employees' valuable time and labor in implementing relocation of the lanes, the "object" of the defendants' scheme was "never to get the employees' labor," but rather to "impede access from Fort Lee to the George Washington Bridge." Accordingly, it was not a scheme to deprive property. *Id.*

Here, the Warehouse Defendants were convicted of aiding and abetting customs fraud by storing aluminum imported into the United States by the Perfectus Defendants. (ECF 276.) This conduct, however, did not impact a property right as, under *Cleveland* and *Kelly*, the right to impose AD/CV duties on aluminum extrusions imported from the People's Republic of China is regulatory in nature. Indeed, the Indictment alleges that AD/CV duties are imposed "to ensure fair competition between United States companies and foreign industry, and to counter international price discrimination that cause[] injury to United States domestic industries." (Indictment, ¶ 26.) In this regard, the AD/CV duties here are like the video poker licenses in *Cleveland* because the duties implicate the government's right to allocation, exclusion, and control of imported goods into the United States.

1       Probation's position that an offense under 18 U.S.C. § 545 constitutes an

2  "offense against property" under the MVRA is thus undermined by the underlying

3  purpose for which AD/CV duties are imposed.  Antidumping and countervailing

4  duties are intended to offset the value of dumping and/or subsidization, thereby

5  leveling the playing field for domestic industries injured by such unfairly traded

6  imports.  ***Here, for purposes of sentencing, Probation adopts the government's***

7  ***position that Perfectus "never sold a single CZW pallet" in the United States.***

8  (PSR, ¶ 48.)  Probation therefore concedes that there is no evidence of harm to the

9  United States domestic aluminum industry or any other victim as a result of these

10  importations.

11       In addition, restitution for the claimed duties cannot be ordered as a matter of

12  law.  When liquidation of the imported pallets became final, CBP relinquished any

13  claim for unpaid AD/CV duties.  Liquidation is the process for determining and

14  assessing the amount of duties owed on imports.  *See* 19 U.S.C. § 1500.  Once

15  liquidation occurs, it permanently deprives a party of the opportunity to contest the

16  duties applied and renders any cause of action to do so moot.  *See SKF USA Inc. v.*

17  *United States*, 28 C.I.T. 170, 173 (2004) (citing *Zenith Radio Corp. v. United States*,

18  710 F.2d 806, 809-10 (Fed. Cir. 1983)); *see also United Steel & Fasteners, Inc. v.*

19  *United States*, 947 F.3d 794, 802 (Fed. Cir. 2020) (holding that Commerce intended

20  to limit the reach of retroactive suspension of liquidation); *Wind Tower Trade Coal.*

21  *v. United States*, 741 F.3d 89, 101 (Fed. Cir. 2014) (acknowledging that while the

22  CBP has a "cognizable interest in administrating the trade laws in a fair, *timely*, and

23  effective manner," it would be improper to grant relief in a manner that goes beyond

24  the "*statutory limit*" of the customs laws) (emphasis added).

25       Here, the Court of International Trade ("CIT") has already ruled on this issue,

26  finding that it could "provide no further relief" for CBP to recover any additional

27  AD/CV duties on the same aluminum pallets imported between 2011 and 2014 at

28  issue in this case because those entries had been conclusively liquidated.  *See*

1   *Perfectus Aluminum, Inc. v. United States*, 391 F. Supp. 3d 1341, 1357–58 (Ct. Int'l

2   Trade 2019), *aff'd*, 836 F. App'x 883 (Fed. Cir. 2020); *see also* 19 U.S.C. § 1514(a)

3   (providing that liquidation "determinations of the Customs Service are final and

4   conclusive upon all persons (including the United States and any officer thereof)").

5        Moreover, pursuant to 19 U.S.C. § 1501, the CIT ruled that CBP was "time-

6   barred … from reliquidating [the] entries to include the assessment of antidumping

7   and countervailing duties" because it did not reliquidate any of the entries within the

8   statutorily mandated time period. *Perfectus*, 391 F. Supp. 3d at 1358, n.18.

9   Importantly, the government did not dispute that the liquidations of the aluminum

10   pallets imported between 2011 and 2014 were final and that duties could not be

11   reassessed under the applicable customs laws in effect at the time of importation.

12   *Id*. at 1357 ("The parties do not dispute that these liquidations are final."). Even

13   more, the government—despite the fact that its criminal investigation in this case

14   was pending at the time of the CIT's decision and even though the Indictment was

15   returned while the CIT's decision was on appeal before the Federal Circuit—never

16   disputed that liquidation was final. By failing to raise this issue with the Federal

17   Circuit, the government thereby agreed with the CIT on this issue and the CIT's

18   decision became final. As a result, CBP forever lost any property right it possibly

19   had or could have argued that it possibly had in AD/CV duties related to the pallets

20   imported between 2011 and 2014. [3]

21

22   _____

23   [3] Consistent with the government's concession that liquidation for the entries of the aluminum pallets was final, the Department of Commerce recently enacted new

23   regulations—which do not apply here—to provide CBP with a procedural

24   mechanism for recovering such AD/CV duties. *See Regulations To Improve*

25   *Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300-01 (Sept. 20, 2021). The adoption of these new regulations further

26   demonstrates that CBP, during the relevant time period, had no right to retroactively

27   collect the additional AD/CV duties it maintains were evaded as a result of

28   violations of 18 U.S.C. § 545.

1    Furthermore, because the government has conceded and accepted a final

2  judgment that it is not entitled to recover, and thereby has no property interest in,

3  any AD/CV duties for the pallets imported between 2011 and 2014, it is now barred

4  by the doctrine of judicial estoppel from asserting a clearly inconsistent position at

5  sentencing that the CBP is entitled to recover the AD/CV duties.  *See United States*

6  *v. Liquidators of Eur. Fed. Credit Bank*, 630 F.3d 1139, 1149 (9th Cir. 2011)

7  (refusing to "overlook what the government … wishes it had not stated" and

8  concluding that judicial estoppel barred the government from arguing a clearly

9  inconsistent position that directly contradicted its original position); *see also Niz-*

10  *Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021) ("If people 'must turn square

11  corners when they deal with the government, it cannot be too much to expect the

12  government to turn square corners when it deals with them.'").

> 2.    Post-Importation Storage of the Aluminum Pallets at the
>        Warehouses Did Not Directly or Proximately Cause the AD/CV
>        Duties to Go Unpaid

16    Probation's recommendation fails, as the facts here demonstrate the

17  Warehouse Defendant's conduct did not cause, directly or proximately, the AD/CV

18  duties to go unpaid.  Indeed, "the central concern of the causal inquiry must be the

19  conduct of the *particular* defendant from whom restitution is sought."  *Paroline*,

20  572 U.S. at 445 (emphasis added).  "But for cause [alone] is insufficient."  *United*

21  *States v. Swor*, 728 F.3d 971, 974 (9th Cir. 2013).  Instead, the government must

22  prove "not only that a particular loss would not have occurred but for the conduct

23  underlying the offense of conviction, but also that the causal nexus between the

24  [particular defendant's] conduct and the loss is not too attenuated (either factually or

25  temporally)."  *Id*.  Here, the evidence does not show that the Warehouse Defendants

26  engaged in any conduct that caused (directly or proximately) the losses attributed to

27  the 18 U.S.C. § 545 offenses charged in Counts Eleven through Seventeen.

28

Counts Eleven through Seventeen alleged that the aluminum pallets at issue were falsely identified on customs forms as being outside the reach of the 2011 AD/CV Orders.  A violation of 18 U.S.C. § 545 is complete with all of its elements at the time of importation, namely, when the allegedly false form is passed through a customhouse of the United States.  *See* Ninth Circuit Model Criminal Jury Instructions 8.36.  Contrary to the Perfectus Defendants, there is no evidence that the Warehouse Defendants had any involvement in the completion of any customs forms (i.e., the commission of the offense).  Instead, the evidence at trial shows that the Warehouse Defendants simply owned the Warehouses used to store the aluminum pallets after they were imported.

Because the CBP's failure to collect the AD/CV duties occurred before any conduct by the Warehouse Defendants, the storage of the aluminum pallets in the Warehouses after the pallets were imported into the United States is not the "but for" cause of CBP's purported losses.  *See United States v. Burger*, 739 F.2d 805, 811 (2d Cir. 1984) (holding defendant's offense of possessing and concealing counterfeit money did not "cause" the loss for which he was required to make restitution where the loss was caused by the passing of the counterfeit bills and the mere possession and concealment of the bogus money by itself did not harm the victim); *United States v. Tyler*, 767 F.2d 1350, 1352 (9th Cir. 1985) (citing *Burger* with approval).

The CBP's decision not to timely exercise its authority under the liquidation provisions to reliquidate further negates a finding of causation.  *United States v. Tyler*, 767 F.2d 1350 (9th Cir. 1985) is instructive here.  Tyler was arrested for stealing timber from the Siskiyou National Forest.  *See Tyler*, 767 F.2d at 1351. After his arrest, the government retained the stolen timber, but chose not to bring any charges until one year later.  *Id*.  Ultimately, the defendant plead guilty to conspiracy to commit timber theft, and the district court ordered him to pay the government restitution in an amount equal to loss in timber's value.  *Id*.  The Ninth

1  Circuit reversed the restitution award, holding the defendant's offense did not cause

2  the government's loss.  *Id*.  Rather, as the Ninth Circuit held, it was the

3  government's decision to retain the timber and wait to bring charges against the

4  defendant that was the "but for" cause of the government loss.  *Id*. (reasoning that

5  but for the government's retention, "there would have been little or no loss").

6        Here, the CBP's decision not to timely reliquidate the aluminum pallets is

7  analogous to the government's decision to retain the timber in *Tyler* because, had

8  the CBP timely reliquidated the entries of the aluminum pallets, it could have sought

9  the collection of AD/CV duties from the Perfectus Defendants.  In other words, but

10 for the CBP's inaction, CBP may have had a right to seek payment of the AD/CV

11 duties.  The testimony at trial confirms that nothing precluded the CBP from seeking

12 reliquidation in a timely fashion.  (RT, Vol. 7, at 24:4-14, 27:11-31:10, 33:11-35:8,

13 36:6-37:18.)  That the CBP made the decision to audit Aluminum Shapes with

14 respect to the AD/CV duties demonstrates as such.  (RT, Vol. 6, at 205:8-207:17,

15 209:23-210:7.)  The purpose of the MVRA is to compensate a victim for the losses

16 directly and proximately caused by certain Title 18 offenses.  It was not meant to

17 serve as a mechanism for excusing government inaction.

18       Furthermore, there is no evidence that any agent acting on behalf of the

19 Warehouse Defendants was involved in the falsification of any customs forms.  As

20 "[o]rganizations can act only through their agents," *see* U.S.S.G., Ch. 8, the

21 evidence cited in the PSRs cannot establish the requisite causal connection between

22 the acts of the Warehouse Defendants and the "evasion" of the AD/CV duties.  At

23 trial, Shen testified that Defendants Doubleday, Production Avenue and Von

24 Karman were formed for the sole purpose of holding title to the Warehouses.  (RT,

25 Vol. 4, at 130:22-24, 141:13-15.)  Shen also testified that SDL's role regarding the

26 Warehouses "was to make sure that property taxes were paid, buildings were

27 insured, and general maintenance was performed and ongoing.  (*Id*. at 142:9-11.)

28 Moreover, Shen testified that he had no involvement in the importation of the

1   pallets, let alone the completion of any customs forms.[4]  (*Id*. at 187:18-24, 198:6-

2   16.)

3       Therefore, Shen's testimony negates a finding that the Warehouse Defendants

4   did anything between June 2011 and September 2013 to cause the evasion of the

5   AD/CV duties.  Likewise, there is no evidence that the Warehouse Defendants

6   caused any evasion of the AD/CV duties thereafter.  Jasmine Wang took ownership

7   of the Warehouse Defendants in or around September 2013.  (PSR, ¶ 69.)  At trial,

8   the government did not present any evidence showing Wang's involvement in the

9   importation of the pallets.  Thus, there is no evidence that anybody acting on behalf

10   of the Warehouse Defendants did anything between September 2013 and June 16,

11   2014 to cause the evasion of the AD/CV duties.

12          3.    Probation Overstates Any Loss to the CBP

13       Even if the MVRA applies to the Warehouse Defendants' convictions under

14   Section 545—it does not—Probation overstates the amount of restitution the CBP

15   would be entitled under the MVRA in two ways.  First, Probation includes

16   importations wholly unrelated to the Warehouse Defendants—pallets purportedly

17   imported by Aluminum Shapes.  Second, Probation impermissibly relies on relevant

18   conduct to enlarge the restitution recommendation.  Both points are outside of the

19   framework dictated by the MVRA.

20       First, Probation overstates the amount of restitution by claiming actual losses

21   related to the aluminum pallets imported by the entity Aluminum Shapes.  These

22   importations do not form the basis of the convictions for Counts Eleven through

23

24   ―――――――――――――

[4] At trial, Shen testified that he formed Berlinetta Trading LLC to import the test

25   shipments of pallets, which—against Liu's directions to not sell the pallets—were

26   sold by Shen to Sierra Corporation.  (RT, Vol. 4 at 165, 173.)  Because the test

27   shipments were done on behalf of Berlinetta Trading LLC, this does not constitute

    evidence that the Warehouse Defendants had any involvement in the importation of

28   the pallets.

Seventeen, which are based on aiding and abetting the *Perfectus Defendants* in the passing of false papers through a customhouse of the United States. At trial, the government did not argue that the Warehouse Defendants aided and abetted Aluminum Shapes. Nor was Aluminum Shapes named as a defendant or identified as an unindicted co-conspirator in this case. It is also undisputed that Aluminum Shapes was not among the seven entities that merged into Perfectus. The evidence at trial demonstrates that, at all relevant times, Aluminum Shapes was a distinct entity from the Perfectus Defendants. The company's former controller, Robert Otterbein, testified that, between 2008 and December 2012, Aluminum Shapes was owned by HIG Capital. (RT, Vol. 6, at 195:9-14, 222:16-223:2.) Otterbein then testified that Aluminum Shapes was purchased by Global Aluminum USA, Inc. ("Global") in December 2012. (Id. at 223:9-224:5.) Notably, Global did not merge with the Perfectus Defendants until December 31, 2014. (Indictment, ¶ 16.) Although Global was owned by Shao, the evidence at trial shows that Aluminum Shapes was simply a subsidiary that operated separate and apart from Global. (RT, Vol. 6, at 225:3-22, 227:21-230:6; see also RT Vol. 2, at 72:8-74:22.) Therefore, because the Warehouse Defendants were not convicted of aiding and abetting Aluminum Shapes, Probation's calculations overstate the amount of restitution by at least $32,311,042.43. (*See* Tr. Exs. 4 and 5.)

Second, Probation overstates the amount of restitution by attempting to recover all of the unpaid AD/CV duties. Unless the offense of conviction "involves as an element a scheme, conspiracy, or pattern of criminal activity," 18 U.S.C. § 3663A(a)(2), a restitution order under the MVRA must be limited to the victim's actual loss that "flows directly from the specific conduct that is the basis of the offense of conviction." *United States v. May*, 706 F.3d 1209, 1214, n. 5 (9th Cir. 2013); *United States v. Napier*, 463 F.3d 1040, 1046 (9th Cir. 2006) (holding restitution may go beyond the offense of conviction only if the offense of conviction contains an element of a scheme, conspiracy or pattern of criminal activity). Here,

1  an offense under 18 U.S.C. § 545 does not contain an element of a "scheme,

2  conspiracy, or pattern of criminal activity."  18 U.S.C. § 3663A(a)(2).  Therefore,

3  the MVRA limits restitution for the convictions on Counts Eleven through

4  Seventeen to the specific conduct that is the basis of these convictions.  *See United*

5  *States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 927 (9th Cir. 2001).

6      The basis for the convictions of Counts Eleven through Seventeen is that the

7  Warehouse Defendants aided and abetted the Perfectus Defendants in passing a false

8  CBP Form 7501 on the seven entries listed in the Indictment.  (Indictment at ¶¶ 39-

9  40.)  As reflected in the chart below—based on the information contained in Trial

10  Exhibits 4 and 5—the AD/CV duties owed for these seven entries equal

11  $38,742,686.10.

| Count | Date | Entry Number | Total AD/CV Value |
|-------|------|--------------|-------------------|
| Count Eleven | 5/19/14 | W3303379083 | $8,593,334.82 |
| Count Twelve | 5/22/14 | W3303379737 | $2,412,164.16 |
| Count Thirteen | 5/23/14 | HR702108724 | $6,331,930.92 |
| Count Fourteen | 5/28/14 | HR702108708 | $418,436.64 |
| Count Fifteen | 5/30/14 | W3303381550 | $6,331,930.92 |
| Count Sixteen | 6/6/14 | HR702109383 | $8,624,478.24 |
| Count Seventeen | 6/27/14 | W3303385676 | $6,030,410.40 |
|  |  |  | **TOTAL:  $38,742,686.10** |

22      Accordingly, to the extent that a restitution award can be based on unpaid

23  AD/CV duties, for Counts Eleven through Seventeen, Probation overstates the

24  amount of potential restitution by $1,797,502,058.93.  For the reasons discussed

25  above, Probation's recommendation of $1,836,224,745.03 in restitution to the CBP

26  must be rejected.

C.     **The Convictions in Counts Two through Ten of Wire Fraud Do Not Support Probation's Recommended Restitution Award**

The Warehouse Defendants object to Probation's recommendation that the Warehouse Defendant pay restitution in the collective amount of $124,270,000 to a list of purported institutional investors in CZW.  Probation's recommendation on this issue suffers from three fatal flaws.  First, the 28 institutional investors identified by the government were not, at any time, beneficial owners of the common stock in CZW traded on the Main Board of the Stock Exchange of Hong Kong Limited ("SEHK").[5]  (PSR, ¶¶ 54, 56.)  Therefore, by definition, the institutional investors are not "victims" under the MVRA as these entities themselves could not have suffered a loss.  Second, Probation has not presented evidence sufficient to demonstrate that the Warehouse Defendants caused *any* investors in CZW to suffer a loss.  Third, Probation's loss calculations are factually and mathematically untenable.  For these reasons, the Court should decline to order any restitution award based on the wire fraud convictions—Counts Two through Ten.

1.     The 28 Institutional Investors Are Not "Victims" under the MVRA

The 28 institutional investors identified by Probation do not qualify as "victims" under the MVRA.  Having no property interests themselves in the CZW stock, they by definition could not have suffered any property loss.  Moreover, they cannot be used as proxies for unnamed and unidentified victims.  "The MVRA is

---

[5] In essence, the wire fraud counts allege securities fraud.  A valid securities fraud claim consists of six elements:  "(1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *In re Bofl Holding, Inc. Securities Litigation*, 977 F.3d 781, 787 (9th Cir. 2020) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

clear that restitution can only be imposed to the extent that the victims of a crime are actually identified, 18 U.S.C. § 3663A(c)(1)(B).  Identification of victims is a statutory prerequisite to the application of the MVRA." *United States v. Catoggio*, 326 F.3d 323, 328 (2d Cir. 2003).  Here, Probation erroneously asserts that these entities were shareholders who suffered losses because of a drop in the price of shares held by them.  This is simply not true.  The investment advisers and investment funds identified by Probation had no ownership interest in even a single share of CZW stock.  As such, they did not gain when the stock price rose or lose when the stock price dropped.  The owners of the stocks were their clients (here, perhaps hundreds or even thousands of unidentified, unnamed entities) whom they advised on their investments in equities.

More specifically, each of the 28 institutional investors is either a United States or foreign "Exchange Traded Fund" ("ETF")—a diverse collection of securities that are bought and sold on stock exchanges the same way as individual stocks.  CZW was included in select ETFs as a means for investors in those ETFs to own shares linked to the Chinese economy and/or worldwide firms engaged in basic manufacturing.  The 28 institutional investors simply oversee the management and marketing of ETFs.  These management and advisory funds are not exposed to the risks of changes in the stock prices of the individual companies that comprise the ETF.  These advisory and management firms effectively act like commissioned sales and management representatives.[6]  And they are distinct from their clients, commonly referred to as Authorized Participants, who purchase and hold the shares

---

[6]  Dimensional Fund Advisors LP is identified as the fund having incurred the largest shareholder loss.  Like the other firms identified as "victims," Dimensional Fund Advisors LP does not purchase, assemble and hold share of the stocks that comprise the fund. *See* Dimensional Fund Advisors LP, *Dimensional ETFs*, https://us.dimensional.com/etfs (last visited Feb. 28, 2022).

of the individual stocks that comprise ETFs.[7]  In short, none of the firms identified by the Probation have been shown to have suffered any losses as a result of the actions of the Warehouse Defendants, CZW or any Defendant.  Therefore, they do not qualify as "victims" under the MVRA.

For these same reasons, such institutional investors could not be plaintiffs in and obtain recoveries in securities cases, only the actual shareholders can do so.  *See e.g. United States v. Ferguson*, 584 F.Supp.2d 447, 458 (D. Conn. 2008) (finding that "[w]hile [an expert's] event study identified 154 institutional holders of LPT-damaged shares, in order to award restitution, this court would have to identify the individuals who had an interest in those institutional holdings").  Here, because Probation has failed to actually identify any specific shareholders who suffered any losses, it has failed to adequately meet the threshold requirement of identifying a victim for the purposes of restitution under the MVRA.

2.   <u>There Is Insufficient Evidence that the Warehouse Defendants Caused a Loss</u>

Even if there were identified victims—which there are not—there is no reliable evidence of a quantifiable loss.  Citing to an unidentified government expert, Probation contends that the scheme to defraud investors in CZW resulted in losses of $289,000,000, 43% (or $124,270,000) of which was not borne by Liu. (PSR, ¶ 54.)  Probation indicates that this measure of losses is based on the one-day drop in CZW market capitalization resulting from release of the Dupré Report

---

[7]   As explained in the *SIFMA Insights - US ETF Market Structure Primer,* unlike Primary Market entities, Secondary Market ETF sellers are not exposed to share price risk.  *See* Katie Kolchin, *US EFT Market Structure Primer*, SIFMA INSIGHTS (Sept. 2018), https://www.sifma.org/wp-content/uploads/2018/09/SIFMA-Insights-US-ETF-Primer.pdf.

1  issued by a short seller in July 2015.[8]  Put simply, this measure of shareholder

2  restitution proposed by Probation is wholly unreliable and therefore unusable.

3        The methodology purportedly relied on by Probation as the measure of

4  shareholder restitution is defined in economic terms as a "corrective disclosure."  A

5  "corrective disclosure" occurs where the company at issue publicly informs

6  shareholders that information previously released by the company was false.  Here,

7  however, rather than offering any "corrective disclosure" issued by CZW, Probation

8  relies on the disclosures made in the Dupré Report.  (PSR, ¶ 54.)  The Dupré Report

9  was authored and released by a then-anonymous short seller who expressly admitted

10  to having a financial interest in the potential decline in CZW's stock price.  The

11  Dupré Report also included disclaimers from the short seller that it "makes no

12  representation, express or implied, as to the accuracy, timeliness or completeness of

13  any such information or with regard to the results to be obtained from its use."

14        In no uncertain terms, the Ninth Circuit held that blog posts "authored by

15  anonymous short-sellers who had a financial incentive to convince others to sell"

16  and that "included disclaimers from the authors stating that they made 'no

17  representation as to the accuracy or completeness of the information set forth in this

18  article' could not plausibly constitute corrective disclosures."  *In re Bofl Holding,*

19  *Inc. Securities Litigation,* 977 F.3d 781, 797 (9th Cir. 2020).  In light of this clear

20  guidance from the Ninth Circuit, the Dupré Report is not a valid "corrective

21  disclosure" for purposes of calculating restitution under the MVRA.

22

23

---

24  [8] Warehouse Defendants understand Probation's loss calculation for the purported

25  wire fraud "victims" to be based on the change in the difference in the closing price
   of CZW's stock on the day the Dupré Report was released—$0.32 USD per share—

26  and the price on August 13, 2015—$0.28 USD per share—the date CZW's stock

27  resumed trading.  The $0.04 USD per share difference was multiplied by the number

28  of shares outstanding to arrive at the claimed loss.

Instead, this Court should view the law governing securities fraud claims as instructive when determining whether there is reliable evidence that the Warehouse Defendants' conduct caused any CZW investors to suffer a loss. In a securities fraud action under federal securities laws, a plaintiff must plead and prove transaction causation and loss causation—analogs for the concepts of but for cause and proximate cause respectively.[9] *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1118 (9th Cir. 2013); *see also Bofl*, 977 F.3d at 789 ("a plaintiff in a securities fraud suit must plead and ultimately prove that the defendant's wrongful conduct caused the plaintiff's injury."). "[T]o prove transaction causation, the plaintiff must show that, but for the fraud, the plaintiff would not have engaged in the transaction at issue[.]" *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005). "[T]o satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor causing a decline in the security's price." *Nuveen*, 730 F.3d at 1120.

A plaintiff has only suffered economic loss, if, "after purchasing her shares and before selling, the following occurred: (1) the truth became known, and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *Bofl*, 977 F.3d at 789. In such a scenario, the plaintiff "is no longer able to recoup in the marketplace the inflationary component of the price she originally paid." *Id*. Here, the cited evidence does not support a finding that the any shareholders suffered a loss or that any such losses were caused by the Warehouse Defendants' conduct.

Applying well-settled law on causation in the securities fraud context, it is clear that Probation fails to identify any reliable evidence to prove either but for

---

[9] "The concept of proximate causation is applicable in both criminal and tort law, and the analysis is parallel in many instances." *Paroline,* 572 U.S. at 444.

causation or proximate cause for the purported aggregated loss.   Moreover, such proof in the aggregate would be insufficient for restitution purposes.  Proof of loss, if any, would require information related to the thousands of actual shareholders and the possibly thousands of individual transactions made by those shareholders at a myriad of points in time, before assessing whether any one or more of the actual shareholders were affected by the events at issue in this case.  Probation has not completed this type of assessment with respect to any shareholder.

**First**, Probation has not identified any misrepresentations made by the Warehouse Defendants and relied on by actual investors in CZW.  Even as to the misrepresentations charged in the Indictment, there is no evidence that any actual investors were misled by such statements, or that any investors purchased CZW's shares because of such misrepresentations.  *See United States v. Stratos*, 2017 WL 272213, at *12 (E.D. Cal. Jan. 20, 2017) (refusing to provide restitution to JP Morgan Chase where no evidence existed to establish that that JP Morgan Chase was misled by defendant's fraud); *United States v. Ward*, 2013 WL 57855, at *5 (N.D. Cal. Jan. 3, 2013) (finding the government did not meet its burden to show that the loses to investors resulted from defendant' criminal conduct where the government did not point to any evidence of specific misrepresentations made by defendants to these victims which caused them to make the investment).

**Second**, Probation has not cited to any evidence that any actual investors suffered a loss, or that any purported loss to an investor was caused by the Warehouse Defendants' conduct.  On the first point, Probation merely refers to the government's assertion that "CZW and its investors lost approximately $289,000,000" when trading resumed after the Dupré Report was issued.  (PSR, ¶ 54.)  As explained above, however, a decline in market value alone is insufficient to establish loss.  *See Bofl*, 977 F.3d at 790 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005)); *see also Ward*, 2013 WL 57855, at *4 ("losses attributable to

a decline in investment value as a result of market forces are not properly included in [a] restitution order.").

**Third**, on this record, even if the actual investors suffered a loss—of which there is no evidence—it would be impossible for the government to demonstrate that the Warehouse Defendants' conduct caused a loss to any investors. The Warehouse Defendants did not (1) participate in any of the public disclosures offered by CZW and (2) did not participate in any of the conduct related to the invoicing and payment for CZW aluminum pallets. Rather, the Warehouse Defendants' only involvement in the charged offense was storing, in plain view, the aluminum pallets imported into the United States.

For these reasons, this Court should decline to order restitution relating to investments in CZW.

### 3. Probation's Mathematical Calculation of Restitution Is Significantly and Irreparably Flawed

Even if this Court were to conclude that restitution relating to investments in CZW to the listed entities is warranted—which it is not—it should not accept the monetary amounts suggested by Probation. There is a substantial discrepancy between the losses Probation contends were incurred by each of the institutional investors and the basis for the government's expert's underlying calculation. As inferred from Probation's description of its estimate, any loss is measured by the change in CZW's share price multiplied by the number of shares managed by each fund at the time of the loss. Since CZW was listed on the SEHK, shares were priced and traded in Hong Kong dollars. As such, share price changes would necessarily have to be converted to USD. The one-day price change relied on by Probation, as properly converted, amounts to $0.04 USD per share.[10]

---

[10] The government's expert agreed that share price change associated with release of the Dupré Report amounted to a decline of $0.04 USD per share.

1       Utilizing the three largest funds identified by Probation—Dimensional Fund

2  Advisors LP, The Vanguard Group Inc. and Norges Bank Investment

3  Management—to illustrate the discrepancies in Probation's restitution calculations,

4  it is readily apparent that Probation's calculations are irreparably flawed and make

5  no mathematical sense.  In August 2015, Dimensional owned 48.2 million shares,

6  Vanguard owned 39.5 million shares, and Norges owned 20 million shares.  Based

7  on the $0.04 USD per share decline, losses in US dollars would amount to: (i) $1.93

8  million for Dimensional; (ii) $1.58 million for Vanguard; and (iii) $800,000 for

9  Norges.  By comparison, Probation claims that Dimensional's loss equals $43.3

10  million, Vanguard's loss equals $35.2 million, and Norges' loss equals $17.6

11  million.  In the aggregate, this amounts to an accounting discrepancy and

12  overestimate by Probation in the amount of approximately $93.4 million.

13       The discrepancy noted above can be shown from reports of the funds

14  themselves.  ETFs periodically report the values of their holdings of the individual

15  stocks that comprise the fund.  For example, in 2014, Norges indicated that the year-

16  end value of its holdings in CZW amounted to $8.72 million USD.  In 2015, Norges

17  indicated that its CZW holdings had increased to $11.7 million USD.  Yet,

18  Probation presents in the PSR that Norges, for example, suffered a supposedly one-

19  day loss of $17,582,107.18 USD, which *is twice the entire value* of Norge's 2014

20  holdings and *50% greater than the entire value* of its 2015 holdings.  Of course,

21  this is a completely nonsensical mathematical result.

22       Accordingly, even if the 28 institutional investors were "victims" under the

23  MVRA—which they are not—Probation's calculation of restitution is fraught with

24  error, factually and mathematically impossible, and wholly unreliable.  Therefore,

25  the requested award of restitution in the recommended amount of $124,270,000 at

26  sentencing should be denied.

27

28

### D.   Any Restitution Owed Should Be Assessed on a Pure Several Liability Basis

Even if the Court determines that a restitution award is appropriate under the framework of the MVRA, pursuant to 18 U.S.C. § 3664(h), if more than one defendant is found to have contributed to the loss of a victim, the Court "may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."  18 U.S.C. § 3664.  It is well-established that district courts have "wide discretion" to apportion liability based on each defendant's "relative culpability."  *United States v. Rechnitz*, 2021 WL 5232395, at *4 (S.D.N.Y. Nov. 9, 2021) (collecting cases from Second, Fourth, Fifth, and Eighth circuits); *see also United States v. Loscalzo*, 18 F.3d 374, 387 (7th Cir. 1994) ("One of the 'other factors' which we believe is an appropriate consideration is the relative culpability of the defendant.") (citing *United States v. Anglian*, 784 F.2s 765, 768 (6th Cir. 1986)).

In this case, the Warehouse Defendants respectfully ask the Court to exercise its discretion and apportion liability for any restitution owed severally between the Perfectus Defendants and the Warehouse Defendants.  As discussed above, the Warehouse Defendants had no involvement in any scheme to defraud investors—they did not make any statements to investors or participate in any efforts to falsify investors—and there is no evidence that any agent acting on behalf of the Warehouse Defendants was involved in the importation of the aluminum pallets. Rather, the evidence clearly demonstrates that the Perfectus Defendants were responsible for importing the aluminum into the country, overseeing the submission of U.S. Customs forms relating to the applicable duties, and for the actions underlying the wire fraud charges.[11]  *See, e.g.*, RT, Vol. 2, at 232:22-233:5; RT,

---

[11] The Warehouse Defendants anticipate that Probation will attempt to rely on Shen's involvement with the $200 million loan as evidence of the Warehouse

Vol. 3, at 104:2-19, 140:14-141:7; RT, Vol. 4, at 141:13-15, 142:9-21, 153:12-154:1, 161:19-24, 165:12-166:9, 187:18-24, 190:15-17; Vol. 5, at 44:12-25, 68:22-25; RT, Vol. 6, at 59:4-7, 94:10-13, 122:11-124:17, 125:17-126:2, 164:1-4, 168:11-24; RT, Vol. 6, at 125:13-126:2; RT, Vol 7, at 140:11-141:15, 143:8-16, 144:21-146:9, 147:7-22, 219:7-13, 219:24-220:2, 224::4-225:5, 226:14-15, 228:19-229:3, 233:14-25, 234:25-235:9.  Therefore, the Perfectus Defendants, rather than the Warehouse Defendants, should be required to pay the total amount of restitution.

## III.   THE COURT SHOULD NOT ORDER IMMEDIATE PAYMENT OF RESTITUTION IN AN AMOUNT THAT WOULD DIVEST THE WAREHOUSE DEFENDANTS OF ALL THEIR PROPERTY

Probation seeks a restitution payment schedule for the Warehouse Defendants that would divest them of all their assets within 90 days of sentencing.  (*See* PSR, ¶ 81).  In an apparent attempt to justify this request, Probation seeks a finding that the Warehouse Defendants are "criminal purpose organizations" within the meaning of U.S.S.G. §8A1.2(b)(1).  The Warehouse Defendants object to this characterization as contained in paragraphs 85 and 96 of the PSR, and they object to the restitution payment schedule suggested by Probation.

For each Warehouse Defendant, Probation summarily asserts that the Warehouse Defendants operated primarily for a criminal purpose and by criminal means because: (i) each Warehouse's sole purpose was to store aluminum that was imported by Perfectus codefendants' predecessor entities through fraudulent means to avoid paying the AD/CV orders and with the intent to fraudulently inflate CZW's

---

Defendants' involvement in the wire fraud scheme. However, the evidence clearly shows that Shen acted through Scuderia Capital Partners—not to be confused with Defendant Scuderia Development LLC—in this transaction.  As Shen testified, these are two distinct entities and, therefore, this evidence does not establish that the Warehouse Defendants were in anyway involved in the scheme to defraud CZW's shareholders.  *See* RT, Vol. 4, at 103:6-16, 108:24-109:23, 112:4-114:16, 115:2-7, 119:22-123:4, 125:13-126:2, 127:9-130:15.

1  revenue; and (ii) each Warehouse was purchased on behalf of Liu with the intent to

2  stockpile and conceal the imported aluminum.  (PSR, ¶ 86.)

3      Yet the evidence does not support these conclusions.  Other than SDL, the

4  Warehouse Defendants were formed as single asset entities for the sole purpose of

5  holding title to the warehouses, which were then used for the legitimate purpose of

6  storing aluminum extrusions and later aluminum pallets and for office space.  (RT,

7  Vol. 2, at 51:9-14, 78:19-23; RT, Vol. 4, at 141:13-14, 176:15-17; RT, Vol. 6, at

8  152:13-18, 158:22-159:3; RT, Vol. 7, at 64:4-6, 214:25-215:1.)  Thus, the

9  Warehouse Defendants did not operate primarily by criminal means because, at all

10 relevant times, the Warehouse Defendants did exactly what they were formed to do:

11 hold title to the Warehouses.  With respect to SDL, there was uncontroverted

12 testimony at trial that SDL paid the property taxes on the Warehouses, maintained

13 insurance on the Warehouses, and paid the fees associated with general

14 maintenance.  (RT, Vol. 4, at 142:9-11.)  Like the other Warehouse Defendants,

15 SDL had no involvement in the $200 million loan.

16     Furthermore, the Warehouse Defendants—unlike the Guideline's examples of

17 an organization used as a "front for a scheme" or an organization "established to

18 participate in" the underlying offense—were not operated primarily for a criminal

19 purpose.  There is no evidence showing that: (i) the Warehouse Defendants sought

20 to conceal the pallets from the government; (ii) that the Warehouse Defendants held

21 themselves out to be in a business other than storage of merchandise; (iii) that the

22 Warehouse Defendants transmitted any wires in furtherance of the scheme to

23 defraud investors in CZW; (iv) that the Warehouse Defendants were mentioned in

24 CZW's annual reports and/or specific disclosures; or (v) that the Warehouse

25 Defendants made any materially false statement to CZW's shareholders.

26     The timing of the offenses compared to when the warehouses were purchased

27 further belies a finding that the Warehouse Defendants are "criminal purpose

28 organizations":

1       •      Doubleday purchased the Ontario Warehouse, on October 27, 2008.
2 This was before CZW issued its IPO Prospectus and before CZW began trading on
3 the SEHK.  Thus, Doubleday was not "established" for the purpose of defrauding
4 investors in CZW as there were no investors to defraud at that time.  Likewise, the
5 Ontario Warehouse was purchased years before the 2011 AD/CV Orders took effect,
6 and in addition to the pallets at issue, at all times stored aluminum extrusions that
7 were lawfully imported into the United States.  These extrusions were sold to
8 legitimate customers in the United States, and therefore, the annual reports issued
9 before the 2011 AD/CVD Order were not false.  Accordingly, the government
10 cannot prove that Doubleday operated primarily for a criminal purpose.

11       •      Von Karman purchased the Irvine Warehouse on March 31, 2009.  This
12 too was before CZW issued its IPO Prospectus and before CZW began trading on
13 the SEHK.  The Irvine Warehouse was also purchased years before the 2011
14 AD/CV Orders took effect, and in addition to the pallets at issue, at all times stored
15 aluminum extrusions that were lawfully imported into the United States.  For the
16 same reasons as Doubleday, the government cannot prove that Von Karman
17 operated primarily for a criminal purpose.

18       •      Production Avenue purchased the Fontana Warehouse on September
19 11, 2009.  Although it was after CZW began trading on the SEHK, it was before
20 CZW issued its first annual report.  The Fontana Warehouse was also purchased
21 before Commerce published its notice to the public about the AD/CV investigation
22 into Chinese aluminum products, and before the 2011 AD/CV Orders took effect.
23 Like Doubleday and Von Karman, the Fontana Warehouse stored the pallets at issue
24 as well as lawfully imported aluminum extrusions that were sold to legitimate
25 customers in the United States.  Thus, the evidence does not establish that
26 Production Avenue operated primarily for a criminal purpose.

27       •      SDL was formed on October 22, 2007.  This is before the charged
28 conspiracy began in July 2008.  (PSR, ¶ 43.)  At trial, Shen testified that SDL was

1  responsible for maintenance of the Warehouses and for paying property taxes.

2  Unlike Scuderia Capital Partners ("SCP"), SDL had no involvement with the $200

3  million loan.[12]   After Wang took control of SDL, the Riverside Warehouse was

4  purchased on October 29, 2014.  This was after the last pallets were imported into

5  the United States on June 16, 2014.  Moreover, there is no evidence connecting SDL

6  to the scheme to defraud investors.  Accordingly, the government cannot satisfy its

7  burden of proving that SDL was a "Criminal Purpose Organization."

8      For these reasons, the Warehouse Defendants should not be determined to be

9  "Criminal Purpose Organizations" within the meaning of U.S.S.G. 8C1.1, and the

10  Court should not set a restitution payment schedule that will serve to immediately

11  divest the Warehouse Defendants of all their assets.

12  **IV.   <u>ADDITIONAL OBJECTIONS TO THE PSR</u>**

13      The Warehouse Defendants also object to the following portions of the PSR:

14      •   **<u>PSR ¶ 6</u>**: The Warehouse Defendants object to PSR ¶ 6 on the grounds

15  that the government abandoned Forfeiture Allegation One and Forfeiture Allegation

16  Two against the Warehouse Defendants when it filed its amended bill of particulars

17  removing the Warehouses from the list of criminally forfeitable property.  Dkts.

18  227; 245.  In the civil forfeiture proceedings, the government acknowledged that it

19  has abandoned its efforts to forfeit the Warehouses in this criminal action.  *See*

20  *United States of America v. Real Property Located at 2323 Main Street, Irvine,*

21  *California*, Case No. 8:17-cv-01592-DMG-SP(x), Dkt. 88 at 15:16-28.[13]   Insofar as

22

23  [12] Shen testified that he used SCP for the $200 million loan – an entity distinct from

24  the Warehouse Defendants.  (RT, Vol. 4, at 105:2-20, 108:11-109:18.)  Because this
    conduct was not taken on behalf of any Warehouse Defendant, this evidence does

25  not show the Warehouse Defendants' involvement in the wire fraud scheme to
    defraud investors in CZW.

26

27  [13] Per the parties' agreement, the government filed the identical opposition in all
    four cases:  17-CV-01875-DMG (SPx); 17-CV-1592-DMG (SPx); 17-CV-01873-

28  DMG (SPx); and 17-CV-1872-DMG (SPx).

1  PSR ¶ 6 states that "Forfeiture Allegation Two is applicable … pursuant to 18

2  U.S.C. §§ 982 and 545" as providing a statutory basis for criminal forfeiture of the

3  Warehouses, the government previously conceded: (i) that 18 U.S.C. § 545 only

4  authorizes criminal forfeiture of the pallets (i.e., the property introduced into the

5  United States in violation of Section 545); and (ii) that Forfeiture Allegation Two

6  applies to the Warehouses only if 19 U.S.C. § 1595a(a) can apply to real property.

7  Dkt. 226, at 3:21-5:10.  It has already been decided that, as a matter of law, 19

8  U.S.C. § 1595a(a) does not authorize the seizure and forfeiture of real property.  *See*

9  *United States of Am. v. Real Prop. Located at 2323 Main St., Irvine, California;*

10  *United States of Am.*, 2021 WL 4520970, at \*6 (C.D. Cal. Aug. 6, 2021).[14]

11  Therefore, Forfeiture Allegation Two is not applicable.

12      •   **PSR ¶¶ 24 through 33, 41, 43 through 52, 57, 68, and 75**: The

13  Warehouse Defendants do not agree with all the factual assertions and legal

14  conclusions contained in these paragraphs and related footnotes.  While it is not

15  necessary to address each misstatement in the PSR individually for the purposes of

16  sentencing, the Warehouse Defendants hereby reserve the right to challenge the

17  accuracy of these purported facts and legal conclusions on appeal, at retrial, and in

18  all other related and unrelated legal proceedings.

19      •   **PSR ¶ 76** The Warehouse Defendants object to the unsupported

20  assertion that they are non-operational.

21  **V.   CONCLUSION**

22      For the foregoing reasons, the Court should decline to order restitution in this

23  matter.  If, however, the Court is inclined to order that restitution be paid as a

24  condition of probation, the Warehouse Defendants respectfully request that an

---

[14] The court filed the identical order in all four civil forfeiture cases: 17-CV-01875-DMG (SPx); 17-CV-1592-DMG (SPx); 17-CV-01873-DMG (SPx); and 17-CV-1872-DMG (SPx).

1   evidentiary hearing be held to determine the total amount of restitution owed, the

2   apportionment of the restitution obligation among the defendants, and the

3   appropriate payment schedule for each defendant.  *See* 18 U.S.C. § 3664 (d)(4).

4

5   Dated:  February 28, 2022              LARSON LLP

6

7

8                                         By: _____

9                                             Stephen G. Larson
                                              Hilary Potashner
10                                            A. Alexander Lowder

11                                        Attorneys for Defendants
                                          SCUDERIA DEVELOPMENT, LLC,
12                                        1001 DOUBLEDAY, LLC,
                                          VON KARMAN - MAIN STREET, LLC, and
13                                        10681 PRODUCTION AVENUE, LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28